BRUCE M. LANDON
DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
907-271-5452
Facsimile: 907-271-5827
Email: bruce.landon@usdoj.gov

Attorney for Federal Defendants

LODGED

DEC 1 5 2005

**FILED**

DEC 1 9 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____ Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

NATIVE VILLAGE OF EYAK,          )
NATIVE VILLAGE OF TATITLEK,      )      Case No. A98-365-CV (HRH)
NATIVE VILLAGE OF CHENEGA,       )
(aka CHENEGA BAY), NATIVE        )
VILLAGE OF NANWALEK, NATIVE      )
VILLAGE OF PORT GRAHAM,          )
                                 )
            Plaintiffs,          )
                                 )
      v.                         )
                                 )
CARLOS GUTIERREZ, Secretary      )
of Commerce,                     )
                                 )
            Defendant.           )
_____)

**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**ON REMAND**

**ORIGINAL LOCATED IN FOLDER
BEHIND FILE**

US Remand Reply Br

*84*

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . -2-

I.      ONLY GENUINE ISSUES OF MATERIAL ISSUES OF FACT PRECLUDE
        SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

II.     PLAINTIFFS MISSTATE THE APPLICABLE REQUIREMENTS FOR THE
        ESTABLISHMENT OF ABORIGINAL RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . -4-

III.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT THAT PLAINTIFFS DO
        NOT HAVE ABORIGINAL RIGHTS TO THE EEZ IN THE GULF OF ALASKA . . -6-

        A. Plaintiffs' Own Description of the Manner of Use of the Gulf of Alaska Precludes a
           Finding of Aboriginal Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

        B. A Several Decades Long Absence from Middleton Island Is Fatal to Plaintiffs' Claim
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

IV.     DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT THAT PLAINTIFFS DO
        NOT HAVE ABORIGINAL RIGHTS IN THE EEZ OF LOWER COOK INLET. . . -14-

V.      DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
        CHALLENGE TO THE SABLEFISH IFQ REGULATIONS BECAUSE PLAINTIFFS
        SHOW NO ABORIGINAL USE OF SABLEFISH . . . . . . . . . . . . . . . . . . . . . . . . -23-

VI.     DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT THAT THE
        REGULATIONS DO NOT IMPINGE ON ANY ABORIGINAL RIGHTS THE
        PLAINTIFFS MAY POSSESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

        A. The Two Issues are Within the Ninth Circuit's Mandate. . . . . . . . . . . . . . . . . . -24-

        B. Plaintiffs' Aboriginal Rights, If Any, Do Not Include Commercial Fishing Rights
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

        C. Plaintiffs' Off-reservation Aboriginal Rights, If Any, Are Subject to All Non-
           Discriminatory Fishing Regulations Applicable to the General Public . . . . . . -26-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

## TABLE OF AUTHORITIES

### FEDERAL CASES

Alaska Fish and Wildlife Federation and Outdoor Council, 829 F.2d 933 (9th Cir. 1987) ............................................... -27-

Aleut Community of St. Paul Island v. United States, 117 F.Supp. 427 (Ct.Cl. 1954) ................................................. -26-

Anderson v. Liberty Lobby, 477 U.S. 242 (1986) ............... -2-, -3-

British Airways Board v. Boeing Co., 585 F.2d 946 (9th Cir. 1979) ................................................................... -3-

Brown Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993) ............................................................ -4-, -9-

Cadarian v. Merrill Dow Pharmaceuticals, 745 F. Supp. 409 (E.D. Mich. 1989) . . . . . . . . . . . . . . . . . . . . . . . . -3-

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................... -2-

Confederated Tribe of the Warm Springs Reservation of Oregon v. United States, 177 Ct. Cl. 184, 1966 WL 8893 *13 (Ct. Cl. 1966) ................................................................ -3-, -5-

Confederated Tribes of Chehalis Indian Reservation v. State of Washington, 96 F.3d 334 (9th Cir. 1996) ......................... -12-

Mescalero Apache Tribe v. Jones, 411 U.S. 145 (1973) .......... -27-

Mutual Fund Investors, Inc. v. Putnam Management Co., 523 F.2d 620 (9th Cir. 1977) .................................................. -2-

Native Village of Gambell v. Hodel (Gambell III, 869 F.2d 1273 (9th Cir. 1989) ......................................................... -25-

Nome Eskimo Comm. v. Babbitt, 67 F.3d 813 (9th Cir. 1995) ...... -4-

Oregon v. United States, 125 Ct. Cl. 241, 112 F. Supp. 543-552 (Ct. Cl. 1953) ......................................................... -3-, -5-

Organized Village of Kake v. Egan, 369 U.S. 60 (1962)  . . . -26-

Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995) ........................................................ -3-, -4-, -9-

Sac and Fox Indians of Oklahoma v. United States, 383 F.2d 991 (Ct. Cl. 1967) .......................................................... -12-

State Farm Mutual Automobile Insurance Co. v. Khoe, 872 F.2d 1427 (9th Cir. 1989) ..................................................... -2-

Story v. Latto, 702 F.Supp. 708 (N.D. Ill. 1989) ............. -4-, -9-

Tee-Hit-Ton Indians v. United States, 132 F.Supp. 695 (Ct.Cl. 1955)
...................................................................... -27-

United States v. Fryberg, 622 F.2d 1010 (9th Cir. 1980)
...................................................................... -27-

United States v. Harris, 117 F.Supp. 915, 14 Alaska 519 (1954)
...................................................................... -27-

United States v. Holt State Bank, 270 U.S. 49 (1926) .......... -27-

United States v. One Parcel of Real Property, 960 F.2d 200, 204
(1st Cir. 1992) ...................................................... -3-

United States v. Pueblo of San Ildefonso, 206 Ct. Cl. 649, 513 F.2d
1383 (Ct. Cl. 1975) ................................................. -2-

United States v. Santa Fe Pac. R.R., 314 US. 339 (1942) ....... -13-

Vizcaino v. United States District Court for the Western District
of Washington, 173 F.3d 713 (9th Cir. 1999) ..................... -24-

Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176 (9th
Cir. 1981) ...................................................... -12-, -27-

Wichita Indian Tribe v. United States, 696 F.2d 1378 (Fed. Cir.
1983) ....................................................... -13-, -19-, -21-

Williams v. City of Chicago, 242 U.S. 434 (1917) .............. -12-


INDIAN CLAIMS COMMISSION

Confederated Tribes of Umatilla Reservation v. United States, 14
Ind. Cl. Comm. 125 (1964) ...................................... -5-, -11-

Hualapai Tribe of the Hualapai Reservation, Arizona v. United
States, 18 Ind. Cl. Comm. 382, 394 (1967) ...................... -11-

Muckleshoot Tribe v. United States, 3 Ind. Cl. Comm. 669 (1955)
...................................................................... -11-

Quapaw Tribe of Indians v. United States, 1 Ind. Cl. Comm. 469, 481
(1950) ......................................................... -5--10-

Shoshone Tribe of Indians of the Wind River Reservation, Wyoming v.
United States, 11 Ind. Cl. Comm. 387, 409 (1962) . . -10-, -11-

FEDERAL RULES

Fed.R Civ.Pro 56 ...................................................... -2-

FEDERAL REGULATIONS

50 CFR § 300.65(g) ................................................... -25-

INTRODUCTION

In this case, plaintiffs challenge the Department of Commerce's individual fishing quota (IFQ) regulations for halibut and sablefish, which plaintiffs claim violate their alleged aboriginal hunting and fishing rights in the Exclusive Economic Zone (EEZ). On remand from the Ninth Circuit, plaintiffs urged the Court to require rebriefing of the prior cross-motions for summary judgment, and the Court granted that request. Defendant renewed his motion for summary judgment by Defendant's Brief on Remand from the Ninth Circuit (Def's Remand Brief). However, plaintiffs ultimately filed no brief renewing their motion for summary judgment. Plaintiffs instead filed an opposition (Plnts' Remand Opposition) to defendant's motion. Plaintiffs contend that they have established genuine disputes of material facts precluding the issuance of summary judgment.

As we demonstrate in this Reply, close examination of Plnts' Remand Opposition reveals that there are no genuine material issues of fact precluding summary judgment on at least some[1]/ of the dispositive arguments set forth in Def's Remand Brief. Specifically, plaintiffs have failed to establish the existence of genuine disputes of material fact on the following issues:

1. That plaintiffs' own description of occupation of the Gulf of Alaska precludes plaintiffs' claim to aboriginal rights in the Gulf of Alaska.

2. That a several-decades gap in travel to Middleton Island precludes plaintiffs' claim to aboriginal rights in the Gulf of Alaska.

3. That the absence of exclusive use in Lower Cook Inlet precludes plaintiffs' claim to aboriginal rights in that area.

4. An absence of aboriginal use of sablefish precludes plaintiffs' challenge to the sable IFQ regulations.

5. That even if plaintiffs had some aboriginal rights, those rights do not include commercial fishing rights.

---

[1]/    This reply addresses only those issues as to which plaintiffs have failed to establish genuine issues of material fact. Because those issues are dispositive, the proper course is to decide those issues. A trial is only necessary on the other issues only if the court does not grant summary judgment to on the issues set forth in this Reply. Defendant reserves all other issues for trial if the Court does not grant summary judgment on the issues argued in this Reply.

US Remand Reply Br                        -1-

6. That any off-reservation aboriginal rights plaintiffs might have are subject to all non-discriminatory fishing regulations applicable to the general public.

All of these issues are dispositive of plaintiffs' challenge to the sablefish regulations and all but issue four are dispositive on plaintiffs' challenge to the halibut regulations.

ARGUMENT

DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT

I.    ONLY GENUINE ISSUES OF MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT

Plaintiffs suggest that because the issue of aboriginal rights is extremely solemn and important, it is not subject to summary judgment. Plnts' Remand Opposition at 1. The appropriateness of summary judgment, however, does not turn on the importance of an issue, but rather on the requirements of Fed.R Civ.Pro 56. That rule provides that summary judgment "shall be rendered forthwith, if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact...." *Accord, Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (mandatory nature of Rule 56).

A fact is *material* if its existence could affect the outcome of the case. *Mutual Fund Investors, Inc. v. Putnam Management Co.,* 523 F.2d 620, 624 (9th Cir. 1977). For purposes of summary judgment, there is no *genuine* issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *State Farm Mutual Automobile Insurance Co. v. Khoe,* 872 F.2d 1427, 1471 (9th Cir. 1989). A mere scintilla of evidence in favor of the non-moving party is not sufficient to defeat summary judgment – the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 251-252 (1986).

In determining the genuineness of a factual dispute, the court must take into account the standard of proof applicable to the action. *Anderson v. Liberty Lobby*, 477 U.S. at 252. The burden is upon plaintiffs to establish aboriginal rights. *United States v. Pueblo of San Ildefonso*, 206 Ct. Cl. 649, 513 F.2d 1383, 1394 (Ct. Cl. 1975). Establishment of aboriginal rights requires

US Remand Reply Br                                    -2-

the application of a rigorous standard of proof. The proof must be such that aboriginal rights are not based on mere speculation. *Pueblo De Zia*, 11 Ind. Cl. Comm. 131 at 167 (1964). Establishment of aboriginal rights "requires a great deal of proof, and the essential evidentiary facts shown by that proof ... should find their way into carefully prepared findings of fact." *Snake or Piute Indians of Former Malheur Reservation in Oregon v. United States*, 125 Ct. Cl. 241, 254-55, 112 F. Supp. 543-552 (Ct. Cl. 1953). The boundaries of aboriginal claims must be shown with reasonable accuracy. *Confederated Tribe of the Warm Springs Reservation of Oregon v. United States*, 177 Ct. Cl. 184, 1966 WL 8893 *13 (Ct. Cl. 1966).

The party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). Rather a genuine issue of material fact must be established by competent evidence. *See, United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir. 1992). Neither legal memoranda nor argument by counsel are evidence, and they cannot create a factual dispute sufficient to defeat summary judgment. *British Airways Board v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1979), *cert. denied,* 440 U.S. 981, *reh. denied,* 441 U.S. 968 (1979).

Summary judgment is not precluded simply because a party has produced an expert to support its position; the court may look beyond the expert's ultimate conclusion and analyze the adequacy of its foundation. *Cadarian v. Merrill Dow Pharmaceuticals,* 745 F. Supp. 409 at 411-12 (E.D. Mich. 1989) . Whether an expert's opinion has a sufficient basis, and whether an evidentiary burden has been met without such opinion are matters of law for the court to decide. *Id.* at 412.

Expert opinions cannot establish genuine issues of material issue as to which the expert is not competent to offer such an opinion. *See, Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1435 (9th Cir. 1995). This principle is particularly important with regard to the declaration of Matt Ganley, an anthropologist relied upon by plaintiffs. His declaration is riddled with statements about fisheries biology, an area about which he is not an expert. For example, Mr. Ganley opines that the failure of archeologists to find sablefish (also called black cod) bones in Chugach kitchen middens is irrelevant because many of the bones were categorized simply as

US Remand Reply Br                    -3-

"cod" bones, and so could be "black cod" bones. As discussed below, despite their nickname, sablefish are in fact not cod at all, nor do their bones resemble cod bones.

When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot defeat summary judgment. *Id.* at 1436; *see also, Brown Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993). Thus, for example, Mr. Ganley opines that the Chugach subgroups did not engage in warfare amongst themselves. Because early contact observers and tribal tradition amply document warfare between the various subgroups of the Chugach, an opinion by Mr. Ganley today that such warfare did not occur cannot defeat summary judgment. *Story v. Latto,* 702 F.Supp. 708 (N.D. Ill. 1989) (opinion of crash specialist that seat belt separated during an accident did not create genuine factual dispute where eyewitness treating paramedic testified that he found the seat belt intact and fastened around victim after the accident).

## II.    PLAINTIFFS MISSTATE THE APPLICABLE REQUIREMENTS FOR THE ESTABLISHMENT OF ABORIGINAL RIGHTS

Defendants previously set forth the legal requirements for the establishment of aboriginal rights at pages 7-9 of Def's Remand Brief and will not repeat those standards. No doubt realizing that they cannot meet those requirements, plaintiffs propose a much more relaxed standard which is simply not supported by the law.

Without any citation to authority, plaintiffs title their exposition of the standards for the establishment of aboriginal rights "The Doctrine Of Aboriginal Rights Is Meant To Allow Natives To Continue Their Way Of Life And Therefore The Standard To Establish Them Is Liberal." Plnts' Remand Opposition at 18. That assertion is both ironic and legally incorrect. It is ironic because this case is not about continuing a way of life, but about changing a way of life. The subject matter of this case is the IFQ regulations for sablefish and halibut.[2]/  Those

───────────────

[2]/    Plaintiffs also assert (Plnts' Remand Opposition at 18) without authority that this case is about aboriginal rights, not a challenge to specific fisheries regulations. They are wrong. The Ninth Circuit has made abundantly clear that there is no cause of action for the adjudication of aboriginal rights per se; there is only a cause of action under the Administrative Procedures Act to challenge

regulations continue the status quo.[3]/ They provide that anyone who landed *any* sablefish or halibut commercially during recent years would receive a quota share. The reason plaintiffs' members did not receive quotas is that they had in fact not been participating in those fisheries. Plaintiffs do not seek to preserve a way of life, but to enter a new industry.

In any event, there is no support for the proposition that there is a liberal standard for the establishment of aboriginal rights. Plaintiffs concede that the burden is upon the proponent of aboriginal rights to establish them. Plnts' Opp. at 19. Plaintiffs correctly point out that the courts have considered expert testimony, oral traditions[4]/ and accounts of early contacts with the tribes. Indeed defendant uses just such sources. However, it is not the source of the evidence that is now at issue, but the strength of that evidence.

The proof must be such that aboriginal rights are not based on mere speculation. *Pueblo De Zia*, 11 Ind. Cl. Comm. at 167. Establishment of aboriginal rights "requires a great deal of proof, and the essential evidentiary facts shown by that proof ... should find their way into carefully prepared findings of fact." *Snake or Piute Indians of Former Malheur Reservation in Oregon v. United States*, 125 Ct. Cl. 241, 254-55, 112 F. Supp. 543-552 (Ct. Cl. 1953). The boundaries of aboriginal claims must be shown with "reasonable accuracy." *Confederated Tribe of the Warm Springs Reservation of Oregon v. United States*, 177 Ct. Cl. 184, 1966 WL 8893 *13 (Ct. Cl. 1966). True, the boundaries need not be as accurate "as a surveyor would like them...." *Quapaw Tribe of Indians v. United States,* 1 Ind. Cl. Comm. 469, 481 (1950). Contrary to plaintiffs' assertion, however, the Indian Claims Commission did not recognize

---

specific agency actions, in this case the IFQ regulations. *Nome Eskimo Comm. v. Babbitt*, 67 F.3d 813 (9th Cir. 1995).

[3]/    For a more detailed description of the IFQ regulations see, Def. Remand Brief at 6-7.

[4]/    Although the courts have stated that oral tradition "is not to be deemed worthless, particularly when it is corroborated by documents and the testimony of others," they have also admonished the importance of corroboration and cross-checking "since informants can mislead researchers by describing some period ... besides the aboriginal, pre-treaty period." *Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, 177 Ct. Cl. at *12. *Confederated Tribes of Umatilla Reservation v. United States,* 14 Ind. Cl. Comm. 125 (1964).

aboriginal title to an "undefined and indefinite area" in *Red Lake, Pembina and White Earth Bands v. United States,* 1 Ind. Cl. Comm. 575 (1951). It was because the bands showed use of an "undefined and indefinite area," *id.* at 597, that the Indian Claims Commission denied the claim in its entirety, *id.* at 606-07.

III.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT THAT PLAINTIFFS DO NOT HAVE ABORIGINAL RIGHTS TO THE EEZ IN THE GULF OF ALASKA

A.   Plaintiffs' Own Description of the Manner of Use of the Gulf of Alaska Precludes a Finding of Aboriginal Rights

Defendant demonstrated at 14-19 of Def's Remand Brief that plaintiffs' own description of their manner of use of the EEZ precludes a finding of aboriginal rights. In their original summary judgment brief, plaintiffs conceded that:

> Historically, land and water in the immediate vicinity of the Chugach Villages was the exclusive territory of each village and could only be accessed by permission, express or implied. For other Chugach Villages, such permission was easily secured as a result of their close ties, including inter-village marriages, partnerships, and adoptions. W-G, P-2 at 28. Open waters of PWS and adjacent areas of the OCS off the Sound on the other hand, were considered "common property" and were jointly and amicably used by all the Chugach Villages in the Sound. <u>Id</u>."

Plnts' SJ brief at 12-13.

This concession is fatal to plaintiffs' claim in the Gulf of Alaska. In order to establish aboriginal rights, plaintiffs must show exclusive use and occupancy of an area. Where an area is used by a number of entities, each of which is itself a governmental/land-owning entity, the exclusive use requirement is not met. In their opposition on remand, plaintiffs take a new tack. No doubt realizing that they cannot meet the stringent standards for establishing joint and amicable possession, plaintiffs now claim that they collectively constitute a single land-owning entity by virtue of shared culture, language and kinship ties, and therefore should not have to meet the stringent standards to establish joint and amicable use of the EEZ. That claim contradicts their own prior briefs. In their Motion for Summary Judgment (Plnts' SJ Mot.) prior to remand, plaintiffs clearly stated that "[h]istorically, Plaintiff villages and their predecessors jointly and amicably hunted and fished *their respective areas* of the OCS to the exclusion of all other tribes...." Plnts' SJ Mot at 1. Regardless of the semantics of plaintiffs' proffer, the fact remains that the peoples in Prince Williams Sound, the eastern coast of the Kenai Peninsula and

US Remand Reply Br                        -6-

Lower Cook Inlet were divided into numerous subgroupings, each with exclusive use areas, politcal independence and a history of warfare between them. They simply do not fit into the mold of entities that the courts have found to constitute a single land-owning unit or separate units satisfying the very exceptional joint and amicable possession doctrine.

Perhaps more than anything else, the clear evidence of conflict between the subgroups of Chugach-speaking peoples sets them apart from any group that has ever been found to constitute a single land-holding entity or holders of joint and amicable possession. Plaintiffs' opposition downplays that history and seeks to create a genuine material issue of fact by arguing that some of the sources cited in our opening brief could be interpreted as referring to warfare between the Chugach and non-Chugach rather than between the various Chugach subgroups. A few of the references may support that interpretation, but plaintiffs do nothing to overcome the record from the reports from the 1700s until the filing of this case of endemic warfare among the Chugach themselves. We summarize that record

During 1787, Portlock, in his description of the Chugach in Prince William Sound stated that "[t]he weaker tribes, I think, are frequently robbed and plundered by the stronger tribes...." Portlock, *A Voyage Around the World; But More Particularly to the North-west Coast of America,* Def. Exh. RR-8[5]/ at 250 [8]. Portlock learned from other Chugach that the Taaticklagmute were the most powerful tribe in the Sound "and hated by all their neighbors, with whom they were continually at variance." *Id.* at 237-238 [6-7]. The Taaticklagmute brought Portlock sea-otter skins "which they had obtained either by plunder or barter; for I understood that his country does not produce any of the sea-otter" which instead came from other parts of the Sound. *Id.* at 238 [7]. This is not the description of joint and amicable possession.

In 1933, Birket-Smith recorded accounts of warfare from Chugach-speaking elders, which he produced in virtually word-by-word translation. "The Warriors of Matyangknat" recounts a war expedition by a village on Montague Island against Mummy Island, and

---

[5]/   Exhibits with a "RR" designation are attached hereto. The bracketed page numbers represent the pagination in the exhibit; the unbrackered the pagination of the original text. See the table of exhibits for the location of exhibits with other designations.

subsequently against Chenega. Birket Smith, *The Chugach Eskimo,* Def. Exh. RR-1 at 135-36 [16-17]. While plaintiffs point to instances where Chugach villages were allied against Koniags, Tlingits and Tanaina, in this story, the Montague Islanders were joined by Koniags to attack Chenega. *Id.* at 136 [17]. "The Killing of the Five Brothers from Kangiaq" tells of raids by a village in the Chenega area on villages on the southeastern coast of the Kenai Peninsula. *Id.* at 136-37 [17-18]. "The Chief of Atyat" recounts warfare between villages on the eastern side of Prince William Sound. *Id.* at 137-39 [18-203]. In describing the territories of the various Chugach subgroups, Birket-Smith noted that the Atyarmiut in Gravina Bay had few wars because they were so poor – "War parties from the west side of the sound used to pass their territory without stopping and continue to Sheep Bay, where there was a better chance for booty." *Id.* at 20 [8]. The Kangirtlurmiut in the northwestern part of the Sound hunted mountain goats at Sheeps Bay on the eastern side of the Sound – "They were careful, however, to arrive when the local inhabitants were away fishing salmon in the Copper River, as they were afraid of them." *Id.* at 21 [9]. Birket-Smith concluded: "In fact, most of their historical traditions refer to feuds between the Chugach villages, or between the Chugach and other tribes, Eskimo as well as Indian." *Id.* at 101 [12].

De Laguna concurred that in former days the Chugach were divided into eight tribes[6]/ and

---

[6]/      Plaintiffs erroneously state that "defendant's own expert [Michael Yarborough] has stated, the 'actual political and legal units were matrilineal clans.' [P-3 at 21]'" Opp. at 23. In fact, Yarborough stated that matrilineal clans were the political unit of the Eyak Indians, a different group than the groups of Alutiiq Eskimos who are the plaintiff villages in this action. Yarborough, like all the experts describes the Chugach as divided among the eight subgroupings. P-3 at 20. Mr. Ganley's initial expert report agreed.

> The eight groups outlined above each denote socio-territorial organization at the sub-regional level. The levels of political organization and, more importantly, allegiance to a particular group have been the topics of a great deal of speculation in other Eskimo areas in Alaska. In Northwest Alaska, Burch maintains that during the 19th century Inupiat groups occupied and defended areas analogous to "nations" or "states," but that alliances between such groups could occur for the purposes of trade, travel, and mutual defense and/or aggression (Burch 1998). The historic and ethnographic information from Prince William Sound suggest a somewhat similar level of socio-territorial organization.

P-2 at 28.

US Remand Reply Br                          -8-

that while these tribes or geographical groups shared the same culture, spoke the same language, entertained each other at feasts, they were politically independent. De Laguna *Chugach Prehistory: The Archeology of Prince William Sound, Alaska* at 27, Exh. S-3 at 2.   The tribes sometimes raided each other but on other occasions might unite against common enemies such as the Tlingit, Tanaina, or Koniag.  *Id.*  She similarly reported that "Prince William Sound and Kenai Peninsula Eskimo sometimes fought each other and sometimes were allied in raids on the Tanaina." RR-9 at 35 [28].  De Laguna describes each part of the Sound "claimed " by and "belong[ing to]" the various subgroups. RR-9 at 12-34 [5-27].

This evidence is neither isolated nor vague.  It refers specifically to conflict between Chugach groups, not between the Chugach and non-Chugach.  It specifically states that Chugach from one part of the Sound hunted at other parts of the Sound at their peril.  This evidence of intra-group conflict distinguishes the Chugach from all of the groups in which a single land-holding entity or joint and amicable possession has been found.

Plaintiffs rely on the opinion in the most recent declaration of their expert Matt Ganley that such intra-group conflict simply did not exist.  When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot defeat summary judgment. *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d at 1436; *see also, Brown Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993).  When contemporary observers and tribal tradition document warfare between the various subgroups of the Chugach, an opinion today by Mr. Ganley that such warfare did not occur, cannot defeat summary judgment. *Story v. Latto,* 702 F.Supp. 708 (N.D. Ill. 1989) (opinion of crash specialist that seat belt separated during an accident did not create genuine factual dispute where eyewitness treating paramedic testified that he found the seat belt intact and fastened around the victim after the accident).

Mr. Ganley's only proffered support in the historical record for the proposition that the Chugach did not engage in conflict between the various subgroups rests on a misreading of passages from Solovjova and Vovnyanko "The Rise and Decline of the Lebedev-Lastochkin Company: Russian Colonization of South Central Alaska" Pacific Northwest Quarterly vol. 90,

198-199, attached hereto as Def. Exh. RR-2. Mr. Ganley misreads the passage to suggest that the

Chugach must have considered themselves all one people because the Russians took hostages

from the "near Chugach" (i.e. those people who lived on the southeast coast of the Kenai

Peninsula) in order to assure the Russians safety in the Sound. But the passage from Solovjova

and Vovnyanko demonstrates just the opposite. The Russians secured their safety by taking

hostages from every place they went. Solovjova and Vovnyanko report that in 1792 Baranov,

"went all around," Prince William Sound and "took Native hostages from three main villages to

insure his crew's safety." *Id.* at 198 [8]. In the fall of that same year, Balushin

> led a party in baidarka's along Baranov's route through the sound. He visited
> indigenous villages where Baranov had established peaceful relations. Like
> Baranof, Balushin demanded hostages as a guarantee of fidelity and Native
> subordination. Because of the hardships of the trip and a shortage of food, he
> risked "leaving three of his people in [one of the villages] to spend the winter," As
> a result that place would have appeared to travelers to be occupied by the LLC.
> He also took 15 Native hostages with their chiefs from two settlements of the
> "close Chugach." Those villages were located in the fjords on the southeaster
> coast of the Kenai Peninsula. One was called Yalitskoe (in modern Yalik Bay),
> the other possibly was in Aialik Bay.

*Id.* at 199 [9]. There is no support in this language for the proposition that hostages from Yalik

Bay and Aialik Bay[2]/ were taken to insure the safety of the Russians in the Sound. Quite the

contrary, Balushin took hostages in the Sound and apparently took the hostages from Yalik on

the way back to Kodiak from the Sound. Mr. Ganley's opinion is, consequently, without

foundation and cannot defeat a motion for summary judgment.

Examination of the cases on which plaintiffs rely leads to the conclusion that plaintiffs

simply did not exhibit the type of unity the courts have required for a finding of joint and

amicable possession or of a single land-holding entity. *Red Lake, Pembina and White Earth

Bans, and Minnesota Chippewa Tribe v. United States,* 1 Ind. Cl. Comm. 584 (1951) (plaintiffs

Chippewa bands found not to have aboriginal title because, *inter alia*, other Chippewa bands

were using the same lands); *Shoshone Tribe of Indians of the Wind River Reservation, Wyoming

v. United States,* 11 Ind. Cl. Comm. 387, 409 (1962) (finding that the Western Shoshone

---

[2]/    The two bays are located in the Kenai Fjords on the southeast cost of the Kenai Peninsula.
Alaska Atlas & Gazetteer 63.

constituted a single land holding entity because, *inter alia*, "The Shonshone speaking people of one village within the region were free to utilize the lands within the area occupied by all the Western Shoshone villages.'); *Hualapai Tribe of the Hualapai Reservation, Arizona v. United States,* 18 Ind. Cl. Comm. 382, 394 (1967) (most material factor in determining land-owning entity is "collective use by the entire group of the entire area."); *Confederated Tribes of the Umatilla Reservation v. United States,* 14 Ind. Cl. Comm. 104, 119 (1964) (determining separate exclusive use areas for the Umatilla, Cayuse and Walla Walla despite the fact that they were all Sahaptin-speaking, closely allied, shared a common culture and subsequently became confederated.)

Plaintiffs' reliance on *Muckleshoot Tribe v. United States,* 3 Ind. Cl. Comm. 669 (1955) for the proposition that exclusive use areas by subgroups are not inconsistent with a larger landholding entity is likewise misplaced. The landholding unit found in that case resembles not the totality of the Chugach and Lower Cook Inlet Eskimos, but rather the eight subgroupings described by all the experts. The Muckleshoots consisted of three villages all located within a few miles of each other and consisting of between 88 and 30 people. *Muckleshoot Tribe v. United States,* 3 Ind. Cl. Comm. at 676, 678. *See also, Nooksack Tribe v. United States,* 3 Ind. Cl. Comm. 492, 496 (1955) ("aboriginally and at the time of the first white contact, there were probably three main Nooksack villages located along the valley of the Nooksack River, all within a span of approximately ten miles along the main river....") The Commission  emphasized in *Shoshone Tribe* v. *United States,* 11 Ind. Cl. Comm. 417, 425 (1962) that the treatment of autologous villages as a unit was appropriate "in a *small area used by all divisions* set forth in the land mark cases, *Nooksack Tribe,* supra and *Muckleshoot Tribe,* supra." (emphasis in original). None of these cases contains any hint of the inter-group conflict that the evidence shows existed between the Chugach sub-groups.

In the alternative, plaintiffs claim that even if the Court were to agree with defendant's analysis regarding joint use of the EEZ, summary judgment would be inappropriate as to approximately one half of the claimed area because "in fact about half of the areas set forth by the Chugach as traditional use areas are claimed by a single village." Plnts' Remand Opposition

at 27 citing to exhibit P-17. Plaintiffs are wrong. Exhibit P-17 is merely a composite map showing the information from Figures 15-19 of Plaintiffs' Exhibit P-3, the original expert report of Matt Ganley. Each of those Figures is clearly labeled as a map of "*contemporary use areas*" of each of the villages compiled from interviews taken in 1996 and 2000. They do not purport to designate aboriginal use areas, much less exclusive aboriginal use areas. The figures include numerous areas perhaps fished commercially today by members of the plaintiff villages, but clearly in areas where even plaintiffs do not claim exclusive use, such as Shelikof Strait and Cook Inlet north of Kachemak Bay. The map in P-17, is thus clearly insufficient to create a genuine material issue of fact precluding the entry of summary judgment.

B. A Several Decades Long Absence from Middleton Island Is Fatal to Plaintiffs' Claim

As demonstrated at 8-9 of Def's Remand Brief, "Whether or not an aboriginal right exists would be a question of fact to establish *continuous* exercise of the right since before pre-treaty times." *Wahkiakum Band of Chinook Indians v. Bateman*, 655 F.2d 176, 180 n. 12 (9th Cir. 1981) (emphasis added). *Accord, Confederated Tribes of Chehalis Indian Reservation v. State of Washington*, 96 F.3d 334, 341 (9th Cir. 1996) *cert. denied*, 520 U.S. 1168 (1997). We also demonstrated with the Declaration of Stephan J. Langdon, Def. Exh. R-3 at pages 14-15, that Chugach use of the Middleton Island area ceased during a large portion of the 20th Century. Langdon found that the Chugach ceased using Middleton Island from the early 1900s until the 1950's or 1960's when the Chugach returned to the Middleton Island area on commercial longline vessels fishing for halibut. The lack of continuity of use is fatal to plaintiffs' claims. *See, Williams v. City of Chicago*, 242 U.S. 434 (1917) (aboriginal claims to Lake Michigan lost by long non-use).

Plaintiffs' opposition presents no competent evidence disputing that a several-decades gap in plaintiffs' travel across the EEZ to Middleton Island occurred in the early part of the twentieth century. Rather, they deny that they have any burden to demonstrate continuous exercise of their alleged rights en route to and from Middleton Island to the present. Their argument is flatly inconsistent with the Ninth Circuit's decisions in *Wahkiakum* and *Chehalis*.

Plaintiffs' attempt to escape *Wahkiakum* and *Chehalis* rests upon a non-sequitur.

US Remand Reply Br                    -12-

Plaintiffs rely on cases such as *Sac and Fox Indians of Oklahoma v. United States,* 383 F.2d 991 (Ct. Cl. 1967) and *Creek Nation v. United States,* 2 Ind. Cl. Comm. 98 (1952). Those cases dealt with the burden imposed upon tribes seeking damages under the "fair and honorable dealings" clause of the Indian Claims Commission Act for aboriginal lands ceded to the United States for unconscionable consideration. Such cases are based on the premise that aboriginal rights were extinguished at some time in the (often distant) past by treaty or otherwise. The tribes sought damages for the taking at that time. Here plaintiffs claim that they *still* hold aboriginal rights. To establish continuing rights, the plaintiffs must establish continuous exercise of those rights to the present, as the Ninth Circuit made clear in *Wahkiakum* and *Chehalis.*

Nor do *United States v. Santa Fe Pac. R.R.,* 314 US. 339, 354 (1942) or *Wichita Indian Tribe v. United States,* 696 F.2d 1378, 1381-1382 (Fed. Cir. 1983), support plaintiffs' claim. *Santa Fe* held that the creation of a reservation for the Hualapai Tribe would not be considered an abandonment or extinguishment by the tribe of its aboriginal territory. Here we have no comparable creation of a reservation. Rather we have a situation where the plaintiffs simply stopped going to Middleton Island for several decades. *Wichita Tribe* held that where a tribe continues to use all of its territory, the fact that it moves the locations of its villages within that territory does not constitute an abandonment or extinguishment of aboriginal rights to the territory. Here on the other hand, the Chugach simply stopped going across the EEZ to Middleton Island for decades and returned only in the 1950s or 1960s, when they returned to the island as part of the already established long-line commercial fishery for halibut.

At page 35 of Plnts' Remand Opposition, plaintiffs would give the impression that there is a factual dispute as to whether the decades-long gap in their use occurred. Careful analysis reveals that this is not so. Plaintiffs state that "the Chugach claim is not based solely on travel to Middlelton island, but on travel plus evidence of actual use as set forth in detail above." Plaintiffs do allege that they engaged in subsistence uses during their travel to Middleton. However, once they ceased going to Middleton, they were no longer engaged in subsistence during that travel. Plaintiffs also allege that defendant's expert Stephen Langdon has documented ample use of OCS waters in the "twentieth century" and that the Chugach

US Remand Reply Br                              -13-

themselves have set forth the specific areas in which they have fished and continue to fish in the "twentieth century." Plnts' Remand Opposition at 35. Langdon, of course, documented use in the *second half* of the twentieth century when the Chugach joined pre-existing commercial fisheries started by others. In sum, defendant has submitted a declaration establishing the existence of the several-decades long gap in the first half of the twentieth century. Plaintiffs have provided no competent evidence disputing the existence of that gap; maintaining merely that they went to Middleton Island sometime during the twentieth century.

Summary judgment is, therefore, appropriate on a specific legal issue. Where the record establishes that plaintiffs ceased going to Middleton Island for several decades and only returned as part of a commercial fishery established by others, can plaintiffs establish current aboriginal rights to the EEZ? The Ninth Circuit has answered that issue in the negative in *Wahkiakum* and *Chehalis* because plaintiffs cannot establish continuous exercise of the alleged right to the present.

IV.  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT THAT PLAINTIFFS DO NOT HAVE ABORIGINAL RIGHTS IN THE EEZ OF LOWER COOK INLET.

At pages 24-27 of Def's Remand Brief, defendant demonstrated that plaintiffs' claim to aboriginal rights in the EEZ of Lower Cook Inlet foundered not only on the paucity of a showing of use by plaintiffs, but also on the abundant evidence of use of the area by other aboriginal groups. Careful review of plaintiffs' Opposition reveals that they have failed to raise a genuine material issue of fact with regard to Lower Cook Inlet.

Briefly, the evidence proving non-exclusive use of Lower Cook Inlet during the historic period includes the following:

1. Portlock's longboat crew made two trips from Prince William Sound up Cook Inlet in 1787. On both trips, the crew encountered Koniags in the Inlet. During the first trip "on their arrival in Cook's River, soon after getting above Point Bede[8]/, they fell in with a party of Kodiac Indians, who they supposed were hunting on account of the Russians; but they saw none of the

---

[8]/  Point Bede is on the Lower Kenai Peninsula less than 10 miles southwest of Port Graham and Nanwalek. Alaska Atlas and Gazeteer 22.

Russian party...." RR-8 at 234-5 [3-4]. During the second trip the "fell in with numbers of Kodiac Indians" and ventured as far north as Trading Bay.[2]/ RR-8 at 243 [7].

2. When a Russian ship shipwrecked and its crew remained for months in Kamishak Bay in 1796, the Natives who paddled by and caused the rescue of the crew were obviously Alaska Peninsula Eskimos.[10]/

3. Davidov, who visited the area in 1803-07 documented Koniag use of the Barren Islands in the eastern part of Lower Cook Inlet, as well as the Inlet further north. Def. Exh. R-3 at page 10.

4. Koniag legends collected in the 19th Century tell of a battle between Koniag shamans on Augustine island. *Id.* at 6.

5. De Laguna's Dena'ina informants had numerous stories of Koniag raids up the Inlet to the north of the Lower Cook Inlet Eskimos. De Laguna *Chugach Prehistory* 34, Def. Exh. S-3 at 3.

6. In his Second Declaration, R-3, Langdon also reviews the evidence for use of Lower Cook Inlet by Tanaina, Alaska Peninsula Alutiiq and Bristol Bay and Lake Iliamna Yupik.

Plaintiffs insist that these facts are "intensely disputed." However, analysis of each piece of "evidence" proffered by plaintiffs at pages 36 to 38 of Plnt's Remand Opposition demonstrates that plaintiffs have submitted no competent evidence to established a genuine factual dispute regarding the non-exclusive use of Lower Cook Inlet. We address plaintiffs'

---

[2]/   Trading Bay is located on the west side of Upper Cook Inlet. Alaska Atlas & Gazeteer 69.

[10]/   "September 15th While building a kayak, the crew saw a two-hatch baidarka passing and called the Natives ashore. "They confirmed that the locality where we were cast ashore was called Kamykshak." "They themselves had recently returned from the Kolosh (Tlingit) hunting party, were hunting seals, and were on the way home.' The survivors dispatched a letter by Boatswain Putilov and as soon as he reached the first Aleut settlement, Naushkak (Nukshak?), sent out to us seven baidarkas with food.' *** Putilof traveled on and "When he reached the second settlement, Kukak, he sent to us additional five baidarkas with food, which reached us on the 25th of September.' Putilov continued on to Katmai." Def. Exh. RR-3 at 13 [15]. Clearly the Native rescuers were Alaska Peninsula Natives, who were "headed home" to Kukak and Katmai, both south of Kamishak Bay on the Alaska Peninsula. See, Alaska Atlas & Gazeteer at 51 and 52. They were coming from the Tlingit country to the east, and so had crossed Lower Cook Inlet to arrive at Kamishak Bay.

proffered "disputes" seriatim, italicizing the statements from Plnts' Remand Opposition.

1. *In general, the authorities agree that the LKP and Lower Cook Inlet were Chugach territory, [SS 30]*. Plnt's Remand Opposition at 36.

Obviously, plaintiffs' Supplemental Statement of Disputed Facts (SS), is not itself evidence. In any event, one seeks in vain at SS 30 for cites to evidence showing agreement by the authorities that Lower Cook Inlet was exclusively Chugach territory. There is agreement that Eskimos whose dialect was closer to that of Prince William Sound than to that of Kodiak lived on the southeast coast of the Kenai Peninsula as far west as Port Graham and Nanawalek on the shores of Cook Inlet. See, e.g. De Laguna , RR-9 at 34-36 [27-29], Birket-Smith, RR-1 at 18 [6]. This is a very different proposition than that Lower Cook Inlet was the territory of the Chugach to the exclusion of the numerous other peoples ringing the Inlet. None of the sources cited at SS 30 provide any evidence on this issue.

2. *Indeed, there is no evidence or statement in the ethnographic record that either [Lower Cook Inlet or Kamishak Bay] were claimed by any other tribal socio-territorial groups in the period prior to Russian domination. [P-11 at 16]*. Plnts' Remand Opposition at 36. Of course, the problem with discussing use of the Inlet during the pre-Russian period is that the Native peoples did not write, and the first records are of necessity during the Russian period. Exhibit P-11 is the third declaration of Matt Ganley. Page 16 describes a division in the Lower Cook Inlet between Tanaina and Alutiiq peoples. The latter group, of course, includes the Koniag and the Alaska Peninsula Alutiiq.  The proffered evidence does not support the proposition of exclusive pre-contact use by plaintiffs of Lower Cook Inlet.

3. *And although the defendant asserts that the Dena'ina were one of these groups, they were in fact a land-based subsistence culture, "fairly independent of salt water." [P-11 at 19]*. Plnts' Remand Opposition at 36. Langdon did document Dena'ina use of Lower Cook Inlet. Def. Exh. R-3. In any event, plaintiffs must show that their use of the area was exclusive. A dispute regarding Dena'ina use does not create a genuine issue of material fact unless plaintiff can also establish non-use by the other Native peoples ringing the Lower Inlet such as the Koniags and the Alaska Peninsula Eskimos.

US Remand Reply Br                    -16-

4. *The defendant also asserts that 'there is ample evidence of Koniag use of Lower Cook Inlet.' [Def. Br. at 24]. However, evidence shows that the Koniag tended to enter Chugach areas only after the Russians had secured permission on their behalf. [P-3 at 24]. The Koniag even when traveling with the Russians, still had to secure safe passage by the taking of Chugach hostages from the Lower Kenai Peninsula. [P-11 at 13-14]. Obviously, the Koniag wouldn't have done this if they could travel freely in Lower Cook Inlet waters.* Plnts' Remand Opposition at 36.

One searches in vain at P-3 at 24 for any statement remotely supporting the proposition that the Koniags tended to enter Chugach areas only after the Russians had secured permission on their behalf. As for the statement that the Koniag even when traveling with the Russians still had to secure safe passage by taking of Chugach hostages from the Lower Kenai Peninsula, Mr. Ganley's Third Declaration relies on the article by Solovjova and Vovnyanko discussed above. That article indicates that after the Russians had largely exhausted the sea otter in Cook Inlet, Baranov organized an expedition, accompanied by Koniags to Prince William Sound during which he took hostages in the Sound. Def. Exh. RR-2 at 198 [8]. Later that year Balushin took a similar trip and once again took hostages in the Sound and apparently on the way back from Yalitskoe and probably Aialak, on the southeast coast of the Kenai Peninsula. *Id.* at 199 [9]. Obviously, these hostages were not to gain permission to hunt in Lower Cook Inlet, since the Koniags and Russians had long been hunting there. Plaintiffs proffer no evidence that the Russians or Koniags ever sought permission or took Chugach hostages in order to be able to use the waters of Lower Cook Inlet.

5. *The defendant also claims that the Russian explorer Davidov 'confirms Koniag use not only of the Barren Islands, but of the Inlet to the North' [Def. Br. at 25]. Again, this was due to Russian permission – it is no coincidence that the source is a Russian explorer and trader making this statement – as well as Chugach hostage taking. [P-3 at 24]* Plnts' Remand Opposition at 37.

Davidov was indeed Russian, but there is no support for the proposition that Koniag use of the Lower Inlet as described was a result of "Russian permission" or "Chugach hostage



taking." Review of the cited exhibit and page reveals no statement remotely to that effect.

6. *With respect to the Barren Islands in particular, the evidence shows that 'none of the ethnographic sources indicate the Barren Islands were ever considered exclusively Koniag territory.' [P-11 at 9].* Plnts' Remand Opposition at 37. The case does not turn, however, on whether the Barren Islands were exclusively Koniag territory. The case turns on whether Lower Cook Inlet was traveled over and used by a number of tribes, including the Koniag. Defendant has no burden to show exclusive Koniag use. Joint use of the Inlet suffices to defeat plaintiffs' claim.

7. *Moreover, the Barren Islands are within a Chugach dialect area, and eyewitnesses indicate Chugach use of them. [P-11 at 9-10, 32}.* Plnts' Remand Opposition at 37. What Mr. Ganley actually stated in his declaration is that "Some maps depicting language and dialect boundaries for the Eskimo Languages in Alaska consistently place the division between Koniag and Kenai Peninsula/Chugach Alutiiq through the Barren Islands (See Attachment 3a) and in one notable case, include the Barren Islands within the Kenai Peninsula Chugach dialect area (See Attachment 3b). Significantly, the first map (3a, P-11 at 31) to the Ganley Declaration shows Prince William Sound, Kenai Peninsula and Koniag dialect areas, but includes Lower Cook Inlet in none of those dialect areas. More importantly, neither map indicates the date as to which the distribution of dialects purports to apply.

8. *Finally, the Chugach have toponyms for these islands. [P-11 at 9]. Thus they must be considered Chugach exclusive use areas.* Plnts' Remand Opposition. at 37. This is a non-sequitur. The fact that the Lower Kenai Peninsula Eskimos have a name for the Barren Islands is probative of whether they knew of those islands, not of whether they used them exclusively. Plaintiffs make no allegation that the Koniags have no toponym for the Barren Islands or Cook Inlet. Plaintiffs' burden is to demonstrate exclusive use and dominion of the waters of Lower Cook Inlet. The evidence of the earliest historic period shows use by the Koniags. The existence of toponyms does not negate that evidence of Koniag use.

9. *The authorities agree that Chugach territory 'included Cook Inlet waters ... extending westward to Kamishak Bay' [P-11 at 16]* Plnts' Remand Opposition at 37. Actually, Mr.

US Remand Reply Br                    -18-

Ganley cites no authority for this proposition, other than that there was a divide in Kamishak Bay between a Dena'ina north and an Alutiiq south. That begs the question of whether those Alutiiq users were Koniags, Alaska Peninsula Alutiiq or Lower Kenai Peninsula Alutiiq. Ganley also states that in the 19th and 20th centuries "the waters of Cook Inlet were traversed by Alutiiqs to harvest resources." P-11 at 16. During that period many others were also using the Lower Cook Inlet. See, Second Declaration of Langdon, R-3. Plaintiffs point to not a single shred of evidence that they, as opposed to other Alutiiq, groups were making exclusive use of Kamishak Bay prior to the Russian period. Aboriginal rights cannot be based upon speculation. *Pueblo de Zia,* 11 Ind. Cl. Comm. 131 at 167 (1964).

10. *It is also clear that the Chugach used the waters through the 19th century and even continue to do so today:* Plnts' Remand Opposition at 37. Whatever the truth of that statement it does nothing to solve plaintiffs' problem. Plaintiffs have not refuted use of Kamishak Bay by others than the Lower Kenai Peninsula Eskimos during the historic period. The fact that the Lower Kenai Peninsula Eskimos may also have used the area does not meet their burden to show exclusive use and dominion.

11. *The defendant claims that Mr. Ganley "candidly admitted" that "one cannot tell whether those Alutiiq [in Kamishak Bay] were Koniags, Kenai Eskimos, or Alaska Peninsula Alutiiq [Def. Br. at 25-26]. However, Mr. Ganley states that this is a mischaracterization as what he asserted was that historical documents alone do not provide the answer.* Plnts' Remand Opposition at 37 n.9. If one examines Mr. Ganley's earlier declaration (P-11), it is clear that our statement is not a mischaracterization. Mr. Ganley reviewed information pointing to a division in Kamishak Bay between "the Alutiiq people and the Dena'ina." P-11 at 6. When speaking of the division, he consistently used the term "Alutiiq," a term that includes not only Chugach and Lower Kenai Peninsula Eskimos, but also Koniags and Alaska Peninsula Alutiiq. *Id.*. He stated that which type of Alutiiq were in Kamishak Bay "is not revealed in the historic record" but offers no evidence outside the historic record on which the determination could be made. *Id.* In his most recent declaration accompanying Plnts' Remand Opposition, Mr. Ganley offers this explanation:

US Remand Reply Br                                      -19-

I drew an ethnic division through Kamishak based upon the historical research performed by Janet Klein in "Kamishak Bay: A Brief History." She documents evidence of kinship connections and land/water use patterns, as well as toponyms learned from Dr. James Kari. Therefore, I based my analysis on a range of evidence even though I believe historical documents alone do not resolve the issue.

Ganley Dec ¶ 29.

We attach "Kamishak Bay: A Brief History" as Def. Exh. RR-3. It provides no foundation for an opinion that the Chugach or Lower Kenai Eskimos as opposed to other Alutiiq groups occupied Kamishak Bay. Indeed, it is remarkable that Mr. Ganley would purport to rely on Klein's work since she states clearly that just about every Native group other than the Chugach and Lower Cook Inlet Eskimos used the Bay.

Like Kachemak Bay, 100 miles eastward, Kamishak was border country. Koniag Alutiiq from the Kodiak archipelago, Aleuts from the Aleutian Islands, Yup'ik from the Yukon-Kuskokwim delta, and Dena'ina Athabaskan Indians from Cook Inlet and Iliamna and Lake Clark country utilized this rugged, often inhospitable land.

Def. Exh. RR-3 at 2 [4].

Klein also noted that Douglas Reger of the Office of History and Archaeology, Anchorage reported in his "Archaeological Reconnaissance Along the Kamishak Embayment" that "Kamishak was the northern boundary for the Koniag Eskimo whose main territory was the Kodiak Island archipelago and the mainland across Shelikof Straits. From there, from Iliamna and Lake Clark country and beyond, and possibly from the Aleutian Islands, great and small parties traveled to Kamishak Bay to hunt, to gather and possibly to fish." Def. Exh. RR-3 at 29 [33].

The only reference to the Lower Kenai Eskimos villages in the entire text of "Kamishak Bay: A Brief History" is as follows:

**1890** Neither Chenik nor Amakdedori is mentioned in the Census. Only the Native village of Ashivak is mentioned. Supposedly its 46 residents moved to Port Graham and Nanwalek in the 1890's possibly after the closure of Douglas Station.

*Id.* at 17 [19]. If this is the source of Mr. Ganley's opinion, it is without foundation. It is unclear what bearing the moving of 46 individuals from Ashivak to the two plaintiff villages in the 1890's would have on whether Kamishak Bay was being used exclusively by Lower Kenai

US Remand Reply Br                    -20-

Eskimos a hundred years before. More importantly, Klein reports the move to the two villages as

a supposition. When she subsequently researched the matter, she demonstrated that no such

move had occurred.

In her "Abandoned Villages, Discovered Histories" (Def. Exh. RR-4), Klein pursued the

possible connection between Kamishak and the Lower Kenai Eskimos. However,

> As research progressed, it became evident that Nanwalek and Port Graham people
> had no strong ties to Kamishak Bay. The fish, marine and land mammals, and
> plants they needed were readily available near their villages. People from
> Seldovia, however, hunted, trapped, fished, and worked as stream guards in
> Kamishak Bay.

*Id.* at 3 [3].

Conversely:

> Katherine Arndt has conducted extensive research into the Alaskan
> Russian Church Archives and has found several families associated with
> Kamishak Bay. The people had strong ties to Katmai [on the Alaska Peninsula],
> also, so there's considerable movement along the Alaska Peninsula coast.

*Id.* at 11 [11].

> Port Graham and Nanwalek residents seldom visited Kamishak Bay.
> "During my gathering of oral histories from residents of Port Graham and
> Nanwalek, I questioned their relationship and interactions, past and present with
> communites on the west side of Cook Inlet. I found there to be no significant
> kinship relationship and little oral history relating to the area." (Ronald Stanek,
> personal correspondence). His studies show that Port Graham and Nanwalek
> residents hunted, fished, and gathered along the tip of the Kenai Peninsula, along
> the entire outer coast as far east as Resurrection Bay, and into Kachemak Bay.
> (Stanek, pp. 52-56) Occasional use did occur, however, especially around
> Augustine Island. (ibid. p. 53).

*Id.* at 13 [13].

Klein concluded in 1999, based on the extensive research of Hussey and Arndt, that

Ashivak  was not even located in Kamishak Bay, but was located south of Cape Douglas on the

Alaska Peninsula. *Id.* at 23-24 [23-24]. Hussey demonstrated that Ashivak and Douglas were

alternate names for the village of Kaguyak on the Alaska Peninsula south of Cape Douglas.

Hussey *Embattled Katmai,* Def. Exh. RR-5 at 238-43 [19-24]. The 1890 census listed the

combined population of Douglas and the next southerly town, Kukak, as 85 persons, of which 82

were listed as "Kodiak Eskimo" *Id.* at 245 [26]. The inhabitants of the Cape Douglas area

remained there until the Katmai eruption of 1912 rendered villages on the northern part of the

Alaska Peninsula uninhabitable -- at which point they were evacuated to the new village of Perryville further south on the peninsula. *Id.* at 356 to 368 [44-56].

Nor do the toponyms of Dr. Kari provide any basis for distinguishing between different Eskimo peoples using Kamishak Bay, since Dr. Kari provided only Dena'ina toponyms. See Def. Exh. RR-3 at 29 [33] and Def. Exh. RR-4 at 9 [9].

In the alternative, plaintiffs argue that even if they were not the exclusive users of Kamishak Bay, their use of that Bay entitles them to aboriginal rights to the waters between the Bay and Port Graham and Nanwalek because they allegedly crossed those waters on the way to and from Kamishak Bay. Plaintiffs' claim to the "intervening waters" is no stronger than their claim to Kamishak Bay.

As shown above, the early historic record and tribal tradition demonstrate Koniag and Alaska Peninsula Eskimo use of Lower Cook Inlet as a whole. Portlock's longboat crew encountered "Kodiac Indians" soon after Point Bede just southwest of Port Graham and Nanwalek in 1787. Def. Exh. RR-8 at 234-35 [3-4]. Russians shipwrecked in Kamishak by in 1796 were rescued by Alaska Peninsula Eskimos who had just crossed the Lower Inlet on the way home from the Tlingit country to the east. Def. Ex. RR-3 at 13 [15]. Davidov, who visited the area in 1803-07 documented Koniag use of the Barren Islands in the eastern part of Lower Cook Inlet, as well as the Inlet further north. Def. Exh. R-3 at page 10. De Laguna noted Dena'ina stories of Koniag raids to the Upper Inlet. Def. Exh. S-3 at 3. Plaintiffs' problem is not merely with common use of the Kamishak Bay area but with the Lower Inlet in general.

In sum, during the historical period, the use of Kamishak Bay and Lower Cook Inlet by others than the Lower Kenai Eskimos is unrefuted. The use of Lower Cook Inlet prior to contact can only be the subject of speculation because none of the Native peoples ringing the Inlet kept written records. As shown above, although Mr. Ganley opines that the Lower Kenai Eskimos exclusively occupied the Lower Inlet prior to the Russians, his opinion is not based upon competent evidence and, therefore, cannot establish a genuine issue of material fact.

US Remand Reply Br                    -22-



V.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
      CHALLENGE TO THE SABLEFISH IFQ REGULATIONS BECAUSE PLAINTIFFS
      SHOW NO ABORIGINAL USE OF SABLEFISH

At pages 29-30 of the Def's Remand Brief, defendant demonstrated that plaintiffs do not

have a history of taking sablefish on the EEZ or elsewhere, and therefore have no aboriginal right

to initiate such a fishery free of the federal regulations. Defendant relied on three sources of

evidence. First, archeological excavations of middens at Chugach sites have yielded no sable-

fish bones. Second, State of Alaska subsistence technical reports for the plaintiff villages show,

at most, *de minimus* use of sablefish. Third, mature sablefish targeted by the commercial fishery

exist at 200 to 800 meters and have only been harvestable with the recent development of deep

water fishing gear.

In response, plaintiffs do not refute the State reports, or demonstrate the technology to

take sablefish at the extreme depths at which they congregate. Rather, they attack only the

evidence regarding bones from the excavation of middens. Even that attack is without

foundation and is based upon the demonstrably erroneous premise that sablefish are a type of

cod.

In response to defendant's showing that "inventories of fish bones from kitchen middens

in Prince William Sound and the Kenai Pensinsula have revealed no bones of sablefish,"

plaintiffs object that "this statement is misleading, because while hundreds of cod bones have

been found in archaeological sites in Prince William Sound, most of the bones have not been

identified by the specific species of cod but rather as 'cod' or 'cod family.'" Plnts' Remand

Opposition at 44. However, as plaintiffs' own exhibit P-22 shows, sablefish are neither "cod,"

nor are they members of the "cod family." To the contrary, sablefish, despite their nickname of

"black cod," are members of the completely different family of anoplopomatidae, while cod

constitute the gadidae family. Mr. Ganley's declaration cannot change this established scientific

fact. Sablefish bones are distinguishable from cod bones. Declaration of Linda Yarborough.

Def. Exh. RR-6.

VI.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT THAT THE
       REGULATIONS DO NOT IMPINGE ON ANY ABORIGINAL RIGHTS THE
       PLAINTIFFS MAY POSSESS

As defendant showed at 35-44 of Def's Remand Brief, if plaintiffs have any aboriginal

rights, the IFQ regulations do not impinge upon them, for two reasons.  First, the Ninth Circuit

has limited possible aboriginal rights on the EEZ to subsistence rights, while the IFQ regulations

deal only with commercial fishing rights.  Second, off-reservation aboriginal hunting and fishing

rights, even where they exist,  are subject to all non-discriminatory hunting and fishing

regulations applicable to the general public.  Plaintiffs do not attempt to establish genuine issues

of material fact with regard to those two issues, arguing instead that reaching those issues would

violate the Ninth Circuit's mandate, and that defendant's argument is wrong as a matter of law.

Neither tack has merit.

    A.    The Two Issues are Within the Ninth Circuit's Mandate.

The en banc panel remanded with instructions "that the district court decide what

aboriginal rights to fish beyond the three-mile limit, if any, the plaintiffs have."  The en banc

panel also directed that "[f]or purposes of this limited remand, the district court should assume

that the villages' aboriginal rights, if any, have not been abrogated by the federal paramountcy

doctrine or other federal law."  Plaintiffs interpret this mandate to prohibit this Court from

reaching the issues regarding subsistence uses versus commercial uses, and the extent to which

off-reservation aboriginal hunting and fishing rights are subject to non-discriminatory hunting

and fishing regulations.  In fact, both issues are within the letter and the spirit of the mandate.[11]/

A determination of "what" aboriginal rights, if any, exist necessarily includes a determination of

the extent of any rights that may be found to exist.  Defendant has shown that even if plaintiffs

could establish some sort of aboriginal fishing rights, those rights would not include commercial

fishing rights and would not include the right to fish off-reservation without observance of non-

---

[11]/    On remand, a trial court must implement both the letter and spirit of the mandate, taking into
account the appellate court's opinion and the circumstances it embraces. *Vizcaino v. United States
District Court for the Western District of Washington,* 173 F.3d 713, 719 (9th Cir. 1999).  Therefore,
a court on remand can only consider issues not expressly or impliedly disposed of on appeal. *Id.* In
this case, the en banc panel remanded this case without deciding any issues.

US Remand Reply Br                              -24-

discriminatory hunting and fishing regulations.

Examination of the transcript of the oral argument before the en banc panel (Def. Exh. RR-7) confirms that the Circuit intended this Court to address these issues. After a series of questions about whether aboriginal fishing rights were subject to Magnuson Act regulations, the panel stated "But we do not yet have a determination by the District Court as to the extent of those aboriginal rights. *** Shouldn't we remand for that purpose.... *** Maybe when they are found to be, maybe all they have their right to do is to go out in little dinghies and throw a line in the water with a fishhook made of fish bone." RR-6 at 5-6 [5-6]. The panel specifically expressed interest in whether the aboriginal rights, if any, would include commercial fishing rights. *Id.* at 9-11 [9-11].

B.  Plaintiffs' Aboriginal Rights, If Any, Do Not Include Commercial Fishing Rights

As demonstrated at 35-36 of Def's Remand Brief, the Ninth Circuit in *Native Village of Gambell v. Hodel (Gambell III,* 869 F.2d 1273 (9th Cir. 1989)*,* limited the aboriginal rights that might exist on the EEZ/OCS to subsistence rights. The regulations in this case do not impinge on any subsistence rights. The IFQ regulations allocate only the commercial fishery. As explained in part III B, *supra*, and recognized by the Court at page 13 of its previous opinion, mature sablefish exist at such depths that they have never been subject to a non-commercial take, and do not make up part of the traditional subsistence harvest of the plaintiffs villages. Plaintiff's Opposition contains no evidence of the existence of a subsistence fishery for sable fish. The plaintiffs villages do take halibut for subsistence purposes. However, the current regulations permit members of plaintiffs to take up to twenty halibut per person per day year-round from most halibut convention waters off Alaska, including the EEZ. 50 CFR § 300.65(g). Even if one were to assign a very low average weight of ten pounds per halibut, the regulations allow each member of the plaintiff villages to take up to 73,000 pounds of halibut per year from the EEZ. This cannot be considered "significant interference" with any aboriginal right to harvest halibut for subsistence from the EEZ. Accordingly, no genuine issue of material fact exists with regard to this issue and defendant is entitled to summary judgment.

US Remand Reply Br                     -25-

C. Plaintiffs' Off-reservation Aboriginal Rights, If Any, Are Subject to All Non-Discriminatory Fishing Regulations Applicable to the General Public

Defendant is likewise entitled to summary judgment that any off-reservation aboriginal right plaintiffs may have are subject to all non-discriminatory hunting and fishing regulations generally applicable to the general public. Although the parties dispute the applicable principles of law, defendants raise no factual disputes with regard to this issue.

As defendants showed in Def's Remand Brief at 37-44, the courts have repeatedly held that off-reservation aboriginal hunting and fishing rights are subject to all non-discriminatory hunting and fishing regulations applicable to the general public. This is simply a court definition of the nature and extent of off-reservation aboriginal hunting and fishing rights. Because an off-reservation aboriginal hunting and fishing right never included the right to hunt or fish except in compliance with generally applicable hunting and fishing regulations, it is not proper to say that such regulations "extinguish" any rights. No extinguishment occurs because the right never included the right to be free of such non-discriminatory regulations.

Nor does the case law require that an agency determine the existence *vel non* of off-reservation aboriginal fishing rights before they can be regulated. In *Organized Village of Kake v. Egan*, 369 U.S. 60(1962) the Supreme Court held that it is not necessary to determine whether off-reservation aboriginal fishing rights exist in order to determine whether they can be regulated. The Supreme Court made clear that conservation regulations apply to aboriginal hunting and fishing rights regardless of whether the regulating authority has adjudicated the existence *vel non* of those rights and regardless of whether the regulations expressly address tribal rights. In *Kake*, the State of Alaska had denied the existence of aboriginal fishing rights, but the Supreme Court allowed the State to regulate whatever aboriginal off-reservation rights might exist.

Plaintiffs seek to avoid the clear holding in *Kake* by arguing that it is limited to instances where a state regulates such rights. Plaintiffs' attempt fails because there are numerous cases of federal agencies regulating alleged off-reservation aboriginal hunting and fishing rights without any determination of those rights or plain statement by Congress specifically authorizing the regulation of those rights. *See, e.g., Aleut Community of St. Paul Island v. United States*, 117

F.Supp. 427 (Ct.Cl. 1954); *Tee-Hit-Ton Indians v. United States*, 132 F.Supp. 695 (Ct.Cl. 1955); *Alaska Fish and Wildlife Federation and Outdoor Council*, 829 F.2d 933 (9th Cir. 1987); *United States v. Harris*, 117 F.Supp. 915, 14 Alaska 519 (1954); see also *United States v. Holt State Bank*, 270 U.S. 49 (1926), at 58-59 (aboriginal rights to use navigable waters were "common rights vouchsafed to all whether white or Indian....").

This well-established principle is not a corollary of the paramountcy doctrine. Rather, it follows from the proposition that absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state laws otherwise applicable to all citizens of the State. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973). See also, *United States v. Fryberg*, 622 F.2d 1010, 1013 (9th Cir. 1980). The principle applies not because the regulations apply to the EEZ, but because they apply to off-reservation fishing not protected by treaty. It is precisely because off-reservation aboriginal fishing rights are subject to all applicable fishing regulations that the Ninth Circuit stated in *Wahkiakum Band of Chinook Indians v. Bateman*, 655 F.2d 176, 180 n.12 (9th Cir. 1981), that "[a]n aboriginal right to fish has been recognized only in the context of interpretation of a ratified treaty or federal statute." It is only when an aboriginal right is recognized through a treaty or statute, that the question of the extent to which state or federal regulation is permissible arises.

Thus, defendant is entitled to summary judgment dismissing plaintiffs' challenge to the IFQ regulations regardless of whether plaintiffs have any unextinguished aboriginal fishing rights in portions of the EEZ.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to defendant dismissing this action.

RESPECTFULLY SUBMITTED this $\underline{15}$ day of December, 2005, at Anchorage, Alaska.

BRUCE M. LANDON
Attorney for Defendant

US Remand Reply Br                     -27-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _15th_ day of December, 2005, a copy of the foregoing was served by United States mail, first class, postage paid, to the following:

Natalie Landreth
Goriune Dudukgian

Lorraine Carter
Secretary

TABLE OF EXHIBITS
Reply in Support of Defendant's Motion for Summary Judgment on Remand
*Native Village of Eyak v. Gutierrez,* A98-0365 CV (HRH) (D. Alaska)

RR-1. Birket Smith, *The Chugach Eskimo,* 1953 (excerpts)

RR-2. Solovjova and Vovnyanko, "The Rise and Decline of the Lebedev-Lastochkin Company: Russian Colonization of South Central Alaska" Pacific Northwest Quarterly vol. 90 (excerpts)

RR-3. Klein, "Kamishak Bay, A Brief History"

RR-4. Klein, "Abandoned Villages – Discovered Histories"

RR-5. Hussey, *Embattled Katmai* (excerpts)

RR-6. Declaration of Linda Finn Yarborough

RR-7. Transcript of En Banc Hearing in this action

RR-8. Portlock, *A Voyage Around the World: But More Particularly to the North-West Coast of America* (excerpts)

RR-9. De Laguna *Chugach Prehistory* (excerpts)

**Location of exhibits attached to other briefs**

Exhibits with an "R" designation are attached to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, Docket # 30

Exhibits with an "S" designation are attached to Federal Defendant's Reply to Plaintiff's Opposition to Federal Defendant's Motion for Summary Judgment, Docket # 37

Exhibits P-1 through P-10 are attached to Plaintiffs' Motion for Summary Judgment, Docket # 24.

Exhibit P-11 is attached to Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment, Docket # 39

Exhibits P-12 through P-22 are attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment [on Remand], Docket # 77