Natalie A. Landreth
NATIVE AMERICAN RIGHTS FUND
420 L Street, Suite 505
Anchorage, Alaska 99501
Phone: (907) 276-0680
Facsimile: (907) 276-2466

Goriune Dudukgian
ALASKA LEGAL SERVICES CORPORATION
1016 West 6th Ave., Suite 200
Anchorage, Alaska 99501
Phone: (907) 222-4524
Facsimile: (907) 279-7417

**Counsel for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


| | |
|---|---|
| NATIVE VILLAGE OF EYAK, *et al*., ) | |
| ) | |
| Plaintiffs, ) | Case No. A98-365 CV (HRH) |
| v. ) | |
| ) | |
| CARLOS GUTIERREZ, ) | THE CHUGACH'S SUR-REPLY IN |
| Secretary of Commerce, ) | OPPOSITION TO DEFENDANT'S |
| ) | MOTION FOR SUMMARY JUDGMENT |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

   I.    DEFENDANT SETS FORTH AN INCORRECT LEGAL STANDARD ........................ 1

   II.   THE CHUGACH HAVE DEMONSTRATED NUMEROUS FACTUAL DISPUTES
       THAT PRECLUDE SUMMARY JUDGMENT ................................................. 6

     A.    The Chugach satisfy the "single land owning entity" criteria because there is no
           evidence of political warfare among them. .................................................. 6
     B.    The Chugach were and remain owners of Middleton Island to this day. .................... 13

   III.  THERE ARE DISPUTED FACTS SURROUNDING USE OF THE LOWER COOK
       INLET ........................................................................................... 14

   IV.  THE CHUGACH HAVE INTRODUCED FACTUAL DISPUTES ON THE USE OF
       DEEPWATER FISH, INCLUDING BLACK COD ....................................... 19

CONCLUSION ....................................................................................... 20

Plaintiff's Sur-Reply

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970) .......................................................... 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 5

*Confederated Tribes of the Colville Reservation v. United States,* 4 Ind. Cl. Comm. 187 (1956) ................................................................................................................................ 4, 7

*Confederated Tribes of the Warm Springs Reservation v. U.S.,* 1966 WL 8893 ........................... 3

*Muckleshoot Tribe of Indians v. United States,* 3 Ind. Cl. Comm. 669 (1955) .......................... 3, 4

*Nome Eskimo Community v. Babbitt,* 67 F.3d 813 (9th Cir. 1995), ........................................... 6

*Nooksack Tribe of Indians v. United States,* 3 Ind. Cl. Comm. 492 (1955) .............................. 2, 3

*Pawnee Indian Tribe of Oklahoma v. United States,* 5 Ind. Cl. Comm. 268 (1957) ............... 5, 13

*Quapaw Tribe of Indians v. U.S.,* 1 Ind. Cl. Comm. 469 (1950) ............................................... 1

*The Snake or Paiute Indians v. the United States*, 125 Ct. Cl. 241 ............................................. 2

*U.S. v. State of Washington,* 730 F.2d 1314 (9th Cir. 1984) .................................................... 3, 4, 7

*Uintah Ute Indians of Utah v. United States,* 5 Ind. Cl. Comm. 20 (1957) ........................... 3, 4, 11

## Statutes

16 U.S.C. 1853(b)(6)(B) .......................................................................................................... 6

## Rules

Fed. R. Civ. P. 56 .................................................................................................................... 4

Fed. R. Evid. 703 ................................................................................................................... 11

## Regulations

50 C.F.R. § 679.40 ............................................................................................................... 5, 6

## Other Authorities

29 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL RULES OF PRACTICE AND PROCEDURE §6274 (2d ed. 1987) ......................................................................................... 11

58 Fed. Reg. 59375-03, 59378 (Nov. 9, 1993) ...................................................................... 19

Alaska Oil Spill Comm'n, "*Spill: The Wreck of the Exxon Valdez,*" (1990) ............................ 5

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (2005 ed.) ................................................ 1, 14

DAVID CASE, ALASKA NATIVES AND AMERICAN LAWS (3rd ed. 1997) ...................................... 13

William P. Rodgers, "*The Exxon Valdez Reopener,*" ALASKA L. REV. 135 (December 2005) ...... 5

## PRELIMINARY STATEMENT

Defendant's reply confirms that summary judgment must be denied.  Defendant essentially concedes that there are disputed issues of fact with respect to aboriginal use and occupancy of the Gulf of Alaska.  In an effort to overcome the Chugach's arguments and salvage his summary judgment motion, defendant introduces and attempts to rely upon several new arguments, a new expert, and several new exhibits.[1]  Each of these new elements increases and further intensifies the factual disputes precluding summary judgment.[2]  Moreover, recognizing the strength of the Chugach's evidentiary showing and the pervasive factual disputes that exist, defendant tries to rewrite the law of aboriginal rights and the rules of summary judgment in order to suggest ─ inaccurately ─ that there is a heightened standard of proof in aboriginal rights cases, and that the Chugach's showing does not matter.  Defendant bases his arguments on incorrect propositions of law that contradict 200 years of precedent on aboriginal rights and that courts rejected long ago.   For all these reasons, defendant's summary motion must be denied.

## I.    DEFENDANT SETS FORTH AN INCORRECT LEGAL STANDARD

In parts I and II of its reply, no doubt recognizing the many fact disputes that make summary judgment inappropriate, defendant now attempts to raise the bar and to nullify the Chugach's evidence by conjuring a new, extremely heightened standard for establishing aboriginal rights.  The centerpiece of the defendant's newly created standard is the assertion that aboriginal rights are subject to a "rigorous" standard of proof.  [Rep. Br. at 2-3]  This has no basis in law.[3]  Neither the word "rigorous" nor anything similar appears in any aboriginal rights

---

[1] New exhibits submitted with the Reply are denoted by the prefix "RR."
[2] The determination and extent of aboriginal rights is a question of fact.  *Quapaw Tribe of Indians v. U.S.,* 1 Ind. Cl. Comm. 469 (1950).
[3] Indeed, it is ironic that the standard to defeat summary judgment is low, but the government is actually arguing that it should be made *more* rigorous when considering events that occurred over hundreds and even thousands of years, and when considering claims made by the only people with whom the government has a trust relationship.  COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (2005 ed.) §5.04[4][a]

cases.  Moreover, contrary to defendant's assertions, the courts have consistently recognized that

tracing territories and use back for decades and centuries can be difficult for tribes to show with

the same kind of detail required in traditional civil cases, and thus they have always taken, by

their own description, a more "liberal" approach, have stated that aboriginal rights were to be

"inferred," and have ruled in favor of the tribes where there was only fragmentary evidence:

> In reaching this conclusion *we recognize the difficulty of obtaining the essential proof necessary to establish Indian title in a tribe at such an ancient date*, and as a result a *liberal approach has been made by the Commission in weighing the limited evidence* submitted in order to determine whether such conclusion as to the approximate limits of the area actually occupied by the claimant tribe can be fairly said to be supported by substantial evidence.  We think that it is.  In this connection, we direct attention to the case of *The Snake or Paiute Indians v. the United States*, 125 Ct. Cl. 241, 254, wherein the Court of Claims made the following statement in its opinion with respect to the sufficiency of the evidence to support a finding of Indian title in a tribe:

> The problem of establishing such exclusive occupancy title by immemorial possession as of a date too remote to admit of testimony of live witnesses, and where no deeds or patents exist, is not a simple one.  At best, the ultimate fact of beneficial ownership by exclusive possession and occupancy *can only be <u>inferred</u> and found from many separate events and a variety of documentary material*.

*Nooksack Tribe of Indians v. United States,* 3 Ind. Cl. Comm. 492, 499 (1955) (former emphasis

added, latter emphasis in original).

Faced with the challenges of gathering information about historic and even prehistoric

times in determining aboriginal rights, courts have inferred the existence of aboriginal rights

because they have recognized that evidence will be scarce:

> Of course, [evidence of an aboriginal entity capable of claiming rights] *must necessarily go back beyond the period of white settlement to where the information becomes extremely scarce*.  Since there is so little information available then it becomes necessary to take the situation as it existed at the time the reports start and *make whatever inferences seem justified thereby*.  In making those inferences it is necessary to bear in mind the various factors, economic, social and political, which go to make up the cultural pattern of the occupants of any given area.  In other words, the criteria must be reasonably adapted to the situation which exists in the particular area under consideration.

Plaintiff's Sur-Reply

*Uintah Ute Indians of Utah v. United States,* 5 Ind. Cl. Comm. 20, 27 (1957) (emphasis added);

*Nooksack Tribe of Indians v. United States,* 3 Ind. Cl. Comm. 492, 499 (1955).  Recognizing

these evidentiary challenges, courts have consistently held that inferences of fact are a necessity,

and that "it becomes necessary to take a common sense approach."  *Muckleshoot Tribe of*

*Indians v. United States,* 3 Ind. Cl. Comm. 669, 677 (1955).  Most recently, the Ninth Circuit

took this approach in determining the usual and accustomed fishing places of the Makah:

> In determining usual and accustomed fishing places the court *cannot follow stringent*
> *proof standards* because to do so would likely preclude a finding of any such fishing
> areas.  Little documentation of Indian fishing locations in and around 1855 exists today.
> The anthropological reports . . . have been very helpful in *determining by direct evidence*
> *or reasonable inferences the probable location* and extent of usual and accustomed . . .
> fishing areas.

*U.S. v. State of Washington,* 730 F.2d 1314, 1316-1317 (9th Cir. 1984) (emphasis added).  In fact,

some cases strongly suggest that use and occupancy may be assumed, thus shifting the burden to

the defendant to show otherwise.  *Muckleshoot Tribe of Indians v. United States,* 3 Ind. Cl.

Comm. 669, 677 (1955) ("In the absence of proof to the contrary, we may *assume* that these

same groups had occupied that area from time immemorial.") (emphasis added).  It is thus

inappropriate at this point, when faced with the numerous material factual disputes, for the

defendant to argue for a higher standard of proof that is totally unsupported by the case law in

order to attempt to obtain summary judgment.[4]

---

[4] In its part IV, defendant makes a troubling argument regarding the kinds of evidence that purportedly can be used
to establish aboriginal rights.  In the context of use of the Lower Cook Inlet, defendant asserts that "use of the Lower
Cook Inlet prior to contact can only be the subject of speculation," because Native people did not keep written
records.  [Rep. Br. at 16, 22]  Defendant also asserts that aboriginal rights cannot be based on speculation.  [Br. at
19]  In essence, defendant is trying to maintain that the only "real" evidence in this action is the records of non-
Natives, mainly the Russian explorers.  This suggestion flies in the face of 200 years of contrary precedent.  The law
recognizes and respects the value of testimony by current tribal members.  *Confederated Tribes of the Warm Springs*
*Reservation v. U.S.,* 1966 WL 8893 at *12.  Courts recognize that Native groups are ancient people with histories
and knowledge of their own – not to mention a long archaeological record – and courts have long valued this
evidence in aboriginal rights cases.  Defendant cannot limit the types of relevant evidence in this manner.

This liberal approach includes defining the boundaries of aboriginal claims. Tribes and groups only have to show "reasonably definable areas" over which they had exclusive use and occupancy. *Muckleshoot Indians v. United States,* 3 Ind. Cl. Comm. 669, 672 (1955). The courts have even held that the boundaries may be based on inference and a dose of common sense: "In other words, the evidence indicates a boundary but the placement thereof becomes a matter of some speculation. We feel that the placement made is logical." *Uintah Ute Indians of Utah v. United States,* 5 Ind. Cl. Comm. 20, 44-5 (1957) (holding that a variance of "a few miles one way or another" does not defeat the claim); *see also U.S. v. State of Washington,* 730 F.2d at 1316-1317 (noting how expert reports also define probable boundaries). Further, the territorial boundaries do not have to be derived from ancient maps, but have often been based on the information supplied by *current* tribal members. *Confederated Tribes of the Colville Reservation v. United States,* 4 Ind. Cl. Comm. 187, 194 (1956) ("[E]very group in the Basin was visited and the maps were first drawn in the presence of informants as information was given, bit by bit, including village location as well as boundary lines.") (describing tribal territorial maps drawn in 1936).

As part of arguing for a new, extremely heightened standard of proof, defendant attempts to transform its motion for summary judgment into a trial by brief. The simple and correct rule is that summary judgment is not appropriate where, as in this case, there are genuine disputes about one or more facts. Fed. R. Civ. P. 56. Instead, relying on *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986),[5] defendant tries to create in its reply brief a new standard for summary judgment in aboriginal rights cases, which would require tribes to satisfy a "rigorous" standard of proof just to survive summary judgment. As demonstrated above, there is no such standard.

Aboriginal rights cases are like most other civil cases – *i.e.* the evidentiary burden is a preponderance of the evidence. *See, e.g., Pawnee Indian Tribe of Oklahoma v. United States,* 5 Ind. Cl. Comm. 268, 284 (1957). Thus, a plaintiff claiming aboriginal rights does not face a higher standard at summary judgment than any other plaintiff. On the contrary, it is the defendant who bears the burden here. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).

In part II, defendant hints that the Chugach will not be able to satisfy the heightened (and incorrect) standard that defendant proposes because the Chugach are in reality trying to "enter a new industry." [Rep. Br. at 5] This assertion is factually wrong because the Chugach have lived off these waters for thousands of years. Perhaps more importantly, it misrepresents how IFQs were allocated. The defendant asserts that IFQs were allocated to "anyone who landed any sablefish or halibut commercially during recent years." [Rep. Br. at 5] This is inaccurate. In fact, IFQ's were allocated only to those who owned or leased their own vessel and who caught sablefish from specific areas now covered by the IFQ program in 1988, 1989, or 1990.[6] Moreover, March 1989 was the date of the Exxon Valdez disaster, which destroyed the waters and much of the fishing capacity of the Chugach villages. This disaster severely limited the participation in the fishery of most of the Chugach tribal members during at least two of the three years (1989 and 1990), because the fishery was drastically limited and many tribal members were focused on cleanup and damage control. And as this Court is acutely aware, the waters immediately around the Chugach's communities were layered with oil.[7] As a result, in order to

---

[5] *Anderson* held that in a libel case where the plaintiff would be required to prove malice by clear and convincing evidence, it should be required to present clear and convincing evidence of malice at the summary judgment stage. It is of limited relevance here.

[6] 50 C.F.R. § 679.40(a)(2) and (3).

[7] Alaska Oil Spill Comm'n, "*Spill: The Wreck of the Exxon Valdez*," 1, 5 and 62 (1990) (stating that the Exxon Valdez disaster contaminated 1,244 miles of coastline and detailing in a map how the spill reached from Prince William Sound to the Alaska Peninsula). William P. Rodgers, "*The Exxon Valdez Reopener*," ALASKA L REV. 135, 136 (December 2005) ("This terrible spill . . . contaminated more shoreline, covered more water . . .and ruined more lives than any oil spill in the history of this continent.")

Plaintiff's Sur-Reply

qualify for an IFQ, fishermen had to demonstrate sablefish catch for 1988; and if a fisherman did

not happen to catch any sablefish during that single season, this would have disqualified him

under the government's regulations.  Thus it is misleading to suggest that the Chugach were

trying to enter a new industry; they had fished these waters for thousands of years for deepwater

fish like sablefish, but the arbitrary and limited window[8] and requirements[9] prevented many of

them from qualifying. [10]

## II.     THE CHUGACH HAVE DEMONSTRATED NUMEROUS FACTUAL DISPUTES THAT PRECLUDE SUMMARY JUDGMENT

### A.     The Chugach satisfy the "single land owning entity" criteria because there is no evidence of political warfare among them.

In part III A, defendant claims the Chugach cannot meet the standard for establishing

aboriginal rights for the Gulf of Alaska because of the joint use doctrine.  Defendant also makes

a corollary argument that the facts offered by Chugach expert Mr. Ganley simply don't count as

factual disputes.  Defendant misunderstands (or misrepresents) the Chugach's evidence relating

to the territories they are claiming.  These are set forth in the composite map of aboriginal rights

---

[8] It should be noted that the Secretary was not required by Congress to limit the issuance of IFQs to those who participated in the sablefish and halibut fisheries during those few years.  Congress specifically stated that the Secretary was supposed to take into account "historical fishing practices in, and dependence on, the fishery." 16 U.S.C. 1853(b)(6)(B).  The Secretary based his determination of "historical fishing practices" arbitrarily on the three years 1988-1990 (which included two years of Exxon Valdez devastation); he never considered (as he should have) the actual historic use of the waters by the Chugach.  Thus, it is not proper to suggest that because most Chugach did not qualify for the IFQ program, it follows that they had never participated in these fisheries, and that they cannot demonstrate aboriginal rights.

[9] In addition to showing that one had caught sablefish on his own vessel from the designated area in the window allowed, the fisherman was also required to demonstrate that he had used had a specific type of gear.  50 C.F.R. § 679.40(a)(2)(i).

[10] Defendant makes an erroneous argument that this case cannot be one grounded in aboriginal rights because "there is no cause of action for the adjudication of aboriginal rights per se." [Rep. Br. at 4 n.2]  The case on which defendant relies, *Nome Eskimo Community v. Babbitt*, 67 F.3d 813, 816 (9th Cir. 1995), says no such thing.  Rather, it says only that the Nome plaintiffs had objected to the mineral lease sale but sought "no relief in this case relating to fishing"; thus they had not demonstrated an actual "case or controversy" to trigger jurisdiction. *Id.* at 815.  In contrast, the present case is based entirely on an assertion of interference with fishing and hunting rights and involves access to certain OCS areas as relief.  [Complaint at 5]  Thus, *Nome* is inapposite.  Furthermore, this Court has already recognized that the IFQ program plainly conflicts with aboriginal rights and that this establishes a sufficient controversy to generate jurisdiction. [Order on Cross-Motions for Summary Judgment at 13 (Sept. 25, 2002)]

claim areas that was submitted with the Chugach's Opposition. [P-2 at 109]  As the composite map indicates, approximately half of the areas being sought by the Chugach are being claimed by a single village so there is no issue of "joint use." [Opp. at 27]  Defendant claims that the entire map is irrelevant because it bears the legend "contemporary use areas," and thus, according to defendant, it does not designate aboriginal use areas.  [Rep. Br. at 11-12]  However, defendant ignores the testimony of Mr. Ganley concerning how he compiled the maps and what they show.  According to Mr. Ganley, these areas are aboriginal use areas delineated based on informants who confirmed that they used these areas and that their parents, grandparents, and ancestors used the same areas for the same resources.  [P-11 at 22]  These areas are used today because they were handed down from one generation of Chugach to the next.  [Kvasnikoff Dec. ¶ 7]  It is common practice in these cases to base territorial boundaries on the information supplied by *current* tribal members,  *Confederated Tribes of the Colville Reservation v. United States,* 4 Ind. Cl. Comm. 187, 194 (1956), as well as on the reasonable inferences of experts.  *U.S. v. State of Washington,* 730 F.2d at 1316-1317.  This is simply how aboriginal use areas are designated.

Defendant also asserts that there is evidence of "warfare" among the Chugach, and that this automatically defeats their claim to aboriginal rights.  [Rep. Br. at 7-10]  As set forth in the Chugach's Opposition, the Chugach were united by kinship, language, culture, and common defense, and thus they constituted a single land-owning entity. [Opp. at 22-24]  Defendant's reply introduces several new exhibits in support of his argument and raises several new legal arguments about expert witness testimony.  Even assuming that defendant was correct about alleged "endemic warfare" (which he is not), *there is not a single case holding that conflict among the members of a group means that they can no longer be considered a group or prevents the vesting of aboriginal rights.*   Nor does defendant cite a single case for this

Plaintiff's Sur-Reply

assertion.  To the contrary, as explained below, every society has common crime and even social

upheavals, but this does not mean that it ceases to be a society, or that the members of the society

cease to be one people or group.

The new exhibits submitted by the defendant do not defeat joint use in that, even if they

refer to the Chugach (which many seem not to), they show only common crimes and conflicts

that are present in all societies.  Some of the new sources, like Portlock [RR-8], are not at all

clear in which tribes they refer to.  Portlock only refers to a tribe being "hated by all their

neighbors," but this could easily refer to being hated by the Tlingit or Kodiak with whom the

Chugach often fought.  [RR-8 at 6]  The same is true for the assertion that the "weaker tribes . . .

are frequently plundered by the stronger tribes."  [RR-8 at 8]  It is not clear which tribes Portlock

was referring to, and again it could easily have been the Tlingit, Kodiak or even Ahtna (and not

the Chugach).  In fact, Portlock wrote of a "proper settlement" which would "give protection to

the whole of the inhabitants of the Sound," which suggests that the Chugach were seeking to

protect their group against those from outside.  [RR-8 at 8]  This is not clear evidence of any

Chugach internal warfare.

The Chugach legends submitted by the defendant also cannot defeat the claim to

aboriginal rights because, at best, they show nothing more than internal crimes and petty

individual conflicts.  As an initial matter, as with Portlock's notes, it is difficult to determine who

some of the groups mentioned are.  For example, the legend of "The Killing of Five Brothers

from Kangiaq" describes a murder of brothers from the Seward area by "the Panrhat people."

[RR-1 at 18]  The Panrhat people are not otherwise mentioned in the legends, nor does their

name appear in the ethnological writings, so it is impossible to determine whether they were in

fact members of the Chugach, as opposed to members of neighboring tribes.  Regardless, after

Plaintiff's Sur-Reply

the murder, the legend provides that these two groups "lived together under one chief"; thus, if the people involved were indeed Chugach people, it was a family conflict that was quickly resolved.  [RR-1 at 18]  The other legends submitted by defendant also recount nothing more than thefts among villagers.  Compare the descriptions in the following two passages, the first of which describes an incident presumably among the Chugach and the latter which describes the relations between the Chugach and the Kodiak:

- In "The Chief of Atyat," the chief plans to steal some beads but ends up befriending the chief of Ellamar in Fidalgo Bay and then befriending the chief of Sheep Bay.  He then tries to rob the people of Nagaulik, but the people catch him in the act and say "When we come to your village we will return with lots of things, but you will go away with nothing. Go back now!" [RR-1 at 19]
- In "The Fight Between the Chugach and the Kodiak Eskimo," while the men go out hunting for fur seals and the "women were alone, *a war party* came from Angiarhtalik on Kodiak Island.  The women did not want *the enemy* to see that there were no men with them."  The women were killed or taken as slaves. [RR-1 at 20]

There is a clear distinction between these two passages.  The first describes a theft between different villagers or families, whereas the latter describes actual inter-group political warfare between two separate groups of people.  Incidents of thefts, crimes or blood vengeance between residents of different villages does not negate Chugach aboriginal rights, because there is no such thing as a society without conflict or crime, and if this were the rule, no tribe could ever establish aboriginal rights.  More broadly, if evidence of crime or conflict within a group automatically meant that the group could not be considered as one unit under the law (and as noted above there is no such case), the United States would not qualify as one unit because it was once divided by a Civil War, and Anchorage would not qualify as a single municipality because its residents commit thefts and violent crimes against one another.  Such a rule would make no sense, and it is not the law.

Plaintiff's Sur-Reply

Defendant also claims that the Chugach have changed their position on joint use and that this defeats their claim to the GOA. [Rep. Br. at 6-7] This is not correct. The Chugach's two briefs (in the prior motion for summary judgment and the Opposition here) contain similar descriptions of Chugach land and water use habits. The Chugach have only further detailed how Native landholding patterns are not black and white, but depend on complex kinship and other social relations. It is black letter law that several governments may comprise a single land-owning entity. [Chugach Opp. at 20-27] That is the case here. Defendant, however, has again created its own standard where one tribe equals one landholding entity. [Rep. Br. at 6-7] The Chugach's characterizations thus only appear different when measured against defendant's own self-serving standard that has no basis in law.

Defendant also argues, for the first time, that Mr. Ganley's testimony does not create a factual dispute sufficient to defeat summary judgment. To the contrary, Mr. Ganley's testimony establishes that the Chugach in fact hunted and fished and exercised aboriginal rights in the Gulf of Alaska and the Lower Cook Inlet [*see, e.g.,* SS 5, 18], and that the Chugach were a single land-owning entity. [SS 25 -30] Because Mr. Ganley's testimony clearly demonstrates that summary judgment should not be granted, defendant now attempts to argue that his opinions should not "count."

First, defendant appears to assert that Mr. Ganley may not disagree with the anthropologist de Laguna on her accounts of "warfare" among the Chugach. [Rep. Br. at 9] There is no rule that an expert may not disagree with a written source. As with many other aspects of this case, the Indian Claims Commission confronted this same issue many years ago. That tribunal, as trier of fact, disregarded ethnographic sources when they were not supported or corroborated by other evidence:

Plaintiff's Sur-Reply

> The Powell and Ingalls report of 1873 is not to be disregarded as absolutely incorrect, but it does not contain an inherent guarantee of exclusive aboriginal use and occupancy of the area [claimed by the plaintiffs]. It is not supported by sufficient background evidence to support its acceptance . . . It is not the desire of this Commission to ignore the recognized authorities in the field of ethnology. However, in considering the exhibits and testimony introduced in this case, we are unable to [find aboriginal use and occupancy of the claimed area].

*Uintah Ute Indians of Utah v. United States,* 5 Ind. Cl. Comm. 20, 26 (1957). The court weighed the source against the other evidence and chose to disregard a historical ethnographic report. Mr. Ganley may similarly hold opinions or interpretations that diverge from de Laguna; it is up to the trier of fact to determine which is correct. To the extent Mr. Ganley disagrees with de Laguna's opinion, his opinion would be admissible and would create a genuine factual dispute because it is based upon proper materials as described in Federal Rule of Evidence 703.[11] At this point, any such disagreements about "joint use" or the single socio-territorial unit of Chugach are clearly disputed facts and render this matter inappropriate for summary judgment.

Second, defendant attempts to undercut the testimony of Mr. Ganley by attributing to him a position that he does not hold. According to defendant, Mr. Ganley declared that conflict did not exist among the Chugach; this contradicts some written sources, and as a result, his declaration cannot be considered competent evidence. [Rep. Br. at 3-4, 9-10] To the contrary, Mr. Ganley never stated that conflict did not exist among the Chugach. In paragraphs 31 and 32 of his Supplemental Declaration filed with the Opposition, Mr. Ganley stated that the defendant's claims of "endemic warfare" and "continuous warfare" *by defendant* were *overstatements* and that what de Laguna had said was that the Chugach "*sometimes* raided each

---

[11] An expert may rely on whatever sources may "reasonably [be] relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703; WRIGHT & MILLER, 29 FEDERAL RULES OF PRACTICE AND PROCEDURE §6274 at 328 (1997 ed.). Mr. Ganley stated in paragraphs 6 through 8 of his supplemental declaration that he relied upon a broad range of materials "typically relied upon by other practitioners in [his] field to conduct similar analyses." [Supp. Dec. at ¶ 8] In paragraph 13 of his supplemental declaration he set forth the information that leads him to believe that the Chugach "functioned as a single socio-territorial unit." Ganley's opinions are thus based on sound, common sources used by for experts in this field.

Plaintiff's Sur-Reply

other."  He added that "such raids likely had more to do with kinship or family disputes," which corroborates the legends described above.  It is thus totally inaccurate to assert that the Chugach's expert overlooked that any conflict existed within the Chugach.

Third, defendant claims that Mr. Ganley is misinterpreting the evidence for his opinion that the Chugach did not engage in "endemic" or political warfare.   Defendant asserts that Mr. Ganley's "only proffered support in the historical record for the proposition that the Chugach did not engage in conflict between the various subgroups" is a flawed analysis of a Russian report, and he submits a new exhibit [RR-2] to challenge Mr. Ganley's characterization of relations among the Chugach.  [Rep. Br. at 9-10]  Defendant's assertion is inaccurate for several reasons.  First, Mr. Ganley did not say there was an absence of conflict.  Second, in explaining the interrelations of the Chugach people, he relied on more than ten sources, not just a sole piece of evidence.  Supplemental Dec. ¶ 13, 30, 31.   Third, Mr. Ganley's interpretation of the passage at issue is entirely likely: he contends that on a voyage "through the Sound," hostages were taken from the settlements of "the close Chugach" on the Lower Kenai Peninsula. [RR-2 at 9]  This plainly refers to a use of hostages from the LKP to secure safety while traveling through PWS.  In fact, this source contains even further confirmation that the Chugach were a single socio-territorial group:

> The Pacific Eskimos or Chugachmiut, whom Russians called the Chugachi, populated the southeastern coast of the Kenai Peninsula and the shores and islands of the [S]ound.

[RR-2 at 8]  They are considered a single group in this passage.  Further, the fact that he referred to them specifically as "the *close* Chugach" (emphasis added) itself implies there were other Chugach, or he would have called them a different name; "close" clearly referred to those on the Kenai Peninsula and the "far Chugach" accordingly would have been those further south in

PWS. [RR-2 at 9]  Mr. Ganley's opinion is therefore well founded, and establishes that there are additional disputed facts.

### B.    The Chugach were and remain owners of Middleton Island to this day.

The second part of defendant's argument that the Chugach do not have aboriginal rights to the Gulf of Alaska in part III of its brief relies on incorrect assumptions about Middleton Island.  Defendant claims that the Chugach's entire claim to traditional use areas on the Gulf of Alaska depends upon travel to a single location, Middleton Island; thus an absence of travel to Middleton Island defeats their claim to the entire Gulf of Alaska.  [Rep. Br. at 12]  This position is flatly wrong as the Chugach have not just demonstrated travel to certain places like Middleton, but also they have submitted direct evidence of use of the OCS.  [SS 5; Henrichs Dec. ¶ 3-8; Kvasnikoff Dec. ¶ 4, 8 ]

The Chugach are not before this Court to establish aboriginal rights to Middleton Island; it is merely one of several landmarks used to illustrate the vast expanse of Chugach travel and resource use.  In fact, the Chugach already own Middleton Island.   A large tract of it (number 29) was deeded to the Chugach Corporation under ANCSA, a Congressional settlement meant to compensate Alaska Natives for the loss of aboriginal lands.  [See Exhibit P-23]  The selection of these lands on Middleton for the Chugach confirms their aboriginal ownership of this island. *See, e.g., Pawnee Indian Tribe of Oklahoma v. United States,* 5 Ind. Cl. Comm. 268, 290 (1957) ("[I]t seems unlikely that the Government would have agreed, as it did, to pay such a large sum to the Pawnees in the way of perpetual annuities and other benefits for the lands being ceded if it had not considered the lands . . . as belonging to the Pawnees.  We think this evidence strongly supports their claim of Indian title to the lands now claimed."); DAVID CASE, ALASKA NATIVES AND AMERICAN LAWS V. F at 70 (3rd ed. 1997).  Furthermore, the ethnologist relied on by

defendant in exhibit RR-1 also confirmed Chugach aboriginal ownership of Middleton Island. [P-2 at 24]

Once aboriginal rights are established, as the Chugach have done here with respect to Middleton, they do not simply lapse. They are not simply lost like private property through adverse possession. Rather, aboriginal rights can "be extinguished *only* by clear and unambiguous act of Congress." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 15.09[1][b] at page 1022 (2005 ed.). They must actually be extinguished through an affirmative act of Congress. Thus, even if the Chugach had not used Middleton for 50 years, which is not accurate, it would not extinguish their aboriginal rights to the island. More importantly, non-use of this single landmark could not possibly defeat claims to *all* of the Chugach's aboriginal areas on the OCS.

## III.    THERE ARE DISPUTED FACTS SURROUNDING USE OF THE LOWER COOK INLET

Defendant takes a similar approach to the Lower Cook Inlet (LCI) as it did with the Gulf of Alaska – it sets up a "straw man" argument and asserts that if the Chugach cannot show exclusive use of a handpicked landmark, they lose their claim to the entire body of water in between. [Rep. Br. at 14-22]   Whereas Middleton Island was the landmark that defendant used with the Gulf of Alaska, defendant uses Kamishak Bay as to the LCI. However, focusing exclusively on Kamishak Bay drastically oversimplifies the Chugach's claim relating to the LCI. The Chugach's claims to the LCI are based on direct evidence of actual use [SS 5; Kvasnikoff Dec. ¶ 4,8] as well as the Chugach's opportunistic use of the intervening waters while traveling to specific landmarks. The Lower Kenai Peninsula Chugach villages of Nanwalek and Port

Graham previously submitted maps of their traditional resource use areas,[12] which clearly show the extent of Chugach use of the LCI for hunting and fishing, and it is far more than simply Kamishak Bay. These locations are ancient territories handed down from one generation to the next. [Kvasnikoff Dec. ¶ 5, 7; P-11 at 22] These maps were, like all the traditional use area maps in this case submitted by the Chugach, based on actual interviews with Chugach elders from each village who had indicated that their ancestors also used the same marked areas for hunting and fishing. [P-11 at 22] Defendant has not refuted these maps. Not only has defendant created a straw man argument, but also it is particularly apparent in this section that defendant is urging this Court to weigh the evidence. [Rep. Br. at 5, referring to the "strength" of the evidence]

Defendant's own exhibits previously submitted already concede that the Chugach used the LCI. Defendant now claims that there is a "paucity" of evidence of Chugach use of the LCI in general. [Rep. Br. at 14, 15, 18] However, the defendant previously submitted as exhibit D-11 a report drafted by the Alaska Department of Fish and Game entitled "Patterns of Wild Resource Use in English Bay and Port Graham, Alaska." This exhibit includes a map of resource use areas "from the 1880s to the present," which clearly shows Chugach use more than three miles from shore in LCI. [D-11 at 67] Further, it also designates the Barren Islands and Augustine Island in the middle of the Inlet as *Chugach resource use areas*. [D-11 at 67] Thus, defendant's own exhibits contradict its argument that there is no "competent" evidence of Chugach use of LCI. [Rep. Br. at 15]

Defendant attempts in eleven points to show there is no evidence of exclusive use of Chugach use of the LCI. In general, defendant is attempting to show that the Koniag (a different

---

[12] For the Court's convenience, these maps have been attached to the end of this sur-reply. Because it is the subject of many fact disputes, Kamishak Bay is denoted by an arrow.

tribal entity) also used the waters of the LCI.  However, a close examination of the documents

reveals that this is not the case.  For example, in points number 4 and 5 [Rep. Br. at 17-18],

defendant asserts that there is no evidence in the Chugach's citation P-3 at 24 that the Koniags

entered Chugach territory only with permission.  Perhaps the defendant's error is due to a

misunderstanding of pagination; "24" refers, as is proper, to the page of the exhibit and not to the

page number of the original report.  And P-3 at exhibit page 24 clearly provides that the Koniags

entered Chugach areas only after the Russians secured permission:

> [T]he Chugach were never controlled to the degree the Komiag and Aleuts were.  Once *the Chugach agreed* to a Russian presence in the Sound, *the trading companies were able to bring in hunters from the Aleutians and Kodiak.*  While it was essential for the Russians to *gain permission to hunt,* the Russians were not dependent on the Chugach for labor.

It could hardly be more clear that Koniag/Kodiak Native presence in Chugach areas occurred

because they were hunting on behalf of the Russians who had first secured permission for them

from the Chugach.  These facts appear in a report/publication of defendant's own expert.  This

also applies to the defendant's statement in point 8 that "evidence of earliest historic period

shows use by the Koniags."  [Rep. Br. at 18]  Defendant cites no evidence for this statement, but

presumably it is based upon the same evidence by Russian explorers and otter hunters for whom

the Koniag worked and for whom the Russians had gained permission.  [R-3 at 10]  It is evident

that any use of Lower Cook Inlet by the Koniag is all derived from otter hunts for the Russians

who had to first gain permission from the Chugach to hunt in Chugach areas.

In points 2 and 9, defendant again misrepresents Mr. Ganley's testimony by contending

that Mr. Ganley's division, or border, of the Chugach claim area at Kamishak Bay includes not

only LKP Alutiiq but Koniag and Alaska Peninsula Alutiiq, and that it is therefore not evidence

of exclusive use.  [Rep. Br. at 19]  However, Mr. Ganley expressly stated that his list of

toponyms on which he bases his Chugach border are *only* LKP Alutiiq, or Chugach, and that all the toponyms came only from residents of Nanwalek and Port Graham; it is therefore incorrect to claim his use of the term "Alutiiq" includes Koniag and Alaska Peninsula people.  [P-11 at 3] Mr. Ganley's report supports the Chugach's claim of exclusive use.[13]

In points 10 and 11, defendant also claims that Mr. Ganley has no basis for drawing the ethnic division, or Chugach border, through Kamishak Bay.  [Rep Br. at 19-20]  The Chugach have consistently referred to this area as "border country."  By definition, it is where the Chugach would converge with other groups.  It represents the edge of Chugach use to this day. [P-2 at 96]   The new exhibit RR-3 confirms this by describing Kamishak as "border country." [RR-3 at 4]  Thus it is entirely consistent with Chugach claims of use and occupancy of the Lower Cook Inlet.

Defendant also challenges Mr. Ganley's testimony that there were kinship ties across the Inlet to Kamishak Bay area. Mr. Ganley came to this conclusion in part because in 1890 an entire village, called Ashivak, relocated from the other side of Cook Inlet around Kamishak Bay to Port Graham and Nanwalek.  [RR-3 at 19, 21]  The fact that an entire village would move across the Inlet – more than 75 miles of water – rather than simply blend into other Alaska Peninsula villages or even just stay on the west side of the Inlet strongly suggests that it had very compelling ties to the two communities of Port Graham and Nanwalek.  Defendant now submits two reports [RR-3 and RR-5] suggesting that Ashivak may have been located further south on the other side of the Inlet than previously thought; however, defendant then draws the unjustified conclusion that because Ashivak may have been located further south, no such move from the

---

[13] Related to the issue of toponyms, in point 7, defendant claims the maps supplied do not show Lower Cook Inlet in the Chugach dialect area.  [Rep. Br. at 18]  It is unclear why defendant makes this argument because there is plainly a line dividing the Lower Kenai Peninsula Chugach from the Koniag and it runs from Kamishak Bay on the other side of the Inlet, through the bottom of the Inlet, and down to the Gulf of Alaska.  [P-11 at 31]

Plaintiff's Sur-Reply

area to Port Graham and Nanwalek had occurred.  [Rep. Br. at 21]  Neither exhibit supports that

extrapolation; they merely suggest that the village was located further south, but still on the other

side of the Inlet.  Furthermore, one of the exhibits even states that the new proffered location "is

pure speculation based solely on a very incomplete series of maps."  [RR-5 at 21]  Neither new

exhibit refutes that a move from the west side of the Inlet to Port Graham area occurred.  In fact,

one of the exhibits even adds to the links between the areas of Ashivak and Port Graham:  it

describes the arrival of two bidarka in Ashivak/Douglas that had "crossed the width of the broad

inlet itself" from a settlement by Port Graham.  [RR-4 at 24]  Therefore, the exhibits submitted

by defendant do not refute the existence of any ties between Port Graham and Nanwalek and

communities on the other side of the Inlet; the new exhibits simply suggest the settlement may

have been further south.  Indeed, the new exhibits provide further evidence of ties.

In point 3, defendant asserts that the Dena'ina (a different tribal entity) used Lower Cook

Inlet, which would also dispute exclusive use by the Chugach.  [Rep. Br. at 16]  However, the

new exhibit reveals that any such use, if accurate, consisted of "sea otter hunts directed by the

Russians."  [R-3 at 5; RR-4 at 9]  This resembles the situation discussed above, where the

Russians gained permission to hunt for the Natives they employed.  Defendant's new exhibit in

fact reinforces that the Dena'ina were a land-based people who "primarily hunted land animals"

because they had migrated from the Talkeetna Mountains.  [RR-2 at 3]  A Dena'ina informant

relied upon in one of the new exhibits specifically states of Kamishak Bay, "That wasn't our

area."  [RR-4 at 9]  Furthermore, the Dena'ina were located at the site of present-day Kenai,

which is north of the claim areas in this case.  [RR-2 at 4]  There can be no other conclusion

other than there are a multitude of disputed facts even only with respect to Lower Cook Inlet.

## IV.    THE CHUGACH HAVE INTRODUCED FACTUAL DISPUTES ON THE USE OF DEEPWATER FISH, INCLUDING BLACK COD

Defendant claims that it is entitled to summary judgment as to the black cod regulation because the Chugach have shown no aboriginal use of black cod.  [Rep. Br. at 23]  First, this represents a fundamental misunderstanding of the law, because aboriginal rights do not depend on a showing of species by species use, but use of a physical area.  [Opp. at 41-42]  Second, *defendant's own evidence* has shown Chugach use of black cod.  [D-12 at 66; D-13 at 104]  Third, one of the Chugach plaintiffs testified that they indeed fished for black cod.  [Henrichs Dec. ¶ 3]

Fourth, the evidence is clear that the Chugach had the capacity and opportunity to fish for deep water species such as black cod.  [Murray Dec. ¶ 4]  In fact the Chugach fished and caught similar fish (*e.g.* cod and halibut) in deep waters on the OCS, and in parts of the OCS, where black cod are found.  [Murray Dec. ¶ 4]   Indeed the Federal Register notice of the very regulations at issue described Pacific cod, rockfish, halibut and black cod as being "interrelated" and stated that they are generally caught together as incidental catch of one another.  58 Fed. Reg. 59375-03, 59378 (Nov. 9, 1993).

Finally, although defendant suggests that the Court should infer that the Chugach never harvested black cod, based on the fact that black cod remains have not yet been found in the 6 sites that have been excavated out of the 200 known sites, this is not sound science.  Non-use may not be inferred from an absence in the record ("absence of evidence is not evidence of absence"). [Murray Dec. ¶ 5]  This is particularly true here considering there are hundreds of unexcavated sites in the Chugach region; the defendant bases its inference on only six of the more than 200 known sites in the Chugach region.  [Murray Dec. ¶5]  This evidence combined

strongly suggests the Chugach did harvest sablefish.  At the very least, it is yet another disputed fact among the many in this case.

## CONCLUSION

This case is entirely inappropriate for summary judgment.  The opening papers and opposition raised a litany of disputed facts pervading the core of the Chugach's aboriginal rights claim and precluding summary judgment, which defendant appeared to concede in reply, and these disputes were only increased by defendant's additional submissions and arguments.  The presence of multiple genuine factual disputes is no surprise – it is why the Chugach ultimately decided not to file a summary judgment motion of their own.  However, rather than abandoning its pursuit of summary judgment, defendant urges the Court to weigh the facts, which is not appropriate, or worse, to change the rules governing aboriginal rights cases and summary judgment and to impose – without basis ─ a heightened burden on the Chugach at the summary judgment stage.  The Court is respectfully requested to deny defendant's motion.

Respectfully submitted this 6th day of March 2006.

S/ nlandreth
Natalie A. Landreth
NATIVE AMERICAN RIGHTS FUND
420 L Street, Suite 505
Anchorage, Alaska 99501
Phone: (907) 276-0680
Facsimile: (907) 276-2466
Email: landreth@narf.org
Bar number: 0405020

**Of Counsel:**
Rich de Bodo
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Phone: (310) 203-7081
Facsimile: (310) 203-7199

**Certificate of Service**

I hereby certify that on the 6th day of March 2006, a true and correct copy of the foregoing THE CHUGACH'S SUR-REPLY IN OPPOSITIN TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was served electronically on and sent postage-paid by first class mail to Bruce M. Landon, Attorney for Federal Defendants, Department of Justice, Environmental & Natural Resources Division, 801 B Street, Anchorage, AK,  99501-3657.

s/nlandreth