RONALD J. TENPAS
Assistant Attorney General

BRIAN A. MCLACHLAN
U.S. Department of Justice
Environment & Natural Resources Division
c/o United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Tel: (206) 553-4148
Fax: (206) 553-4067
brian.mclachlan@usdoj.gov

Attorney for Federal Defendants
(Additional Counsel Listed in Signature Block)


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA


| | |
|---|---|
| NATIVE VILLAGE OF EYAK,  ) | |
| NATIVE VILLAGE OF TATITLEK,  ) | Case No. A98-365-CV (HRH) |
| NATIVE VILLAGE OF CHENEGA,  ) | |
| (aka CHENEGA BAY), NATIVE  ) | **DEFENDANT'S TRIAL BRIEF** |
| VILLAGE OF NANWALEK, NATIVE  ) | |
| VILLAGE OF PORT GRAHAM,  ) | |
| ) | |
| Plaintiffs,  ) | |
| ) | |
| v.  ) | |
| ) | |
| CARLOS GUTIERREZ, Secretary  ) | |
| of Commerce,  ) | |
| ) | |
| Defendant.  ) | |
| ———————————————— ) | |


Defendant's Trial Brief

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   DEFENDANT'S POSITION AND AUTHORITIES AS TO THE CONTESTED
      ISSUES OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Whether, as a Matter of Law, Aboriginal Hunting and Fishing
            Rights Could Have Been Established by Plaintiffs in the Claimed
            Areas of the Gulf of Alaska and Lower Cook Inlet . . . . . . . . . . . . . . . . . . 2

      B.    Whether, as a Factual Matter, Plaintiffs Can Establish Actual,
            Exclusive, and Continuous Use and Occupancy of the Claimed
            Areas for a Long Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.    The Location of Plaintiffs' Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            2.    The Relevant Time Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            3.    Plaintiffs' Burden to Prove Actual and Continuous Use . . . . . . . . . . . . 9

            4.    Exclusive Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                  a.    Whether Plaintiffs Were a Single Land-Owning
                        Entity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                  b.    Joint and Amicable Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      C.    The Nature and Extent of Plaintiffs' Aboriginal Fishing Rights,
            If Any . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

FEDERAL CASES                                                                PAGE

Caddo Indian Tribe of Oklahoma v. United States, 4 Ind. Cl. Comm. 214 (1956) review denied, 140 Ct. Cl. 63, 155 F. Supp. 727 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cherokee Nation v. Georgia, 30 U.S. 1 (1831) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Confederated Tribes of Chehalis Indian Reservation v. Washington, 96 F.3d 334 (9th Cir. 1996), cert. denied, 520 U.S. 1168 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Confederated Tribes of the Warm Springs Reservation of Or. v. United States, 177 Ct. Cl. 184, 1966 WL 8893 *13 (Ct. Cl. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,14

Confederated Tribes of the Umatilla Reservation v. United States,   8 Ind. Cl. Comm. 513 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Coos (or Kowes) Bay, Lower Umpqua (or Kalawatset), & Siuslaw Indian Tribes v. United States, 87 Ct. Cl. 143, 1938 WL 4076, *7 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Duwamish Indians v. United States, 79 Ct. Cl. 530 (1934), cert. denied, 295 U.S. 755 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Iowa Tribe of the Iowa Reservation in Kan. & Neb. v. United States, 22 Ind. Cl. Comm. 232 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,13

Johnson and Graham's Lease v. McIntosh, 21 U.S. 543 (1823) . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lummi Tribe of Indians v. United States, 181 Ct. Cl. 753 (1967) . . . . . . . . . . . . . . . . . . . . . . . 13

Montana v. United States, 450 U.S. 544 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Native Village of Eyak v. Trawler Diane Marie, ("Eyak I")154 F.3d 1090 (9th Cir. 1998), cert. denied, 527 U.S. 1003 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Oneida Indian Nation of N.Y. State v. Oneida County, New York, 414 U.S. 661 (1974) . . . . . . 5

Puyallup Tribe of Indians v. United States, 17 Ind. Cl. Comm. 17 (1966) . . . . . . . . . . . . . . . 12

Quanaielt Tribe. v. United States, 7 Ind. Cl. Comm. 1 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . 13

Quapaw Tribe of Indians v. United States, 1 Ind. Comm. Cl. 469 (1951) . . . . . . . . . . . . . 10, 11

FEDERAL CASES                                                                                          PAGE

Skagit Tribe of Indians v. United States, 7 Ind. Cl. Comm. 292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Skokmish Tribe of Indians v. United States, 17 Ind. Cl. Comm. 1 (1966) . . . . . . . . . . . . . . . . 13

Snake or Piute Indians of Former Malheur Reservation in Or. v. United States, 112 F. Supp. 543
(Ct. Cl. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Steilacoom Tribe v. United States, 11 Ind. Cl. Comm. 394 (1962) . . . . . . . . . . . . . . . . . . . . . . 12

Strong v. United States, 518 F.2d 556 (Ct. Cl. 1975), cert. denied, 423 U.S. 1015 (1975) . . . . 13

Swinomish Tribe of Indians v. United States, 26 Ind. Cl. Comm. 371 (1971) . . . . . . . . . . . . . 12

Tlingit & Haida Indians of Alaska v. United States, 177 F. Supp. 452 (Ct. Cl. 1959) . . . . . . . . 9

Tlingit & Haida Indians v. United States, 389 F.2d 778 (Ct. Cl. 1968) . . . . . . . . . . . . . . . . . . . 3

United States v. Alaska, 422 U.S. 184 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

United States v. Alaska, 521 U.S. 1 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. California, 332 U.S. 19 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

United States v. California, 381 U.S. 139 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Pueblo of San Ildefonso, 206 Ct. Cl. 649, 513 F.2d 1383 (Ct. Cl. 1975) . . . . . . 9

United States v. Santa Fe Pac. R. Co., 314 U.S. 339 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Seminole Indians of the State of Fla., 180 Ct.Cl. 375, 1967 WL 8871, *7
(1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Washington, 730 F.2d 1314 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Village of Gambell v. Hodel, 869 F.2d 1273 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176 (9th Cir. 1981) . . . . . . . . . . 10

Zuni Tribe of N.M. v. United States, 12 Cl. Ct. 607 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FEDERAL STATUTES                                              PAGE

16 U.S.C. § 1811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. 1811(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

43 U.S.C. § 1601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

43 U.S.C. § 1603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

43 U.S.C. 1603(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

43 U.S.C. 1332(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

43 U.S.C. § 1332(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pursuant to the Court's Order for Pretrial Proceedings and Final Pretrial Conference (Dkt. 123) ("Pretrial Order"), Defendant, Carlos Gutierrez, Secretary of Commerce, hereby submits this trial brief.

## I.    INTRODUCTION

In this action, Plaintiffs challenge certain regulations of the Department of Commerce relating to fishing for halibut and sablefish (also known as black cod), claiming that the regulations violate their alleged non-exclusive aboriginal hunting and fishing rights to areas of the Exclusive Economic Zone (EEZ)[1/] in the Gulf of Alaska and Lower Cook Inlet.  This Court previously held that Plaintiffs' alleged rights were precluded by federal paramountcy.  Order dated September 25, 2002 (Dkt. 42).  Pursuant to the Ninth Circuit Court of Appeals Order and Mandate, this case was remanded to the Court to decide what aboriginal rights, if any, Plaintiffs may have to fish beyond the three-mile limit.  Order on Remand dated August 16, 2006 (Dkt. 59).  The en banc panel also directed that for purposes of this limited remand, the Court should assume that the Plaintiffs' aboriginal rights, if any, have not been abrogated by the federal paramountcy doctrine or other federal law.  Id.

Pursuant to the Pretrial Order, the Parties submitted a Joint Statement of Issues (Dkt. 134), which included Defendant's Separate Statement of Issues.  The issues of law identified by

---

[1/]    When speaking of fishery resources, as opposed to minerals, it is more accurate to refer to the area beyond the three-mile limit of state jurisdiction as the EEZ, rather than the Outer Continental Shelf ("OCS").  The Outer Continental Shelf Lands Act claims power of disposition over "the subsoil and seabed of the outer Continental Shelf . . .," but makes clear that "the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected . . .."  43 U.S.C. 1332(1) & (2).  The Magnuson Act, in contrast, claims "sovereign rights and exclusive fishery management over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone."  16 U.S.C. 1811(a).

Defendant's Trial Brief                    1

Defendant in the Joint and Separate Statements of Issues are discussed below.[2]/

## II. DEFENDANT'S POSITION AND AUTHORITIES AS TO THE CONTESTED ISSUES OF LAW

### A. Whether, as a Matter of Law, Aboriginal Hunting and Fishing Rights Could Have Been Established by Plaintiffs in the Claimed Areas of the Gulf of Alaska and Lower Cook Inlet.

The Ninth Circuit instructed the Court to assume that Plaintiffs' aboriginal rights, if any, have not been *abrogated* by the federal paramountcy doctrine or other federal law. The Court must determine, in the first instance, whether Plaintiffs could have established any aboriginal rights in the marine waters now comprising the EEZ notwithstanding whether those rights, if any, were subsequently or consequently *abrogated*. Because aboriginal rights are determined pursuant to federal common law, this Court must thus determine whether the federal common law of aboriginal rights permits Plaintiffs to establish aboriginal non-exclusive fishing rights in the claimed areas of the EEZ, and, if so, during what time period(s).

Plaintiffs assert that they have aboriginal rights in areas beyond three miles from shore in the Gulf of Alaska and Lower Cook Inlet based on use and occupancy of such areas in prehistoric and historic periods. Defendant's position is that Plaintiffs' argument is based on a flawed assumption: that use and occupancy of off-shore marine waters – which historically were considered the high seas and not subject to any nation's sovereignty – could form the basis for aboriginal rights under federal law.

---

[2]/    In the Joint Statement of Issues, Defendant noted that the Court had previously ruled on a number of issues and also found that certain other issues were beyond the Ninth Circuit's limited remand. <u>See</u> Joint Statement of Issues at 2-3 & n.1, n.2, 7-8. Defendant expressly reserved those issues for further appellate review and hereby incorporates the Joint Statement of Issues by reference.

Aboriginal rights to the use and occupancy of an area could not have existed in the absence of the exercise and recognition of territorial sovereignty over that area by a nation. Tlingit & Haida Indians v. United States, 389 F.2d 778, 786 (Ct. Cl. 1968) ("Citizens of a sovereign do not possess rights of ownership beyond that which the sovereign itself might own."). Moreover, the use and occupancy of the claimed areas by Plaintiffs could not have given rise to aboriginal rights under *federal law* until the United States acquired sovereignty over Alaska in 1867. At the time the United States purchased Alaska, the concept of territorial sovereignty over ocean areas seaward of the three-mile territorial sea was not established in customary international law.[3] See United States v. California, 332 U.S. 19, 33 (1947). Thus, no aboriginal rights to the claimed areas could arise or be recognized under either federal or international law as it existed in 1867.

In fact, until 1945, the vast majority of coastal nations had claimed, and the United States had only recognized, coastal nation jurisdiction over the "territorial sea" of three or, in some cases, four nautical miles.[4] I. Brownlie, Principles of Public International Law 191-194 (3d ed.

---

[3]    In United States v. Alaska, 422 U.S. 184 (1975), the Supreme Court found that Russia did not exercise sufficient sovereign authority over Lower Cook Inlet prior to its sale of Alaska to the United States for that body of water to be considered a historic bay under international law. In doing so, the Court noted that in 1821, Tsar Alexander I issued a ukase that purported to exclude all foreign vessels from the waters within 100 miles of the Alaska coast. Id. at 190 (citing S. Exec. Doc. No. 106, 50th Cong., 2d Sess., 204-205 (1889). The ukase was subsequently and unequivocally withdrawn in the face of vigorous protests from the United States and England. Id. at 191-92.

[4]    In 1945, the Truman Proclamation claimed for the United States certain sovereign rights over the resources of the continental shelf adjacent to the United States. Exec. Proc. No. 2667, 10 Fed. Reg. 12,303 (Sept. 23, 1945). In 1953, the United States implemented the jurisdiction it had previously asserted over the outer continental shelf (OCS) by enacting the Outer Continental Shelf Lands Act (OCSLA). The OCSLA was expressly not an assumption by the United States of full sovereignty over the OCS or its superjacent waters, but was rather an assertion of limited

Defendant's Trial Brief                    3

1979).

Plaintiffs apparently envision their aboriginal rights as suspended inchoate in the ocean area awaiting the day when the United States claimed sovereignty over the areas now comprising the OCS and EEZ thus somehow bringing their purported aboriginal rights into legal existence. However, this scenario would require their aboriginal rights to have remained in existence as a vestigial remnant of their former sovereignty as unconquered Alaska Native tribes.  This would, of course, be inconsistent with the Alaska Natives' status as diminished sovereigns whose continued existence is subject to federal legislative authority.  Montana v. United States, 450 U.S. 544, 563-564 (1981); Cherokee Nation v. Georgia, 30 U.S. 1, 17 (1831).

Moreover, recognition of aboriginal title in off-shore waters is fundamentally at odds with the common law of aboriginal rights.  Judicial recognition that aboriginal fishing rights could potentially exist in off-shore marine waters – in the absence of a treaty or statute acknowledging such rights – occurred in the Village of Gambell litigation.  In Village of Gambell v. Hodel, the Ninth Circuit found that the federal paramountcy doctrine did not, as a matter of law, bar the assertion of all possible aboriginal claims on the OCS, and it remanded the matter to the district court to determine, *inter alia*, whether the plaintiffs actually possessed such rights.  869 F.2d 1273, 1280 (9th Cir. 1989) ("Gambell III").  To the extent Gambell III extended the theory of aboriginal rights to apply to off-shore marine waters, Defendant respectfully asserts

jurisdiction over the natural resources of the OCS.  43 U.S.C. § 1332(2).  In 1976, the United States claimed jurisdiction over certain living resources within the 200 miles adjacent to the landward boundary of the territorial sea.  See Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1811.  In 1983 President Reagan issued a proclamation declaring a 200-mile Exclusive Economic Zone for the United States.  Proclamation No. 5030, 48 Fed. Reg. 10,605 (March 10, 1983).

that it was incorrectly decided.[5]/

Aboriginal property rights are a creation of and governed by the law of the nation wherein the property is located.  Under the theory of aboriginal title, as first described by Chief Justice Marshall in Johnson v. McIntosh, the European nations whose explorers discovered and established settlements in North America acquired title to the *soil* already occupied by the Indians by the international law principle of "discovery." 21 U.S. 543, 573-575 (1823).  The Europeans' title was, however, subject to the Indians' right of occupancy.  As the Supreme Court explained in Oneida Indian Nation v. County of Oneida:

> although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign -- first the discovering European nation and later the original States and the United States -- a right of occupancy in the Indian tribes was nevertheless recognized.

414 U.S. 661, 667 (1974).

In Johnson v. McIntosh, Justice Marshall acknowledged that application of the discovery doctrine and recognition of aboriginal title under the federal common law was founded upon the adoption of those policies by the United States government:

> As the right of society, to prescribe those rules by which property may be acquired and preserved is not, and cannot be drawn into question; as the title to lands, especially, is and must be admitted to depend entirely on the law of the nation in which they lie; it will be necessary, in pursuing this inquiry, to examine . . . those principles . . . which our own government has adopted in the particular case, and given us as the rule for our decision.

21 U.S. at 572; see also id. at 584 (inquiring whether "the American States rejected or adopted

---

[5]/    The Gambell III court also found that the United States had asserted sufficient federal sovereignty over the OCS to compel recognition of aboriginal rights in the OCS, and that alleged aboriginal rights on areas of the OCS would not have been extinguished by the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. 1603(b).  Defendant respectfully contends that these issues were also incorrectly decided and reserves them for further appellate review.

this principle?").  In <u>United States v. Santa Fe Pac. R. Co.</u>, 314 U.S. 339 (1941) the Supreme Court similarly looked to the established policy of the federal government in deciding whether the lands conveyed to the United States from Mexico, known as the Mexican Cession, were subject to the Walapai tribe's claims of "Indian title."  <u>Id.</u> at 344-45.  Thus, the roots of the federal common law of aboriginal rights spring from the policy of the United States to recognize certain rights in the original occupiers of the lands of the nation.

In contrast to the *lands* of the United States, however, the discovery doctrine did not apply to off-shore waters.  Rather, off-shore waters were considered the "high seas" under both United States and international law, and historically the United States stood for the principle of "freedom of the seas."  <u>United States v. California</u>, 332 U.S. at 34.  Moreover, the federal government, subsequent to extending its jurisdiction and sovereign rights to submerged lands of the OCS and waters of the EEZ, has not adopted any policy of recognizing aboriginal rights in those areas.  In sum, Plaintiffs are trying to extend the federal common law of aboriginal rights, developed to apply to inland areas, to off-shore ocean waters historically part of the high seas.  Such extension is not supported by any established policy or practice of the federal government to recognize aboriginal title or rights in off-shore marine waters.

**B.      Whether, as a Factual Matter, Plaintiffs Can Establish Actual, Exclusive, and Continuous Use and Occupancy of the Claimed Areas for a Long Time.**

In its Order on Motion for Summary Judgment ("SJ Order"), this Court held that aboriginal fishing rights flow from aboriginal title; that to establish aboriginal title, there must be a showing of actual, exclusive and continuous use and occupancy for a long time; and that, therefore, in order to establish aboriginal fishing rights, Plaintiffs must show "actual, exclusive, and continuous use and occupancy" of the claimed areas for a long period of time.  SJ Order at

Defendant's Trial Brief                    6

8-9 (Dkt. 106).  Assuming without conceding that aboriginal rights could have been established in the claimed areas as a matter of law, the Parties agree on the elements that Plaintiffs are required to prove in order to establish aboriginal title and any aboriginal fishing rights that flow from aboriginal title.  See Joint Statement of Issues at 3 (listing issue as "whether Plaintiffs can establish actual, exclusive, and continuous use and occupancy of the claimed areas for a long time").

Defendant will urge at trial that Plaintiffs cannot meet their burden to show sufficient continuous and exclusive use of the claimed areas of the EEZ during any time period to establish aboriginal rights.  In brief, Defendant will contend that:

(a) Plaintiffs cannot show that their ancestors sufficiently used the claimed areas for harvesting natural resources during the relevant time periods to establish aboriginal rights to such areas;

(b) Plaintiffs' ancestors did not exercise exclusive dominion and control over the claimed areas and other persons and entities used such areas;

(c) to the extent Plaintiffs' ancestors did use the claimed areas, they did not comprise a single land-owning entity, nor did they jointly and amicably use such areas; and

(d) Plaintiffs' ancestors' absence from Middleton Island for a significant period evidences that Plaintiffs' ancestors did not continuously use the claimed areas.

### 1.        The Location of Plaintiffs' Claim

Plaintiffs' claim is limited to portions of the EEZ in Lower Cook Inlet and the Gulf of Alaska.  It is undisputed that the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 et seq., extinguished all aboriginal claims within the uplands, inland waters and three-mile territorial sea of Alaska.   43 U.S.C. § 1603.  In order to establish any aboriginal rights beyond the three-mile limit, Plaintiffs must make a requisite showing of use of the EEZ.  Use of the

Defendant's Trial Brief                        7

inland waters and three-mile territorial sea of Alaska establishes no rights to the EEZ.[6]/

At trial, the Court will need to decide the geographic extent of Plaintiffs' aboriginal rights, if any. The boundaries of aboriginal claims must be shown with reasonable accuracy. Confederated Tribes of the Warm Springs Reservation of Or. United States, 177 Ct. Cl. 184, 1966 WL 8893 *13 (Ct. Cl. 1966). Defendant maintains that Plaintiffs cannot establish the boundaries of any claims within the EEZ with reasonable or credible accuracy.

### 2.    The Relevant Time Period

In its SJ Order, the Court noted that "[t]he parties have not addressed the question of when plaintiffs' lost sovereignty of the land in question." SJ Order at 11, n.21. Defendant maintains that Plaintiffs' ancestors at no time exercised sovereignty as a matter of law or fact over the claimed areas. Sovereignty could not have been exercised as a matter of law because sovereignty in off-shore ocean waters was not recognized under international or United States law. Sovereignty as a matter of fact is lacking because Plaintiffs' ancestors did not possess the socio-political structure or the technology to effectively assert exclusive dominion and control over the open waters of the Gulf of Alaska and Lower Cook Inlet, areas encompassing hundreds

---

[6]/     The three-mile territorial sea is measured from the coastline. The coastline is not necessarily the interface between uplands and marine waters. United States v. Alaska, 521 U.S. 1, 8 (1997). Rather, the coastline is drawn from headland to headland of the entrances to "juridical bays" as defined in Article 7 of the Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958 [1964] 15 U.S.T. (Pt. 2) 1607, T.I.A.S. No. 5639. United States v. California, 381 U.S. 139, 161-62 (1965). Prince William Sound in its entirety constitutes a juridical bay. The EEZ begins three miles seaward of the entrances to Prince William Sound. Lower Cook Inlet as a whole does not constitute a juridical bay. See United States v. Alaska, 422 U.S. 184 (1975). However, Kamishak Bay, Kachemak Bay and the numerous smaller bays and fjords of Lower Cook Inlet and the east coast of the Kenai Peninsula are juridical bays. The EEZ begins three miles seaward of the entrances to those bays. Islands, including Middleton Island and the Barren Islands, have their own three-mile territorial sea.

Defendant's Trial Brief                    8

to thousands of square miles.

In addition, Defendant will urge at trial that Russian domination of Plaintiffs' ancestors occurred by the late 1700s, and at least by 1800, and thus the relevant time period to assess Plaintiffs' claims of actual and exclusive use is prior to that time. Even if the Court were to find that the relevant time period extends beyond that date, Plaintiffs could not prove the factual prerequisites to establish that they possess aboriginal rights in the claimed areas.

### 3.     Plaintiffs' Burden to Prove Actual and Continuous Use

The burden of proof is on a party claiming aboriginal rights to establish those rights by a preponderance of the evidence. United States v. Pueblo of San Ildefonso, 206 Ct. Cl. 649, 513 F.2d 1383, 1394 (Ct. Cl. 1975). Aboriginal rights must be shown by "proof of actual use and occupancy from time immemorial." Tlingit & Haida Indians of Alaska v. United States, 177 F. Supp. 452, 460 (Ct. Cl. 1959). Establishment of aboriginal rights "requires a great deal of proof, and the essential evidentiary facts shown by that proof ... should find their way into carefully prepared findings of fact." Snake or Piute Indians of Former Malheur Reservation in Or. v. United States, 112 F. Supp. 543, 552 (Ct. Cl. 1953).

Defendant will contend that Plaintiffs cannot establish sufficient use of the claimed areas during the relevant time period(s). Defendant will also contend that, to the extent Plaintiffs rely on contemporary or recent oral accounts to establish use of the claimed areas, such evidence is legally insufficient in light of other evidence and reasonable inferences to the contrary. Coos (or Kowes) Bay, Lower Umpqua (or Kalawatset), & Siuslaw Indian Tribes v. United States, 87 Ct. Cl. 143, 1938 WL 4076, *7 (1938) ("To establish Indian title to a vast acreage of lands by oral testimony, irrespective of the obstacles of establishing it by any other method, exacts a decree of

Defendant's Trial Brief                    9

proof sufficient to overcome contemporaneous documentary and historical evidence to the contrary.").[7]/

In addition, the Ninth Circuit has stated: "Whether or not an aboriginal right exists would be a question of fact to establish <u>continuous</u> exercise of the right since before pre-treaty times." <u>Wahkiakum Band of Chinook Indians v. Bateman</u>, 655 F.2d 176, 180 n.12 (9th Cir. 1981) (emphasis added); <u>accord</u>, <u>Confederated Tribes of Chehalis Indian Reservation v. Washington</u>, 96 F.3d 334, 341 (9th Cir. 1996), <u>cert. denied</u>, 520 U.S. 1168 (1997). Defendant will urge at trial that Chugach use of the Middleton Island area ceased during a large period of the 20th century, and this fact negates Plaintiffs' claims to continuous use of the areas used for travel to Middleton Island, as well as other areas of the EEZ.

### 4.       Exclusive Use

Defendant will urge at trial that, to the extent Plaintiffs' ancestors used the claimed areas at all, such use was not exclusive. The "key to Indian title lies in evaluating the manner of land-use over a period of time. Physical control or dominion over the land is the dispositive criterion." <u>United States v. Seminole Indians of the State of Fla.</u>, 180 Ct.Cl. 375, 386, 1967 WL 8871, *7 (1967). A tribe alleging aboriginal rights to an area must demonstrate the existence of those rights, even if no other tribe claims aboriginal rights in the area. <u>Quapaw Tribe of Indians v. United States</u>, 1 Ind. Comm. Cl. 469, 488 (1951). The term "exclusive" in this context is

---

[7]/      <u>See</u> <u>also</u> <u>Zuni Tribe of N.M. v. United States</u>, 12 Cl. Ct. 607, 617 n.12 (1987) (oral recounting throughout generations decreases in reliability with each intervening generation); <u>Confederated Tribes of the Warm Springs Reservation of Or.</u>, 177 Ct. Cl. 184, 1966 WL 8893 at *12 ("The importance of corroboration and cross-checking cannot be undervalued since informants can mislead researchers by describing some period (usually the reservation one) besides the aboriginal pre-treaty period.").

defined as "excluding or having the power to exclude, limiting or limited to possession, control,

or use by a single individual or organization, and as applied to use and occupancy of land by

aboriginal Indians involves consideration of the 'land using entity.'"   Confederated Tribes of the

Umatilla Reservation v. United States, 8 Ind. Cl. Comm. 513, 552 (1960).

        Defendant does not dispute that at least some of Plaintiffs' ancestors traveled across

certain limited sections of the EEZ to engage in trade or subsistence activities in other

destinations.  Travel across the EEZ, however, is insufficient to establish aboriginal rights to the

intervening waters of the EEZ.  The courts that have considered the question have held that

travel to a destination is not sufficient by itself to create aboriginal rights.  Caddo Indian Tribe of

Oklahoma v. United States, 4 Ind. Cl. Comm. 214, 218 (1956), review denied, 140 Ct. Cl. 63,

155 F. Supp. 727 (1957) (travel through area on way to yearly buffalo hunts not considered use

and occupancy in Indian manner); see also United States v. Washington, 730 F.2d 1314, 1317

(9th Cir. 1984) (rejecting theory that "usual and accustomed" fishing areas in Makah treaty could

be established by mere travel).  And courts have been especially reluctant to find aboriginal

rights to waterbodies that served for travel by more than one group.  Iowa Tribe of the Iowa

Reservation in Kan. & Neb. v. United States, 22 Ind. Cl. Comm. 232, 313 (1969) (Missouri

River, though traveled by tribe, was not exclusively occupied); Skagit Tribe of Indians v. United

States, 7 Ind. Cl. Comm. 292, 319 (1959) (Deception and Canoe Passes in Puget Sound not

exclusively occupied).  Defendants will establish at trial that, while Plaintiffs' ancestors did

travel across certain limited parts of the claimed areas, they were not the only Alaska Natives to

do so.  Moreover, Plaintiffs' ancestors who traveled across these areas were not part of a single

land-owning entity.

Defendant's Trial Brief                 11

a.    Whether Plaintiffs Were a Single Land-Owning Entity

Where an area is used by a number of entities, each of which is itself a governmental/land owning entity, the exclusive use requirement is not met.  The Parties agree that at issue is whether Plaintiffs' ancestors constituted a single land-owning entity.  See Joint Statement of Issues at 3.

Defendant will urge at trial that during the relevant periods (a) Plaintiffs' ancestors were divided into a number of villages or local subgroups; (b) the political unit of their society, and thus the political land-owning entity, was the village or local subgroup; and (c) the villages or local subgroups had at most exclusive use of areas only in the immediate vicinity of their villages in near-shore areas.  Defendant will further argue that these villages or local subgroups did not combine to form a larger "pan-Chugach" territorial land-owning entity, nor did they possess the political structure or ability to exercise exclusive dominion and control over the claimed areas of the EEZ.

In this respect, Plaintiffs' ancestors  resembled the various tribes of western Washington State.  There the various tribes spoke dialects of the Coast Salish language and showed striking cultural similarities.  See Swinomish Tribe of Indians v. United States, 26 Ind. Cl. Comm. 371, 372-73 (1971; Puyallup Tribe of Indians v. United States, 17 Ind. Cl. Comm. 17, 18 (1966).  The Commission found that the "primary political land holding unit was the village."  Id. at 24; Steilacoom Tribe v. United States, 11 Ind. Cl. Comm. 304, 333 (1962).  In the Western Washington cases, the Indian Claims Commission and Court of Claims consistently found that tribes could establish aboriginal rights to the exclusive use areas in the vicinity of the individual tribes, but not to the general area of Puget Sound used by the Coast Salish as a whole.  See e.g.,

Lummi Tribe of Indians v. United States, 181 Ct. Cl. 753 (1967); Duwamish Indians v. United States, 79 Ct. Cl. 530 (1934), cert. denied, 295 U.S. 755 (1935)[8]/.

### b.    Joint and Amicable Use

The doctrine of "joint and amicable" possession is a narrow exception to the exclusive use requirement, and applies only in rare situations.  Strong v. United States, 518 F.2d 556, 561 (Ct. Cl. 1975), cert. denied, 423 U.S. 1015 (1975).  The fact that a group of Natives are friendly with other groups, or even that they were allies, does not satisfy the "joint and amicable" criteria. Id. at 562; Iowa Tribe of Iowa Reservation in Kan. & Neb., 195 Ct. Cl. at 370.  There is no "joint and amicable" possession where "each tribe had separate lands, [and] there was no community of interest in the lands..."  Strong v. United States, 518 F.2d at 562.

In Iowa Tribe of the Iowa Reservation in Kan. & Neb. v. United States, the Commission explained that "[o]nly in the case of closely integrated tribes or bands has the Commission held that joint tribal entities could hold Indian title to the same territory at the same time (on an exclusive but undivided basis)."  22 Ind. Cl. Comm. 232, 281-82 (1969).  In Confederated Tribes of the Warm Springs Reservation of Or., the court found joint ownership of the Wayapam bands as a group rather than as subtribes after finding not only that the Wayapam were related culturally and linguistically, but also that:

They all had common allegiances, privileges, and duties and all sub-tribe

---

[8]/    See also Skokomish Tribe of Indians v. United States, 17 Ind. Cl. Comm. 1, 24 (1966); Swinomish Tribe of Indians v. United States, 26 Ind. Cl. Comm. 371, 383-83 (1971); Puyallup Tribe of Indians v. United States, 17 Ind. Cl. Comm. 1, 24 (1966); Quanaielt Tribe v. United States, 7 Ind. Cl. Comm. 1, 27 (1958). The Western Washington cases concerned areas within state waters.  They are consistent with cases about lands in other parts of the United States.  See e.g., Iowa Tribe of the Iowa Reservation in Kan. & Neb. v. United States, 22 Ind. Cl. Comm. 232, 281-82 (1969)

Defendant's Trial Brief                13

<u>members had complete freedom in the economic utilization of any part of the
Wayapam territory</u>.

177 Ct. Cl. 184, 1966 WL 8893, *14 (1966) (emphasis added).

Here, Defendants will present evidence showing that the individual Chugach subgroups
had at most separate exclusive use zones near their villages and that conflict between the
subgroups was endemic, thus precluding a finding of joint and amicable use.

      **C.**     **The Nature and Extent of Plaintiffs' Aboriginal Fishing Rights, If Any.**

Plaintiffs cannot establish, and are not claiming, full aboriginal title to the claimed areas.
This Court has held, and the Ninth Circuit affirmed, that Plaintiffs do not have aboriginal title to
any areas within the EEZ/OCS.  <u>Native Village of Eyak v. Trawler Diane Marie</u>, ("<u>Eyak I</u>") 154
F.3d 1090 (9th Cir. 1998), <u>cert. denied</u>, 527 U.S. 1003 (1999).  That decision is *res judicata.*
Moreover, exclusive aboriginal title is outside the scope of the complaint in this action.

If the Court determines that Plaintiffs can establish, as a matter of law, and have proved,
as a factual matter, aboriginal rights in some or all of the claimed areas, then the Court will need
to decide the nature and extent of the non-exclusive fishing rights Plaintiffs have.  <u>See</u> Ninth
Circuit Court of Appeals Order dated July 12, 2004 (Dkt. 57) at 2.

Defendant maintains that Plaintiffs must show aboriginal use of specific species in the
claimed area in order to have aboriginal rights to harvest those species.  The Court has rejected
this argument.  SJ Order at 13.  Defendant will thus not re-brief the issue here.  Nonetheless, in
order to fully preserve this mixed question of law and fact for further review, and in light of
Plaintiffs' challenge to Defendant's halibut and sablefish regulations, Defendant proposes to
offer evidence at trial, and suggests the Court issue findings of fact, concerning whether
Plaintiffs specifically harvested halibut and/or sablefish from the EEZ in the relevant time period

and, if so, the amount and type (e.g., commercial or subsistence) of fishing engaged in for each species.

If the Court finds that Plaintiffs have aboriginal fishing rights in all or parts of the claimed areas, the Court should also determine whether the challenged halibut and sablefish regulations conflict or significantly interfere with such rights.  See Gambell III, 869 F.2d at 1280.  In addition, depending on the nature and extent of aboriginal fishing rights Plaintiffs may have, if any, the Court should assess whether such rights conflict with international law.[9]/

The challenged regulations have been discussed at length in prior pleadings, see e.g., Def.'s Mem. in Supp. of Mot. for Summ. J. on Remand at 5-7, and those discussions are incorporated by reference here.  Should the Court deem these issues to be beyond the scope of the Ninth Circuit's remand, Defendant reserves them for further review.

Finally, the Court has determined that certain issues and arguments are beyond the scope of the Ninth Circuit's limited remand, including arguments or defenses based on federal paramountcy or other federal law.  The Ninth Circuit has not rejected these arguments and defenses, and Defendant expressly reserves them for further appellate review.

RESPECTFULLY SUBMITTED this 18th day of July, 2008.

---

[9]/     Precisely what Plaintiffs would be entitled to if they possess "non-exclusive aboriginal hunting and fishing rights" in the claimed areas is unclear due to the novel nature of Plaintiffs' claims.  Would such a right entitle Plaintiffs to a specific percentage of the harvest of all species in the area?  Would such a right entitle Plaintiffs to fish where-ever and when-ever they desire?  It is thus difficult to determine whether such rights would conflict with international law or the United States' treaty obligations (such as under the Convention between the United States and Canada for the Preservation of Halibut in the North Pacific, Mar. 2, 1953, 5 U.S.T. 5, T.I.A.S. No. 2900).

RONALD J. TENPAS
Assistant Attorney General

  /s/ Brian McLachlan
BRIAN MCLACHLAN (D.C.
472413)
U.S. Department of Justice
Environment & Natural Resources
Division
c/o United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Tel: (206) 553-4148
Fax: (206) 553-4067
brian.mclachlan@usdoj.gov

BEVERLY F. LI (WSBA # 33267)
U.S. Department of Justice
Environment & Natural Resources
Division
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: 202-353-9213
Facsimile: 202-305-0506
beverly.li@usdoj.gov

JOSEPH H. KIM (IL 6243249)
United States Department of Justice
Environment & Natural Resources
Division
P.O. Box 7369
Washington, DC 20044-7369
Telephone: 202-305-0207
Facsimile: 202-305-0275
joseph.kim@usdoj.gov

DEAN K. DUNSMORE
U.S. Department of Justice
Environment & Natural Resources
Division
801 B Street, Suite 504
Anchorage, AK 99501-3657
Telephone: (907) 271-5452
Facsimile:(907) 271-5827

dean.dunsmore@usdoj.gov

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 18, 2008, the foregoing Joint Statement of Issues  was served on the following counsel of record via the Court's ECF system as more fully reflected on the Notice of Electronic Filing:

Goriune Dudukgian
gdudukgian@alsc-law.org

Natalie Landreth
landreth@narf.org

Richard de Bodo
rdebodo@hhlaw.com

/s/ Brian McLachlan
Brian McLachlan
Counsel for Defendant

Defendant's Trial Brief                    18