Natalie Landreth
NATIVE AMERICAN RIGHTS FUND
801 B Street, Suite 401
Anchorage, Alaska 99501
Phone: (907) 276-0680
Facsimile: (907) 276-2466
Email: landreth@narf.org

Goriune Dudukgian
ALASKA LEGAL SERVICES CORPORATION
1016 West 6th Ave., Suite 200
Anchorage, Alaska 99501
Phone: (907) 222-4524
Facsimile: (907) 279-7417

Rich de Bodo
HOGAN & HARTSON LLP
1999 Avenue of the Stars Suite 1400
Los Angeles, California 90067
Phone: (907) 310-785-4694
Facsimile: (907) 785-4601

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| NATIVE VILLAGE OF EYAK *et. al*,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>CARLOS GUTIERREZ, SECRETARY OF COMMERCE<br><br>　　　　　Defendant. | Case No. A98-365-CV (HRH)<br><br>**PLAINTIFFS' TRIAL BRIEF** |

## I.　PRELIMINARY STATEMENT

　　　　This case is about preserving the Chugach culture and way of life. For thousands of years, from prehistoric times on, the Chugach and their forefathers have fished and hunted in the Lower Cook Inlet including in areas far from shore. The five village Plaintiffs now ask this

Court to affirm their aboriginal hunting and fishing rights in the Gulf of Alaska and Lower Cook Inlet that they and their ancestors have traditionally used, and continue to use.

This suit began after the Defendant issued fishing regulations under the Magnuson-Stevens Act that ignored the Act's explicit mandate not to "affect or change" the fishing rights of Native Americans whether in a treaty or otherwise. S. Rep. No. 94-416 at 692 (1975). The Act also directed the agency to take into account "historical tribal dependence on the fishery." Instead of following this Congressional directive, the Defendant disregarded the Chugach dependence on the fishery for the previous thousand years or more and arbitrarily limited individual fishing quota permits (IFQs) only to those who had caught sablefish and halibut in the designated areas during the years 1988-1991. Because the Exxon Valdez oil spill occurred in 1989 and destroyed the fisheries in the area, most Chugach people could not get a boat or crew during this time (nor would anyone eat the fish that came out of the polluted waters) and as a result landed few Chugach people caught sufficient fish to qualify. Almost overnight, the Chugach found themselves shut out of the very fishery on which they had depended since time immemorial. Faced with no other choice, they turned to this Court to ask that their rights be recognized and protected like hundreds of Tribes before them and that they be allowed access to hunt and fish in an area that has now been allocated almost entirely to others. However, Plaintiffs have asked for less than that to which they are entitled under the law-- namely, *non-exclusive* aboriginal rights, so that they do not exclude others. Instead, Plaintiffs simply ask this Court to allow them *access* to their traditional hunting and fishing grounds.

As the Court knows, Plaintiffs' struggle to preserve their rights has already reached the Ninth Circuit and now returns to this Court on remand. The Ninth Circuit has focused the issues for this Court to decide: it has requested this Court to determine "what aboriginal rights, if any, the villages have." *Eyak Native Village v. Daley*, 375 F.3d 1218, 1219 (9th Cir. 2004).[2] This Court was directed to assume that Plaintiffs' aboriginal rights have not been abrogated by federal paramountcy "or any other federal law." The Ninth Circuit asked this Court to make factual findings, and not simply legal rulings that the Circuit could itself have made. While the task that lies before the Court is unique, the legal standards that govern it are fairly simple and straightforward. As explained below, the determination of aboriginal rights is a question of fact -- one that should be evaluated according to a liberal standard of proof.

## II. PLAINTIFFS CAN ESTABLISH ABORIGINAL FISHING RIGHTS THROUGH A PREPONDERANCE OF EVIDENCE SHOWING LONG-TERM USE AND OCCUPANCY OF THE CLAIMED AREAS.

The doctrine of aboriginal rights is rooted in longstanding "concerns of humanity and policy," which properly recognize that U.S. sovereignty is subject to the right of native peoples to continue their traditional way of life in lands they have used and occupied since time immemorial. *Village of Gambell v. Hodel*, 869 F.2d 1273, 1277 (9th Cir. 1989) (*Gambell III*).

---

[2] To the extent Defendant may seek to argue that Plaintiffs' aboriginal rights have been abrogated by federal paramountcy or other federal law, that Plaintiffs should be required to establish aboriginal use on a species-by-species basis, or that Plaintiffs' rights are limited to subsistence use, these issues all plainly lie outside the scope of the remand. Indeed, this Court previously instructed the parties not to brief the first argument, expressly rejected the second, and declined to consider the third because it "is not within the scope of the Ninth Circuit's limited remand." *See* Order of December 1, 2006 ("Order") at 7, 13. Should the Court wish to reconsider its position on any of these issues, Plaintiffs request permission to address them in a separate briefing.

[5] The Court previously posed the question of "when plaintiffs lost sovereignty of the land in question," presumably for purposes of determining whether Plaintiffs can show use for "a 'long period of time' prior to the loss of the land." Order at 11 & n.21. Plaintiffs, however, maintain that a date of "loss" is fundamentally inapplicable to this case. Determining a date of loss in cases of aboriginal title has been necessary only inasmuch as the courts needed a date from which to calculate the compensation owed for the loss of the use of their land, based on the values of the land at the time it was lost. Here, by contrast, Plaintiffs are not seeking any such monetary compensation, having never lost their use of the claimed OCS waters, but are merely seeking a declaration affirming their rights to go on using the waters to the full extent to which they are entitled by right.

"[H]umanity demands, and a wise policy requires, that the rights of the conquered to property should remain unimpaired." *Id.* (quoting *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 586 (1823)). In fact, the United States government established the Indian Claims Commission specifically to handle aboriginal claims and "deal fairly and justly with Indian groups" for over 30 years. *Snake or Paiute Indians v. United States,* 125 Ct. Cl. 241, 260, 112 F.Supp. 543 (Ct Cl. 1953).

This Court knows from previous briefs the basis for aboriginal rights. The "doctrine of discovery" provides that while Indian Nations were sovereigns in their own right with their own lands and laws, a "discovering" European nation necessarily had the sole right to acquire title from the Indian Tribe. *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). The "rights of the original inhabitants were, in no instance, entirely disregarded," however, and the "discoverer" took title to the territory "subject only to the Indian right of occupancy." *Id.* This ancient doctrine is the basis for the claim before this Court: when the United States entered what would later be called Alaska and the waters of the Gulf of Alaska and the Lower Cook Inlet, it necessarily claimed a territory that was and is subject to the Indian right of occupancy. The scope of that right is the subject of this case.

As discussed in greater detail herein, aboriginal rights are established demonstrating, by a preponderance of the evidence, long-term exclusive use and occupancy of the claimed lands. *See Snake or Piute Indians of Former Malheur Reservation v. United States*, 112 F. Supp. 543, 551 (Ct. Cl. 1953) ("[T]he issue is whether appellant exclusively used and occupied in the Indian manner, to the exclusion of all other tribes or bands, the land in question or some definite part of it."). Plaintiffs can and will make such showing at trial. Because respect for aboriginal rights

under law is based on a "concerns of humanity," courts have always examined such claims under a liberal standard.

> A. **Aboriginal Title Cases Are Governed by a Liberal Standard of Proof That Permits Reliance on a Broad Range of Evidence**

In more than 200 cases over the past two centuries, the Indian Claims Commission and federal courts have developed standards of proof and evidence for determining aboriginal rights, which are distinct from those applied in other kinds of civil cases. The existence of aboriginal rights is a question of fact and must be shown by a preponderance of evidence. *Quapaw Tribe of Indians v. U.S.*, 1 Ind. Cl. Comm. 469, 481 (1950). Further, courts have consistently acknowledged the difficulty of making an adequate showing of facts that date back to prehistoric and pre-modern times—and, as a consequence, have acknowledged the practical necessity of taking a "liberal approach…in weighing the limited evidence" that is usually available. *Nooksack Tribe of Indians v. United States*, 3 Ind. Cl. Comm. 492, 499 (1955). Consistent with this understanding, while aboriginal rights require a showing of "actual occupancy of definable territory," it is *not* required that the boundary lines be defined with surveyor-like precision. Rather, "some general boundary lines of the occupied territory must be shown," along with proof that the territory was occupied to the exclusion of others, consistent with the Indian standards and customs. *Quapaw Tribe of Indians v. U.S.*, 1 Ind. Cl. Comm. 469, 481 (1951); *see also Tlingit and Haida Indians of Alaska v. United States*, 177 F. Supp. 452, 460 (Ct. Cl. 1959) ("where the Indians have proved that they used and occupied a definable area of land, the barren, inaccessible, or useless areas encompassed within such overall tract and controlled and dominated by the owners of that surrounding land…have not been eliminated from the area of total ownership"). Plaintiffs have delineated such boundaries, and have shown and will show ample evidence of actual, exclusive use and occupancy of the territory within them.

More generally, it is well established that a very broad range of evidence in support of use and occupancy may be admitted and considered in adjudicating claims of aboriginal title. Typically such evidence includes, but is not limited to, testimony of expert witnesses in the fields of ethnology and anthropology; contemporary historical accounts by traders and explorers, even if vague or imprecise; oral testimony of natives descended from members of the tribe or group "who had actual knowledge of the land claimed by the tribe, which knowledge had been passed on by word of mouth"; and other materials and documents that may shed light on the state of aboriginal rights. *See Confederated Tribes of the Warm Springs Reservation v. United States*, 177 Ct. Cl. 184, 1966 WL 8893, *8-13 (Ct. Cl. 1966); *see also Snake or Paiute*, 112 F. Supp. at 552 (noting that "the ultimate fact of beneficial ownership by exclusive possession and occupancy can only be inferred and found from many separate events and a variety of documentary material"). In particular, testimony of elders "is entitled to some weight…particularly when it is corroborated by documents and the testimony of others." *Id.* at *12. Plaintiffs have marshaled a substantial amount of evidence in all these categories and will present it at trial; the critical instruction to be taken here is that the evidence is not viewed through a narrow lens.

**B.     The Crucial Element of Long-Term Use and Occupancy Is Control Over the Claimed Areas**

There is no rigid legal definition of the type of activities that go to establish use and occupancy. The inquiry must necessarily be adapted to the particular cultural mores and habits of the group claiming title. *See Sac and Fox Tribe of Indians v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967) (defining "use and occupancy" as "use and occupancy in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers"). Thus, proof of aboriginal rights in this case must be measured against the evidence of the specific Chugach

way of life, their landholding (and waterholding) patterns and way of life. Moreover, the "key to Indian title lies in evaluating the manner of land-use over a period of time," and thus physical control or dominion over the land, not ownership, permanent residence, or population density, is "the dispositive criterion." *United States v. Seminole Indians of the State of Florida*, 180 Ct. Cl. 375, 1967 WL 8871, *6 (Ct. Cl. 1967). In the *Seminole* case for example, use and occupancy was found sufficient to sustain a claim of title where the evidence showed that the Seminoles had traveled all over the Florida peninsula as part of a nomadic hunting lifestyle. *See id.* at *6-7. In the same spirit, the courts have repeatedly held that aboriginal rights can extend over "seasonal or hunting areas over which the Indians had control even though those areas were used only intermittently." *Warm Springs*, 1966 WL 8893 at *5; *see also Spokane Tribe of Indians v. United States*, 163 Ct. Cl. 58, 1963 WL 8583, *5 (Ct. Cl. 1963) ("intermittent or seasonal use has been accepted as showing Indian title"); *Delaware Tribe of Indians v. United States*, 128 F. Supp. 391, 395 (Ct. Cl. 1955) (rejecting argument that certain outlet was "only a passageway or road" where Delawares had no rights, noting that they could hunt, fish, gather, and otherwise use this outlet and that these uses were "the only things [Indians] have done on lands for which they have obtained compensation in numerous cases").

     Under this standard, plaintiffs' evidence of the opportunistic hunting and fishing lifestyle of the Chugach and their forebears – including their seasonal fishing patterns, their capacity for and practice of traveling long distances over open water and fishing as they traveled, and their operation of a trade economy – bears directly on whether they can establish use and occupancy of the claimed areas in the Gulf of Alaska and Lower Cook Inlet. *See Tlingit*, 177 F. Supp. at 456-57 (describing the Tlingit and Haida Indians' use of claimed lands and waters). Plaintiffs do *not* need to prove that the Chugach or their ancestors resided continuously or built permanent

settlements in these areas, but rather that they used the areas according to a seasonal pattern as part of their traditional way of life, and to the exclusion of others except by Chugach permission.

As for what constitutes "long-term" use and occupancy, the law is clear that while the length of time required is not fixed, aboriginal title may be established in no more than a few decades of use and occupancy. *See, e.g., Strong v. United States*, 518 F.2d 556, 565 (Ct. Cl. 1975) (aboriginal title established through use and occupation for 39 years); *Seminole*, 1967 WL 8871 at *7 (50 years occupancy would be "sufficient, as a matter of law, to satisfy 'the long time' requirement essential for Indian title"). The long-term requirement originally arose out of the concern that the aboriginal rights doctrine should not serve to enrich Native groups who had subjugated territories only *recently* prior to the accession of the U.S., at the expense of other Native groups who had previously used and occupied those territories for substantial periods of time:

> The status of aboriginal ownership is not accorded to tribes at the very instant they first dominate a particular territory but only after exclusive use and occupancy 'for a long time.' … Justice would not be vindicated if a tribe were able to [assert a claim] on the ground that it was unfairly deprived by the Government of its original ownership of property, where the lands were but recently seized by conquest from another tribe. The rights of aboriginal title must have time to take root, transforming a conquered province into domestic territory. The Claims Commission Act, which seeks to repair damages caused by United States conquest of Indian lands, should not be turned into an engine for creating aboriginal title in a tribe which itself played the role of conqueror but a few years before.

*Sac and Fox Tribe of Indians of Oklahoma v. United States*, 315 F.2d 896, 905 (Ct. Cl. 1963). No such considerations, however, are applicable here. Plaintiffs will demonstrate at trial that the Chugach have used and occupied the relevant areas for thousands of years, and at a minimum, they exclusively used and occupied such waters at the time of Russian incursion, and accordingly have never abandoned their homelands or waters.

Finally, notwithstanding any contrary suggestion that may be raised by Defendant, the "long time" requirement does *not* require the Chugach to have used and occupied every inch of the claimed areas in the same manner and to the same degree from time immemorial to the present. *See Wichita Indian Tribe v. United States*, 696 F.2d 1378, 1381 (Fed. Cir. 1983) (noting that "the tribe will hold title to a general area which is defined by a somewhat shifting pattern of occupancy within the general area"). To the extent that Defendant may suggest that the Chugach abandoned their rights during an alleged "gap" in their travel to Middleton Island, such a gap, even if proven, would not erase Plaintiffs' showing of long-term use and occupancy in the claimed area. *See* Order at 11 (noting "the court is not convinced that such a hiatus would be fatal to plaintiffs' claim of aboriginal fishing rights" and that "[t]he fact that plaintiffs stopped using Middleton Island for a period of 50 to 60 years does not necessarily mean that they have not shown use for a 'long period of time'").[5] On the contrary, once aboriginal rights are established or take root, they do not disappear unless there is an express Congressional extinguishment of these rights. *U.S. v. Santa Fe Pac. R.R.*, 314 U.S. 339, 359-361 (1942). Moreover, an express Congressional extinguishment is easily spotted, such as the one set forth in the Alaska Native Claims Settlement Act:

> All aboriginal titles, if any, and claims arising out of aboriginal title in Alaska based on use and occupancy . . . and including any aboriginal hunting and fishing rights that may exist, are hereby extinguished.

43 U.S.C. § 1603. It is obvious that there is no such extinguishment here, merely a poorly worded and flawed regulation that failed to take into account the aboriginal fishing rights of the Tribes that depended on the fishery.

    **C.**     **The Exclusivity Requirement is Met Where A Group Connected by Linguistic and Cultural Ties Joins in Common Use and Occupation of a Definable Area of Land or Water**

To establish aboriginal rights Plaintiffs must show a level of dominion over the claimed areas by the Chugach. The rule of exclusivity is to be "reasonably applied," and is generally defined as "excluding or having the power to exclude, limiting or limited to possession, control, or use by a single individual or organization." *Confed. Tribes of the Umatilla Indian Reservation v. United States*, 8 Ind. Cl. Comm. 513, 552 (1960). This does not equate to a requirement that the Chugach exercise some kind of border patrol (although they will demonstrate that they did have a similar type of organization), only that they had *the power to exclude* others. As a threshold matter, with certain rare exceptions, aboriginal rights are asserted by a "land-owning entity." *See id.*; *see also Hualapai Tribe v. United States*, 18 Ind. Cl. Comm. 382, 394 (1967). However, the definition of a single land-owning entity is quite broad, and hinges not on the political structure of the claimant but on its culture and use of the claimed land. By no means does a single land holding entity have to be a single Tribe.

### 1. A "land-owning entity" may be comprised of separate sub-units or groups as long as they maintain a larger group identity.

A single land-owning entity is defined mainly by cultural continuity and common use and control of a designated area. "If a group of village entities speak the same dialect, move about more or less together in search of subsistence and retain a hold on the same general area of land for their homes, then...they should be considered an entity capable of prosecuting a claim and establishing their right thereto as a group." *Warm Springs*, 1966 WL 8893 at *14 n.21 (quoting *Lummi Tribe v. United States*, 5 Ind. Cl. Comm. 525, 546). Political cohesiveness or centralization, on the other hand, is *not* a necessary element of such an entity:

> [T]here have been few instances of a clear-cut, politically unified, tribal land using entity. ... I[n general, wherever we have found a group of Indians that possess some unifying linguistic and cultural ties and have joined in a common use and occupation of a definable area of land," we have found that such a land owning entity possessed Indian title. In such cases the most material factor has been the unity of land use and

occupation—the collective use by the entire group of the entire area. The political unity of the bands or identifiable group may be very weak—indeed it may be virtually nonexistent—provided, however, there is a unity in the land use and occupation.

*Hualapai Tribe*, 18 Ind. Cl. Comm. at 394; *see also Muckleshoot Tribe of Indians ex rel. Ross v. United States*, 3 Ind. Cl. Comm. 659, 675 ("To prevent recovery for all the lands claimed to be used collectively…there must be *substantial evidence* that the various…bands not only did not constitute a single political unit, but also that they were not an identifiable group or tribe in the ethnic or cultural sense.") (emphasis added). The law could not be clearer on this point: the decisive factors for finding a single land-owning entity are (1) *sociocultural*, not political, unity, and (2) shared use and occupation of a particular area. Plaintiffs will show that they meet these criteria by proffering extensive evidence that the Chugach villages are and have been intimately connected by kinship ties, are united as region under ANCSA, and share a common language, culture, and society, and that since time immemorial they have joined together to hunt and fish over the claimed waters.

Further, the courts have explicitly found aboriginal title even where the claimant was comprised of individual communities that controlled certain areas adjacent or specific to them, on the ground that they all shared and used areas that were understood to be common to the larger entity. For example, in *Muckleshoot Tribe of Indians ex rel. Ross v. United States*, 3 Ind. Cl. Comm. 659, the court noted that there were three "separate, distinct, and autonomous" aboriginal villages in the Muckleshoot territory but rejected the argument that the villages could not bring one unified action for aboriginal title. The court further found that while each village had the "exclusive use (in the sense that members of other villages could use same only with the permission of the permanent occupants thereof) of their village settlement area...outlying territories such as berry picking and root gathering spots or fishing waters were used in common

by the occupants of all the villages" and hence met the test for establishing aboriginal rights. *Id.* at 675. The Indian Claims Commission explained in detail that what was important was not necessarily the makeup of the entity, but how they used their territory together:

> There have been a great number of cases before this Commission in which complex issues have been raised concerning the identity of the tribe or group which actually comprised the land owning entity. *Actually there have been few instances of clear-cut, politically unified, tribal land using entity.* Often land use areas have been utilized by tribelets, or bands, or other autonomous small groupings or villages. But this Commission has tried to apply a common sense approach to each individual case. Where various groups of Indians joined together to collectively use and occupy in Indian fashion an area of land, we have found such land using entity to have established Indian title to the tract so used. *We have not used the argument of separate autonomous villages or groups to defeat a claim based on Indian title.* Of course each case must be considered and decided on its own particular facts. But, in general, whenever we have found an overall group of Indians, possessing some unifying linguistic and cultural ties and where such Indians joined in a common use and occupation of a definable area of land, we have found that such a land owning entity possessed Indian title.

*Hualapai Tribe v. United States,* 18 Ind. Cl. Comm'n. at 394 (1967) (emphasis added). Thus, who can hold aboriginal rights is not a simple "one tribe" rule with a joint use exception, but rather one general definition of "land owning entity." *See also Nooksack*, 3 Ind. Cl. Comm. at 494 (while "ancestors of claimant Indians may have existed as separate villages which were largely autonomous in a political sense...throughout their aboriginal existence there appears to have been ties of kinship, a common culture and dialect...different from that of neighboring village groups, and with the individual Indians of one village being free to utilize the lands within the area occupied by all the Nooksack villages."). The legal concept of a single land-owning entity thus plainly contemplates the type of ownership pattern in which villages linked by familial, cultural and linguistic ties exercise some control over separate areas but also use and occupy areas in common.

Even if the Chugach did not constitute a single land-holding entity, but were instead separate groups entirely, they would still hold aboriginal rights through the doctrine of joint use. Because the single land-holding entity is so broadly interpreted, Courts have not often looked to joint use, but when they have, they have held that two or more groups may occupy an area "in joint and amicable possession without destroying the 'exclusive' nature of their use and

occupancy, and without defeating Indian title." *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1394; *see also Warm Springs*, 1966 WL 8893 at *5 n.6. In the former case, the federal court clearly set forth that even two different Tribes or "entities" could hold the same territory:

> [t]here are no holdings of this court which say that two Indian tribes or groups, each a separate 'entity' and *each with its own separate lands,* can never assert joint ownership to other lands which are commonly used and occupied.

*San Ildefonso* at 1395. Thus, even if the Court were to find that the Chugach were separate groups in some sense (that is not a single land holding entity), they would still hold the same territories under the doctrine of joint use.

### 2. Permissive use by others also does not defeat exclusivity.

The case law uniformly acknowledges that the claimant Chugach may grant *permission* to outsiders to travel over or use its territory without relinquishing title to those areas:

> A tribe's exclusive use and occupancy of a territory is not affected by its permitting other tribes...to use the area, as distinguished from using it in common with such other tribes...Nor will use by other Indians defeat title where such use was made with acknowledgment that the land was the exclusive home of the plaintiffs.

*Iowa Tribe of the Iowa Reservation v. United States*, 22 Ind. Cl. Comm. 232, 278-79 (1969). Thus, evidence of use by other groups should not be assumed to defeat exclusivity without due consideration of whether such use was permissive. In *Wichita Indian Tribe v. United States*, 696 F.2d 1378 (Fed. Cir. 1983), the trial judge ruled that the Wichitas did not have exclusive use of certain Oklahoma hunting grounds based on a finding that two other tribes were mutual users of those grounds. The Court of Claims, however, reversed, observing that "[i]f the Comanches and the Kiowas entered Wichita territory mainly to trade with them and considered this land to be that of the Wichitas, these visiting tribes should be considered guests of the Wichitas, and their presence would not affect the Wichitas' aboriginal title." *Id.* at 1385; *see also Strong*, 518 F.2d at 565 (finding Delaware presence "overwhelmingly predominant" and "[t]hose incidents of use

and occupancy by other Indians...as permissive or as so sporadic as not to be inconsistent with Delaware use and occupancy"); *Spokane Tribe*, 1963 WL 8583 at *6 (holding that expert's conclusion that area was used in common failed to "adequately consider whether...use by other Indians was by permission and at the sufferance of the Spokanes or as a matter of right"); *Confed. Tribes of the Colville Reservation v. United States*, 4 Ind. Cl. Comm. 187, 195-96 (1956) (finding that "[t]he evidence justifies determining that use of fishing sites...by other tribes was in the capacity of visitors").  As Plaintiffs will prove at trial, the historical evidence amply demonstrates that the Chugach defended their territories so strongly that even the Russians had to secure permission to travel or hunt in their traditional areas of use, and that any other uses by others were with the permission of the Chugach.

### III.   CONCLUSION

Claims for aboriginal rights involve, among other things, many pieces of evidence in the form of books, articles, ethnographic and archaeological reports, anthropologist reports, original documents, first hand accounts, and recollections of elders and such claims cover an extraordinary period of time.  In this respect, they are unlike any other case that courts consider and they are viewed through a more tolerant lens; the standard to prove them is different because the core issues to be proven are different.  Here the Chugach have set forth those standards and the measuring stick against which their own history is to be judged.  For that is in essence what this case is about: it is a trial of a people's history, to determine who they are, where they came from and how they lived.  They are asking that this Court recognize and protect that history and way of life and find that the Chugach have non-exclusive aboriginal rights to hunt and fish in the areas upon which they have depended for generations.

DATED this 18th day of July 2008.

                    <u>s/nlandreth</u>

                    Natalie A. Landreth (Bar no. 0405020)
                    NATIVE AMERICAN RIGHTS FUND
                    801 B Street, Suite 401
                    Anchorage, Alaska 99501
                    Phone: (907) 276-0680
                    Facsimile: (907) 276-2466
                    Email: landreth@narf.org

**CERTIFICATE OF SERVICE**

I, Natalie Landreth, certify that a true and correct copy of Plaintiffs' Trial Brief was served on July 18, 2008 pursuant to the Court's electronic filing procedures upon the following:

Dean Dunsmore     dean.dunsmore@usdoj.gov, lorraine.carter@usdoj.gov

Beverly F. Li     beverly.li@usdoj.gov, efile_nrs.enrd@usdoj.gov

Brian McLachlan     brian.mclachlan@usdoj.gov


                                                  s/nlandreth