Tracy Buck
June 11, 2008

Page 8

1    testify as to each of these 14 topics?

2        A     Yes, I do.

3                MR. KIM:  I'm going to interject

4    just for the record, the defendant has lodged a

5    series of written objections to the 30(b)(6)

6    notice.  We're also going forward subject to

7    those objections.

8                MR. DUDUKGIAN:  Just so I'm clear,

9    are you going to be making -- I'm assuming you're

10    going to continue to make objections on the

11    record to any specific questions that are asked;

12    is that correct?

13                MR. KIM:  That's correct.

14        Q     (BY MR. DUDUKGIAN)  Okay.  Ma'am, can

15    you tell me what you did to prepare for this

16    deposition today?

17        A     In order to prepare for the deposition,

18    I reviewed the Complaint.  I reviewed the Notice

19    for Rule 30(b)(6).  I reviewed the defense

20    briefings and exhibits and the defense expert

21    reports.  I also reviewed another appeal brief on

22    an unrelated case, and I have a copy with me.

23        Q     What unrelated case was the appeal brief

24    on?

25        A     It was actually the Native Village of

Tracy Buck
June 11, 2008

Page 9

1   Eyak against the Department of Commerce, and I
2   reviewed it specifically related to the
3   definition of sovereignty.
4       Q    So, first of all, let me ask:  Do you
5   have any legal training?
6       A    No.
7       Q    Can you give me a basic outline of your
8   education following high school?
9       A    I have a Bachelor of Arts degree from
10  the University of Alaska Southeast and a master's
11  degree in organizational management from the
12  University of Phoenix.
13      Q    What year was your MS?
14      A    It's been several years.  2003.
15      Q    Do you remember what year your BA was?
16      A    1992, I believe.
17      Q    Now, you mentioned that you reviewed
18  some pleadings or appellate briefs in Eyak versus
19  Department of Commerce, and I'm trying to
20  understand.  There's been two Eyak cases that are
21  related to this, Eyak 1 and Eyak 2.
22           Was this briefing in one of those
23  two cases or a third case that I'm not aware of?
24      A    You know, I'm not sure.  I was provided
25  a copy specifically for the purpose of the

Tracy Buck
June 11, 2008

Page 10

```
 1   definition of sovereignty, and I'm not sure which
 2   case it came from.
 3       Q     But you said you have a copy of it?
 4       A     I do have a copy of it.
 5       Q     And who provided it to you?
 6       A     Demian Schane with the Department of
 7   Commerce.
 8       Q     If I could just look at the caption of
 9   it.
10       A     Sure.
11             MR. KIM:  Off the record.
12             (Break taken.)
13       Q     (BY MR. DUDUKGIAN)  Based on your review
14   of the brief that you mentioned, what is the
15   Department of Commerce's position on the
16   definition of sovereignty?
17       A     My understanding based on my review of
18   that brief is that the definition of sovereignty
19   is control of an area and -- for purposes of the
20   nation.
21       Q     I'm sorry.  You said control of an area
22   for purposes --
23       A     Of that nation.  It has control.  I
24   think the term used was total control for
25   statehood or something of that nature.
```

Tracy Buck
June 11, 2008

Page 11

1     Q    Okay.  You said you reviewed some expert

2  reports.  Do you recall which expert reports you

3  reviewed?

4     A    There were several of them.  I'm not

5  sure if I can remember all of them.  There was --

6  and I'm not sure if I can get the first name.

7  There was Wilkins, Brian Wooley, Michael

8  Yarborough, Steve Langdon.  There was a

9  Mr. Wilkins, Robin Engles, Mr. Knoll.  There may

10  have been others.  Those are the ones I can

11  remember.

12     Q    Some of these individuals that you

13  identified have provided several reports through

14  the years.  This case has been going for quite a

15  few years.  Do you know if you reviewed all of

16  their reports or just some?

17     A    I believe I reviewed the most recent

18  reports that they did.  They may have been filed

19  in 2008.  I also reviewed some from Michael and

20  Linda Yarborough that were included in earlier --

21  included as exhibits with the response to the

22  Ninth Circuit remand, I believe.

23     Q    Okay.  So let me see if I can get an

24  accurate list.

25              You reviewed the 2008 reports from

Tracy Buck
June 11, 2008

Page 12

1    the defendant's experts, correct?

2        A      Correct.

3        Q      And as far as pre-2008 reports, you

4    reviewed reports from Michael Yarborough and

5    Linda Yarborough that were attached to some

6    briefing?

7        A      Correct.

8        Q      Do you know -- do you recall reviewing

9    any other pre-2008 expert reports for your

10   deposition?

11       A      I may have done so if they were included

12   as exhibits, but I can't remember specifically.

13       Q      Included as exhibits with what?

14       A      With the briefings for the Department of

15   Commerce.

16       Q      Okay.  Did you have an opportunity to

17   review any of the plaintiffs' expert reports?

18       A      I did not.

19       Q      Did you personally speak with any of the

20   experts you identified?

21       A      I did not.

22       Q      You said you had a chance to review

23   exhibits.  Do you mean exhibits to a previous

24   briefing?

25       A      Yes, exhibits to previous briefings.

Tracy Buck
June 11, 2008

Page 13

1    Q    Do you recall which briefings you looked

2  at?

3    A    They -- I believe one was the response

4  to remand and one was the response to the

5  plaintiffs' -- I can't remember the specific

6  name.  The plaintiffs dis -- the plaintiffs

7  responded to the initial response of the

8  Department of Commerce, and I reviewed the

9  Department of Commerce's response to the

10  plaintiffs' request to -- that the court not

11  honor a summary judgment, I believe.

12    Q    Okay.  Is it correct to say that you

13  only reviewed the defendant's briefings in this

14  case?

15    A    Yes, that's correct.

16    Q    And is it correct to say that you only

17  reviewed briefings since the remand from the

18  Ninth Circuit?

19    A    That's correct.

20    Q    How much time would you say you have

21  spent in reviewing materials in preparing for

22  this deposition?

23    A    I have spent three full days and a

24  partial day.

25    Q    When did you begin preparing?

Tracy Buck
June 11, 2008

Page 14

1      A      On Friday afternoon.

2      Q      Do you have any idea why you were
3  selected as the Department's designee in this
4  case?

5      A      My understanding is that the Department
6  of Commerce attorneys requested -- sent out a
7  notice around the Department looking for someone
8  who had knowledge in these areas, and they got no
9  response.  I have -- I work in an area that I
10  have knowledge of commercial fishing permits in
11  these areas, the Pacific halibut and sablefish
12  IFQ program as well as the halibut subsistence
13  registration program, so they asked me if I would
14  be willing to do the deposition.

15      Q      Which, I guess, reminds me, I don't
16  think I ever asked you what exactly a permit
17  specialist does.

18      A      Well, the Restricted Access Management
19  Program is responsible for issuing the commercial
20  fishing permits for federal waters off Alaska.
21  My specific role in there is to supervise the
22  staff that actually reviews applications and
23  issues the permits.

24      Q      How big is that staff?

25      A      I currently supervise seven people.

Tracy Buck
June 11, 2008

Page 15

1    Q    And as far as the Alaska region, what
2  species are regulated by the Department?
3    A    Halibut, sablefish, rockfish, Pacific
4  cod, pollock and various other ground fish,
5  Bering Sea Aleutian Islands crab, Tanner and
6  king.  There are -- there may be others that I
7  haven't included.  There's scallops, I believe.
8    Q    Is salmon regulated by the federal
9  government in federal waters?
10   A    Regulation of salmon has been delegated
11  to the State.
12   Q    And for all of these species, does the
13  federal government currently have an IFQ program,
14  or is that just for certain species?
15   A    Only for certain species.
16   Q    And that would definitely include
17  halibut and sablefish?
18   A    Correct.
19   Q    And have you worked on the halibut and
20  sablefish fisheries?
21   A    I was initially hired to review the
22  applications for that program on its
23  implementation in 1994.
24   Q    Which program is that?
25   A    The halibut/sablefish IFQ program.

Tracy Buck
June 11, 2008

Page 16

1    Q    Okay.  So there's just one program for
2  both species?

3    A    It's called one program.

4    Q    Okay.  That's just an internal moniker
5  for the program?

6    A    The regulations were drafted at the same
7  time, but it is an internal moniker.

8    Q    But as far as commercial fishermen,
9  there are two different permits involved,
10  correct?

11    A    There are two different permits,
12  correct.

13    Q    You said you reviewed the Complaint.
14  There have been several iterations of this case,
15  as we've discussed.  Do you know which Complaint
16  you reviewed?

17    A    I am not sure, no.

18    Q    Did you review the defendant's Answer?

19    A    I did not review the defendant's Answer.

20    Q    And you also mentioned the 30(b)(6)
21  notice that I handed you a copy of.

22        Besides the documents that we've
23  discussed, did you review any other documents in
24  preparing for this deposition?

25    A    No, I did not.

Tracy Buck
June 11, 2008

Page 25

1    of Eyak, Native Village of Tatitlek, Native

2    Village of Chenega, Native Village of Nanwalek

3    and Native Village of Port Graham.  And unless I

4    say otherwise, you can assume when I talk about

5    the plaintiffs that I'm talking about the five

6    villages collectively.

7        A     All right.

8        Q     What is the Secretary of Commerce's

9    position on whether the plaintiff villages have

10   any aboriginal rights in the federal waters

11   depicted on NOAA map 16013?

12             MR. KIM:  Objection; calls for a

13   legal conclusion.

14       Q     (BY MR. DUDUKGIAN)  You may answer,

15   ma'am.

16       A     My understanding based on the defendant

17   briefs that I read is that the Department of

18   Commerce's opinion is the plaintiffs have no

19   aboriginal rights in those waters.

20       Q     And for purposes of my next question,

21   I'm going to break it down by each individual

22   plaintiff village.

23             What is the Department of

24   Commerce's position on whether the Native Village

25   of Eyak has any aboriginal rights in the federal

Tracy Buck
June 11, 2008

Page 26

1    waters in map 16013?

2                    MR. KIM:  Objection; calls for

3    legal conclusion.

4        A      Based on my understanding of the

5    materials that I reviewed, the defendant briefs

6    in particular, the Department of Commerce's

7    opinion is the Native Village -- I'm sorry -- was

8    it Eyak?

9        Q      (BY MR. DUDUKGIAN)  Eyak.

10       A      -- has no aboriginal rights in the

11   federal waters identified on the chart.

12       Q      And what is that position which -- what

13   facts is that position based on?

14       A      That position is based on -- this is

15   based on my understanding of the materials that I

16   reviewed.  That is based on the fact that the

17   Native Village of Eyak did not have exclusive

18   control of those waters, did not exclusively use

19   or control those waters.

20       Q      Are there any other facts on which the

21   Secretary of Commerce bases its position that the

22   Native Village of Eyak has no aboriginal rights

23   in federal waters?

24       A      It is my understanding that the

25   Department is also basing that opinion based on

Tracy Buck
June 11, 2008

Page 27

1    my reading of the briefings, on the federal law

2    of paramountcy, and additionally based on the

3    Alaska Native Claims Settlement Act which

4    abolished all aboriginal rights in the waters

5    zero to three miles.

6        Q    Are there any other facts on which the

7    Secretary of Commerce is basing its position that

8    the Native Village of Eyak has no aboriginal

9    rights in federal waters?

10       A    Not that I recall.

11       Q    What documents support the Secretary of

12   Commerce's position that the Native Village of

13   Eyak does not have aboriginal rights in federal

14   waters?

15       A    I don't -- I don't know the answer to

16   that.

17       Q    And why is it that you don't know the

18   answer to that question?

19       A    I am just unaware of the -- other than

20   the documents that I have reviewed, I am unaware

21   of the documents that may exist to support that

22   opinion.

23       Q    Okay.  Well, let's talk about the

24   documents that you did review.

25            Of the ones that you reviewed,

Tracy Buck
June 11, 2008

Page 28

1    which documents support the assertion that --

2    support the position that the Native Village of

3    Eyak has no aboriginal rights in federal waters?

4         A     I would refer to the plaintiffs'

5    briefings that cite the actual legal cases that

6    support the Department of Commerce position.  I

7    would cite to various expert reports.  I believe

8    Michael Yarborough, in particular, who has stated

9    in the reports that there was no evidence of the

10   Native Village of Eyak having exclusive control

11   or use of those waters for an extended period of

12   time.

13        Q     So do you recall specifically which

14   pages of the Yarborough report support the

15   position that the Native Village of Eyak does not

16   have aboriginal rights on federal waters?

17        A     I don't recall specific pages, no.

18        Q     Do you recall specific examples or facts

19   from the Michael Yarborough report that support

20   the Secretary's position with respect to Eyak?

21        A     I recall based on my review of his

22   report and other expert reports, and I can't

23   remember which ones, that other entities or other

24   Alaska Native tribes such as Aleuts, De'nainas,

25   Eyaks -- I'm sorry, that was included in there --

Tracy Buck
June 11, 2008

Page 29

1    Tlingits also used those waters.

2        Q      Do you recall other passages from the

3    Michael Yarborough report that support the

4    Secretary of Commerce's position vis-a-vis the

5    Native Village of Eyak?

6        A      I can't recall specific passages, no.

7        Q      Do you recall specific passages from any

8    of the other expert reports that support the

9    Secretary of Commerce's position vis-a-vis Eyak?

10       A      I can't recall specifically, no.

11       Q      Let's shift now and talk about the

12   Native Village of Tatitlek.

13              What is the Secretary of Commerce's

14   position on whether the Native Village of

15   Tatitlek possesses aboriginal rights in the

16   federal waters on map No. 16013?

17              MR. KIM:   Objection; calls for

18   legal conclusion.

19       A      Based on my review of the briefings, the

20   defense briefings and the expert reports in this

21   area, my understanding is the Department of

22   Commerce's position is that the Native Village of

23   Tatitlek does not have aboriginal rights in the

24   waters.

25       Q      (BY MR. DUDUKGIAN)   And please state for

Tracy Buck
June 11, 2008

Page 31

```
 1      A      My testimony was the Department's
 2  opinion was the Native Village of Tatitlek did
 3  not have exclusive use or control of those waters
 4  for an extended period of time.
 5      Q      Okay.  What I want to ask you is,
 6  there's various components to that statement.
 7  There's the exclusive, the control, the use and
 8  the extended period of time.
 9              Which of those components of your
10  statement is lacking for Tatitlek?
11      A      My understanding based on the
12  information that I reviewed in preparation for
13  this deposition is that all of those components
14  are missing.
15      Q      And is that the same for Eyak, which we
16  discussed a few minutes ago?
17      A      Yes.
18      Q      Let's go back to Eyak, because I think I
19  misunderstood what you said with respect to Eyak.
20              So we talked about the exclusivity
21  of Eyak's use of the waters, and you talked about
22  passages from the Michael Yarborough report that
23  other Native groups were using the same waters.
24              Can you tell me all facts that
25  support the Secretary of Commerce's position that
```

Tracy Buck
June 11, 2008

Page 32

1    Eyak did not use the federal waters depicted on
2    map 16013?
3        A      I thought I already answered that
4    question.  I guess I don't understand what you're
5    asking.
6        Q      Well, let me back up.  When we were
7    talking about Tatitlek, you had a statement that
8    Tatitlek did not -- let me just read it so that I
9    can accurately say it -- that Tatitlek did not
10   have exclusive control or use of the waters, the
11   federal waters for an extended period of time.  I
12   said, which of the components of that statement
13   were lacking, and you said all of them.
14              You also said that all of the
15   components were lacking for the Native Village of
16   Eyak.
17              In our earlier conversations I
18   talked to you about what you were basing the
19   Department's position on the lack of exclusivity
20   in the federal waters.  So now I want to shift
21   from the exclusive nature of the use to just use
22   in general.
23              You're saying -- your testimony is
24   that the Secretary of Commerce's position is that
25   the Native Village of Eyak did not use the

Tracy Buck
June 11, 2008

1    federal waters depicted on map 16013, correct?

2        A       I don't recall my exact words.  What I

3    meant to say was they did not have exclusive use

4    and control of those areas over an extended

5    period of time.

6        Q       Okay.  So the key component being

7    exclusive.

8        A       Exclusive.

9        Q       Is that the key component for the Native

10   Village of Tatitlek?

11       A       Yes, it is.

12       Q       Now, can you tell me all documents that

13   support the Secretary of Commerce's position that

14   Tatitlek did not have exclusive control or use of

15   the OCS waters?

16       A       I would refer back to the defendant's

17   briefings, as well as the expert reports.  I

18   would refer to the same expert report of Michael

19   Yarborough for my response to that.

20       Q       Is there anything additional that you

21   would refer to for Tatitlek that we didn't

22   discuss about Eyak?

23       A       I don't believe so.

24       Q       Let's talk now about Chenega.

25               What is the Secretary of Commerce's

Tracy Buck
June 11, 2008

Page 34

1    position of whether the Native Village of Chenega

2    possesses aboriginal rights in federal waters on

3    map 16013?

4                    MR. KIM:   Objection; calls for

5    legal conclusion.

6       A     Based on my understanding and review of

7    the Department of Commerce pleadings and exhibits

8    and expert reports, the opinion of the Department

9    of Commerce is that the Native Village of Chenega

10   has no aboriginal rights in the waters on map

11   16013.

12      Q     For the record, do they have aboriginal

13   rights on waters that might not be on this map?

14      A     No, they do not.

15      Q     Okay.  Please tell me all facts that

16   support the Secretary of Commerce's position that

17   the Native Village of Chenega does not possess

18   aboriginal rights on the federal waters on map

19   16013.

20      A     My understanding of the documents that I

21   reviewed, the defendant's briefings, the expert

22   reports are that the Native Village of Chenega

23   did not have exclusive use and control of those

24   waters for an extended period of time, that the

25   federal law of paramountcy applies to those

Tracy Buck
June 11, 2008

Page 35

1    waters, and that under the Alaska Native Claims

2    Settlement Act any aboriginal rights in the

3    waters from zero to three miles were

4    extinguished.

5        Q     Are there any other facts that support

6    the Secretary of Commerce's position with respect

7    to Chenega?

8        A     Not that I am aware of.

9        Q     With respect to the first statement

10   about the exclusive use and control of the waters

11   for an extended period of time, is exclusivity

12   the key component once again?

13       A     Yes, it is.

14       Q     Are any of the other components of that

15   statement lacking with respect to Chenega?

16       A     All of them are.

17       Q     Okay.  Well, I guess I'm kind of getting

18   confused here.

19             Are all of them lacking for all

20   three villages that we've talked about so far?

21       A     My testimony is that in regard to all

22   three villages they did not have exclusive use

23   and control of the waters in question for an

24   extended period of time.

25       Q     Okay.  Just so I'm clear, and maybe I

Tracy Buck
June 11, 2008

Page 75

1    the Tlingits and Koniags from traveling through

2    those waters?

3                    MR. KIM:  Objection; form,

4    compound.

5        Q     (BY MR. DUDUKGIAN)  Let me rephrase the

6    question.

7                    Is it the Secretary of Commerce's

8    position that while the plaintiff villages may

9    have hunted and fished on the waters in map 16013

10   that they lack aboriginal rights because they did

11   not prevent other aboriginal groups from

12   traveling through the same waters?

13                   MR. KIM:  Same objection.

14       A     It's my understanding based on the

15   defense briefs that I have read and the expert

16   reports and exhibits that the Department of

17   Commerce position is plaintiffs did not have

18   aboriginal rights in the waters on map 16013.

19       Q     (BY MR. DUDUKGIAN)  That's the one.

20       A     Because they did not have exclusive use

21   and control of those waters for an extended

22   period of time.

23       Q     Which is what we've talked about

24   earlier.  I just want to make sure I understand

25   what you mean by "they did not have exclusive

Tracy Buck
June 11, 2008

Page 76

1   use."

2              They did not have exclusive use

3   because while they may have used the waters for

4   hunting and fishing, they did not prevent other

5   groups from accessing the same waters.  Is that a

6   fair characterization of your testimony?

7       A     Based on my understanding of the

8   information that I reviewed, they -- the

9   plaintiffs were not the sole users of those

10  waters.

11      Q     Okay.  One other thing before we jump

12  back into Port Graham.  Can you tell me during

13  precontact times only and this is, you know, with

14  respect to all plaintiff villages, all specific

15  incidents of use -- when I say "you," the

16  Secretary of Commerce or Department of Commerce

17  is aware of by non-Chugach groups in relevant

18  federal waters on map 16013?

19      A     It's my understanding based on the

20  defendant briefings and expert reports and

21  exhibits that the waters on map 16013 were used

22  by groups other than the plaintiffs for trade,

23  travel and warfare in particular.

24      Q     So I guess what I'm asking is:  Are you

25  aware of any specific incidents from the material

Tracy Buck
June 11, 2008

Page 77

1   that you reviewed or just in general of

2   non-Chugach groups traveling through the relevant

3   waters to trade?

4        A     I don't recall.

5        Q     So you're not aware of any specific

6   instance?

7        A     No, I'm not.

8        Q     When you say "travel," are you aware of

9   any specific instances before contact that a

10  non-Chugach group would have traveled through

11  relevant waters on map 16013?

12       A     It's my understanding based on documents

13  that I reviewed for this deposition that the

14  Tlingits may have traveled to Middleton Island to

15  give birth to their shamans and to collect eggs.

16       Q     And that would have been precontact?

17       A     My recollection of the materials that I

18  reviewed is it would have been precontact.

19       Q     What other specific instances of travel

20  by non-Chugach groups is the Secretary of

21  Commerce aware of during precontact times?

22       A     I can't recall any other specific

23  instances.

24       Q     Precontact, are you aware of any

25  specific instances of warfare between the Chugach