Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3
 4    EYAK, et al.,                  )
                                     )
 5              Plaintiffs,          )
                                     )
 6    vs.                            )
                                     )
 7    CARLOS GUTIERREZ,              )
      SECRETARY OF COMMERCE,         )
 8                                   )
                Defendant.           )
 9    _____) CASE NO. A98-365-CV(HRH)
10
11
12    _____
13                       DEPOSITION OF
                    MICHAEL R. YARBOROUGH
14    _____
15                      May 23, 2008
                         9:30 a.m.
16
17
                         Taken at:
18             Native American Rights Fund
                  420 L Street, Suite 505
19                   Anchorage, Alaska
20
21
22
23
24    Reported by:  Sandra M. Mierop, CRR, CCP, CBC
25
```

Michael R. Yarborough
May 23, 2008

Page 2

1          A P P E A R A N C E S
2
   FOR THE PLAINTIFFS:
3
   ALASKA LEGAL SERVICES CORPORATION
4  1016 West 6th Avenue, Suite 200
   Anchorage, Alaska  99501
5
   By: Goriune Dudukgian
6
7  FOR THE DEFENDANT:
8  U.S. DEPARTMENT OF JUSTICE
   Environment and Natural Resources Division
9  U.S. Attorney's Office
   700 Stewart Street, Room 5220
10 Seattle, Washington  98101
11 By: Brian A. McLachlan
12
13 Also present:
14 Kathleen Doherty
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          INDEX TO DEPOSITION
2  MICHAEL R. YARBOROUGH          MAY 23, 2008
3          EXAMINATION
                    PAGE
4
   BY MR. DUDUKGIAN                4
5  BY MR. McLACHLAN               221
   BY MR. DUDUKGIAN               225
6
          EXHIBITS
7
   NUMBER      DESCRIPTION    FIRST REFERENCE
8                  PAGE, LINE
9  1   CV Michael R. Yarborough    9, 24
10 2   Expert Report, Yarborough  180, 7
11 3   Supplement Expert Report   196, 2
       Yarborough
12
   4   Declaration, Yarborough   201, 15
13
   5   Second Declaration,       211, 19
14     Yarborough
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          MICHAEL R. YARBOROUGH
2  having been duly sworn, testified as follows:
3          EXAMINATION
4     Q.   (BY MR. DUDUKGIAN)  Sir, can you please
5  state your name and business address for the
6  record?
7     A.   My name is Michael Yarborough,
8  Y-a-r-b-o-r-o-u-g-h; and my business address is
9  3504 East 67th Avenue, Anchorage  99507.
10    Q.   And I know you've done depositions
11 before; I've read one of your deposition
12 transcripts.  That's how I know.  But I'd like to
13 go over some of the basic ground rules with you,
14 if I could.
15         I'm going to be asking you a series
16 of questions that you need to answer under oath
17 as if you were testifying in court.  The court
18 reporter will be transcribing my questions and
19 your answers.  It's important that all of your
20 answers need to be audible.  "Uh-huhs" and
21 "huh-uhs" will not do.  You understand?
22    A.   Yes.
23    Q.   Because the transcript is being
24 prepared, it's important that only one of us
25 speak at a time.  I'm going to do my best not to

Page 5

1  interrupt you.  If you can do the same for me,
2  I'd appreciate it.
3     A.   Yes.
4     Q.   I'm going to ask you some questions.  I
5  want to tell you that I know very little about
6  anthropology or archeology.  If you don't
7  understand my questions, please let me know and
8  I'll rephrase it as many times as it takes.
9     A.   Okay.
10    Q.   If you answer one of my questions, I'm
11 going to assume that you understood it, okay?
12    A.   Yes.
13    Q.   If at any point during the deposition
14 you want to change one of your earlier answers or
15 you realize maybe you didn't understand my
16 question, let me know and we can go back to it.
17         If ever you need a break for any
18 reason, even if we had one five minutes ago,
19 please let me know and we'll take a break anytime
20 you want to, okay?
21    A.   I will.
22    Q.   Can you think of any reasons why you
23 might not be able to testify truthfully today?
24    A.   No.
25    Q.   Are you physically feeling okay?

2 (Pages 2 to 5)

EXHIBIT  2
Page  2  of  58

Michael R. Yarborough
May 23, 2008

Page 6

1    A.    Yes.
2    Q.    You seemed a little hesitant --
3    A.    I woke up with a headache, but other
4    than that, I'm fine.
5    Q.    And you don't think your headache's
6    going to interfere with your ability to testify
7    today?
8    A.    No; but if it does, I'll let you know.
9    Q.    Okay.  Thank you.  Are you under the
10   influence of any nonprescription medication
11   today?
12   A.    No.
13   Q.    Prescription medication?
14   A.    No.
15   Q.    Okay.  With that, I think I've covered
16   the basic ground rules.  And I want to start by
17   asking you a little bit about your CV.  You've
18   submitted several throughout the years.  This
19   case has been going on for a long time.  But I
20   believe that I have the most recent one with me.
21   And I might have left my copies, but if you need
22   to look at it, we can go off record, and I can go
23   get copies.  But I just had some questions about
24   it.  And, again, if you need to actually look at
25   it, let me know.

Page 7

1              So it looks like you got your
2    bachelor's degree in anthropology, correct?
3    A.    Yes.
4    Q.    I know little about anthropology.  Can
5    you give me a basic definition of what
6    anthropology is?
7    A.    Anthropology is the study of human
8    culture, human past and, basically, physical
9    anthropology, human -- basically, human
10   physiology.  Basically, anthropology is the study
11   of man.
12   Q.    And this might be a very basic question,
13   but how would you distinguish it from just
14   history?  Like, if you had a degree in history,
15   how would that be different than a degree in
16   anthropology?
17   A.    History revolves around written records,
18   recorded history.  Anthropology is, as I said,
19   the study of humans, human behavior, human
20   physical structure.  Human culture.
21   Q.    Okay.  Were there any particular areas
22   within the field of anthropology that you studied
23   for your bachelor's degree?
24   A.    My bachelor's degree was a generalized
25   degree in anthropology.

Page 8

1    Q.    So, am I correct in assuming there is no
2    point of emphasis for that degree?
3    A.    I specialized a bit -- more in
4    archeology, but, as I said, my degree is in
5    anthropology, so we -- we studied all three of
6    the major areas.
7    Q.    Can you tell me what those three areas
8    are?
9    A.    Cultural anthropology, physical
10   anthropology and archeology.
11   Q.    Can you give me a basic explanation of
12   what cultural anthropology is?
13   A.    Cultural anthropology is the study of
14   culture, learned, shared behavior.
15   Q.    Physical anthropology?
16   A.    Physical anthropology deals with,
17   basically, the human body, both paleontology,
18   study of human development, and also modern human
19   physiology.
20   Q.    And archeology?
21   A.    Study of past culture.
22   Q.    So, I guess I might have been confused
23   about this, but anthropology, in general, can be
24   a study of current or past cultures; is that
25   correct?

Page 9

1    A.    Yes.
2    Q.    Anthropology is limited to a study of
3    past cultures?
4    A.    No.  I think --
5    Q.    Okay.
6    A.    I think you misstated your question.
7              Anthropology --
8    Q.    Archeology -- sorry, yeah.  So,
9    anthropology is the study of culture, and
10   archeology is the study of -- did I say
11   archeology?  Archeology is the study of past
12   culture?
13   A.    Anthropology is the broader field.
14   Archeology is a subdivision of that field that
15   specializes in the study of the past.  But,
16   again, they're all part of the same broader
17   discipline.
18   Q.    Okay.  And your master's degree, that's
19   specifically in archeology, correct?
20   A.    No, anthropology.
21         MR. DUDUKGIAN:  Can we go off
22   record for a second?
23         (Discussion off the record.)
24         (Yarborough Exhibit No. 1 marked.)
25   Q.    (BY MR. DUDUKGIAN) Sir, the court

3 (Pages 6 to 9)

EXHIBIT  2
Page  3  of  58

Michael R. Yarborough
May 23, 2008

Page 10

1  reporter just marked this document as Exhibit 1.
2  Do you recognize it?
3      A.   Yes.
4      Q.   Is it a copy of your current CV?
5      A.   Yes.
6      Q.   And perhaps you can clear up some
7  confusion, but at least on your CV it says that
8  your master of arts degree is in archeology?
9      A.   My master's degree is in archeology with
10  a -- anthropology with a specialty in archeology.
11  The diploma on my wall says "M. A. Anthropology."
12  That's not totally correct, but it's correct.
13      Q.   That's why I wanted to ask you the
14  question.  You got your bachelor's in '72 and
15  '73.  So was it one academic year of study to get
16  your master's degree then?
17      A.   Yes.
18      Q.   And I think you testified that your
19  specialization for your master's degree was in
20  archeology.  Did you take any general
21  anthropology courses to get your master's degree?
22      A.   Yes.
23      Q.   And do you recall what those general
24  anthropology courses were in?
25      A.   I took a year-long class in human

Page 11

1  osteology, which is physical anthropology.  I
2  took a class in ethno history, which is a -- I
3  guess they call that a subdivision of cultural
4  anthropology.  I think those are the two that
5  come to mind immediately.
6      Q.   Okay.  And do you know how many courses
7  in archeology you needed to take for your degree?
8      A.   I can't remember specifically.
9      Q.   Okay.  And was there an area within
10  archeology, the field of archeology that you
11  specialized in for your degree?
12      A.   I went to Toronto to study Arctic
13  archeology.
14      Q.   And does that include the Arctic regions
15  throughout the planet, or just Canada and North
16  America?  Or can you explain a little bit about
17  what Arctic archeology means?
18      A.   Canada and North America.
19      Q.   Did you have to write a thesis to get
20  your master's degree?
21      A.   No.
22      Q.   And then it says on your CV that you did
23  do some coursework to get -- towards a Ph.D.
24  degree.  Do you have a Ph.D.?
25      A.   No.

Page 12

1      Q.   And what kinds of coursework did you
2  take for the Ph.D. degree?
3      A.   It was a continuation of the master's
4  program, additional courses in archeology.  I
5  took a year of Russian.  Took a class in
6  geomorphology.
7      Q.   In your coursework for Ph.D., did you
8  take any general anthropology classes?
9      A.   No.
10      Q.   Besides the institutions listed on your
11  CV which are the University of Arkansas and the
12  University of Toronto, have you attended any
13  other institutions, whether graduate or
14  undergraduate, ever in your life?
15      A.   I've taken occasional classes over at
16  UAA.
17      Q.   Okay.
18      A.   Just for personal interest.
19      Q.   And am I correct in assuming that those
20  classes were not towards the obtaining of any
21  degree?  Just for your personal edification?
22      A.   Yes.
23      Q.   And do you have any other degrees other
24  than the ones listed on your CV?
25      A.   No.

Page 13

1      Q.   Do you have any other employment since
2  you got your master's degree?  Have you worked
3  for any period of time for any other employers
4  other than the ones listed on your CV?
5      A.   I worked for about three months at a
6  radio station in Kodiak in 1976.
7      Q.   Really?
8      A.   That was --
9      Q.   Were you a DJ?
10      A.   I was news director.
11      Q.   Oh, news director.  Have you -- I see on
12  your CV there is -- you taught anthropology at
13  the Kodiak Community College?
14      A.   Yes.
15      Q.   It looks like for one semester?
16      A.   Yes.
17      Q.   Besides that position, have you had any
18  other teaching experience?
19      A.   No.
20      Q.   On your CV there's a list of one, two,
21  three, four publications, and also six papers
22  that you presented at professional meetings.
23  Besides the four published papers, are there any
24  other published papers that you are aware of that
25  you have been credited as an author?

4 (Pages 10 to 13)

EXHIBIT  2
Page  4  of  58

Michael R. Yarborough
May 23, 2008

Page 14

1    A.   No. I don't think so.
2    Q.   And are the papers presented a complete
3    list of the papers you've presented at
4    professional meetings?
5    A.   Yes. Through the last one in 2008.
6    Q.   Have you ever been terminated from any
7    job for any reason?
8    A.   No.
9    Q.   Do you hold any -- currently hold any
10   professional licenses?
11   A.   No.
12   Q.   Have you ever held any professional
13   licenses?
14   A.   I had an FCC license to work at the
15   radio station, but --
16   Q.   Okay. Other than that, can you think of
17   anything else?
18   A.   No.
19   Q.   Do you have any memberships in any
20   associations or societies on -- and I don't even
21   know if there are any associations or societies
22   in your field. First of all, are there?
23   A.   Yes.
24   Q.   Are you a member of any of the
25   associations or societies?

Page 15

1    A.   I'm a member of the Alaska
2    Anthropological Society, Canadian Archeological
3    Association, the Society for Historic Archeology,
4    and the Society for American Archeology. I think
5    that covers it.
6    Q.   In what areas would you consider
7    yourself to be an expert?
8         MR. McLACHLAN: Objection. Vague.
9         MR. DUDUKGIAN: Okay. Let me
10   rephrase the question.
11   Q.   (BY MR. DUDUKGIAN) First of all, sir,
12   did you understand that question?
13   A.   Not entirely.
14   Q.   Okay. I will rephrase, then.
15        Do you consider yourself to be an
16   expert in anthropology?
17        MR. McLACHLAN: Objection.
18   Q.   (BY MR. DUDUKGIAN) You can answer it,
19   sir.
20   A.   An expert?
21   Q.   Well, let me back up for a second. Can
22   you define for me what you understand by the term
23   "expert"?
24   A.   No.
25   Q.   Do you understand that you've been

Page 16

1    retained as an expert witness in this case?
2    A.   Yes.
3    Q.   And what do you understand to be the --
4    the scope of your retention as an expert witness
5    in this case?
6    A.   It's my understanding that I was
7    retained to give expert testimony on the material
8    facts in this case from my perspective as an
9    Alaskan archeologist.
10   Q.   And what would you consider to be expert
11   testimony? I guess -- I'm trying to get on the
12   same page as you as to the use of the word
13   "expert."
14        So, what would you consider to be
15   expert? You said you were hired to provide
16   expert testimony. Can you explain to me what you
17   mean by that?
18   A.   My professional opinion, best
19   professional opinion.
20   Q.   And in what fields do you believe you're
21   qualified to give, quote, unquote, expert
22   testimony?
23   A.   From my perspective as an Alaskan
24   archaeologist.
25   Q.   Would it be correct to say that you

Page 17

1    believe you are qualified to provide expert
2    testimony on archeology involving the five
3    Plaintiff villages in this case?
4         MR. McLACHLAN: Objection. Vague.
5    Q.   (BY MR. DUDUKGIAN) You can answer it.
6    A.   Yes.
7    Q.   Do you believe that you are qualified to
8    provide expert testimony on anthropology -- the
9    anthropology of the five Plaintiff villages in
10   this case?
11        MR. McLACHLAN: Objection. Vague.
12   Q.   (BY MR. DUDUKGIAN) You can answer it.
13   A.   As far as archeology is a subdivision of
14   anthropology, yes.
15   Q.   Earlier when I was talking to you about
16   the subparts of anthropology, you also mentioned
17   cultural anthropology and physical anthropology.
18   Do you believe yourself to be qualified to
19   provide expert testimony on the cultural
20   anthropology of the five Plaintiff villages in
21   this case?
22   A.   No.
23        MR. McLACHLAN: Objection. I
24   wanted to get an objection in there.
25        Objection. Vague.

5 (Pages 14 to 17)

EXHIBIT  2
Page  5  of  58

Michael R. Yarborough
May 23, 2008

Page 18

1          MR. DUDUKGIAN:  It's not -- noted.
2     Q.   (BY MR. DUDUKGIAN) Do you, sir, consider
3   yourself to be qualified to provide expert
4   testimony on the physical anthropology of the
5   five Plaintiff villages in this case?
6          MR. McLACHLAN:  Objection.  Vague.
7     A.   No.
8     Q.   (BY MR. DUDUKGIAN) Besides being
9   qualified to provide expert testimony on the
10   archeology of the five Plaintiff villages in this
11   case, are there any other fields or areas where
12   you believe yourself qualified to provide expert
13   testimony?
14          MR. McLACHLAN:  Objection.  Vague.
15     A.   As an archeologist, I used a lot of
16   different areas of expertise to bring to bear on
17   my conclusions as an archeologist.
18     Q.   (BY MR. DUDUKGIAN) And can you list for
19   me all of these different areas of expertise?
20     A.   I could not.  Let me just say that in my
21   profession as an archeological consultant, I deal
22   with everything from 9-, 10,000-year-old
23   archeology sites up through World War II and Cold
24   War period sites.  So, the types of expertise
25   that I bring to bear in formulating my reports

Page 19

1   and my conclusions really vary depending on what,
2   where I'm dealing with.
3     Q.   Well, sir, in your various expert
4   reports you've provided opinions on a lot of
5   different areas that -- to use your -- to use
6   your words, a lot of areas of expertise that bear
7   on the topic; and I want to come up with a list.
8   And if it's not exclusive, at least you can start
9   with what you can think of.  You said the word "a
10   lot of areas of expertise," and I kind of want to
11   get a list started at least of these different
12   areas of expertise that you have as an
13   archeologist.  So, if you can, just start naming
14   for me these different areas.
15     A.   Specific to this case?  Or shall I be --
16     Q.   Let's start with generally.
17     A.   Okay.  Generally.  I use archeological
18   data.
19     Q.   Okay.  What else?
20     A.   I use information from physics for
21   radiocarbon dating.  We use ground-penetrating
22   radar.  I draw upon soil science.  A lot of
23   aspects from biology.  Climate change.
24   Tectonics, volcanism.  I use a lot of historic
25   resources.

Page 20

1          I draw upon ethnographic
2   information that's been collected in the past,
3   like, Frederica de Laguna and Kaj Birket-Smith.
4          For some of the studies we do of
5   historic buildings, I draw upon architects.  I've
6   worked with human osteologists for our skeletal
7   remains.  I've spent a lot of time working with
8   World War II records, DEW line site information,
9   archives.  And that's what immediately comes to
10   mind.  I'm sure there's some things I'm leaving
11   out.
12     Q.   Well, if you remember anything
13   throughout the course of the day, let me know.
14          And I do want to follow up on some
15   of the things you identified.  For example, you
16   said you consult historic resources.  Can you
17   give me some examples of historic resources that
18   you consult?
19     A.   Generally?
20     Q.   Yes.
21     A.   In my work?
22     Q.   Yes.
23     A.   I've looked at everything from both
24   primary and secondary sources on the Russian
25   period, early American period, archival

Page 21

1   materials, historic photographs, explorers'
2   journals, Alaska Commercial Company records,
3   company records.  Pretty much the why -- and also
4   published summaries, secondary sources.
5   Public -- published sources of information.  Some
6   of them more recent; some of them older.
7     Q.   So, let me see if I understand what
8   you're telling me.  If I'm wrong in any respect,
9   you let me know.
10          You identified a lot of different
11   areas that you have to consult or take into
12   account in formulating your opinions in
13   conducting your research as an archeologist.
14   You've mentioned historic resources, ethnographic
15   resources, tectonics, climate change, various
16   other things.  And my question to you is:  In
17   each of these various fields that you have to
18   consult, do you consider yourself an expert
19   qualified to provide expert testimony in any of
20   those fields?
21          MR. McLACHLAN:  Objection.  Vague.
22     A.   My expertise is in taking all the
23   diverse sources of information that I and pretty
24   much any archeologist draw upon, and evaluating
25   the information and using it, basically, to

6 (Pages 18 to 21)

EXHIBIT  2
Page  6  of  58

Michael R. Yarborough
May 23, 2008

Page 22

1 formulate my conclusions.  I would not say that
2 I'm an expert in radiocarbon dating, but I
3 certainly know how to use the technique.
4     Q.    Okay.  Just to give an example, you
5 mention that you, as an archeologist, consult
6 ethnographic resources.  Do archeologists in your
7 field regularly consult ethnographic resources?
8     A.    Certainly.
9     Q.    And do archeologists in the field
10 regularly consult historic resources?
11     A.    Certainly.
12     Q.    Of the types that you've identified
13 earlier?
14     A.    Yes.
15     Q.    And do archeologists in your field
16 routinely consult human osteology materials?
17     A.    Yes.
18     Q.    And, let's see, shifting gears a little
19 bit, I want to ask you about the kinds of
20 information that you considered in this case in
21 formulating your opinions.
22          Did you consider any information
23 from physics in formulating your opinions in this
24 case?
25     A.    I did not.

Page 23

1     Q.    Did you consider any information
2 involving ground-penetrating radar in formulating
3 your opinions in this case?
4     A.    Not in this case, no.
5     Q.    Did you consider any soil science in
6 formulating your opinions in this case?
7     A.    Indirectly.
8     Q.    And can you explain that for me, sir?
9     A.    A lot of my understanding of the
10 archeology in Prince William Sound comes from
11 work that my wife and I did in 1988, and a lot of
12 the techniques of soil science, radiocarbon
13 dating went into the formulation of that report,
14 which as -- it formulates a lot of the basis of
15 my understanding of Prince William Sound
16 archeology.
17     Q.    Can you tell me more about the project
18 that you're working on -- is that Linda
19 Yarborough?
20     A.    Yes.
21     Q.    That was when?  In the '80s?
22     A.    1988.
23     Q.    Can you describe for me the project that
24 the two of you were working on?
25     A.    We were contracted by the National

Page 24

1 Forest Services to do testing and evaluation of
2 an archeological site in Northwest Prince William
3 Sound.
4     Q.    What's the name of that site, please?
5     A.    Uqciuvit.
6     Q.    I think the court reporter would
7 appreciate if you'd spell that.
8     A.    U-q-c-i-u-v-i-t.
9     Q.    What's the nearest contemporary
10 community to that site?
11     A.    Whittier.  Chenega Bay.
12     Q.    And when you say "testing and
13 evaluation," can you explain to me what you mean
14 by that?
15     A.    We were tasked with defining the limits
16 and nature of the site, its age, character,
17 culture, history, evaluating how it was being
18 affected by erosion.
19     Q.    So, in my idealistic Indiana Jones -- by
20 the way, did you see that movie this week?
21     A.    Not yet.
22     Q.    I'm going to see it tonight.
23          -- version of archeology,
24 archeologists are, you know, digging through soil
25 and fighting off booby traps.  But, basically,

Page 25

1 finding bones and other artifacts of ancient
2 peoples.
3          At this site, were you guys
4 responsible for uncovering these ancient bones
5 and artifacts, or were you doing something
6 different?
7     A.    The short answer is "yes."  It was a
8 standard archeological excavation.
9     Q.    Okay.  And after the excavation, you
10 guys were -- also, part of the scope of the
11 project was trying to classify what was
12 uncovered, correct?
13     A.    We did the usual archeological report,
14 yes.
15     Q.    And is that one of the published papers
16 that's listed in your CV?
17     A.    No; it's never been published.
18     Q.    Okay.  You said one of your tasks was to
19 define the limits and nature of the site.  What
20 do you mean by "the limits of the site"?
21     A.    Size and depth.
22     Q.    Okay.  And when you say "the nature of
23 the site"?
24     A.    Age.
25     Q.    Okay.

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

EXHIBIT  2
Page  7  of  58

Michael R. Yarborough
May 23, 2008

Page 26

1    A.   Contents, degree of preservation,
2  cultural context.
3    Q.   Do you know which people had inhabited
4  the site you were studying?  Do you understand
5  that?
6    A.   I understand the question.  No.
7    Q.   So, to this day, it's not clear who had
8  occupied that site?
9    A.   Which specific people?
10   Q.   Right.  I mean, you used -- we're going
11 to get to this in a second.  But in your various
12 reports, you talk about Pacific Eskimo, Chugach
13 Eskimo?
14   A.   Pacific Eskimo.
15   Q.   But you can't be more specific than
16 Pacific Eskimo as far as who had occupied that
17 site?
18        MR. McLACHLAN:  Objection.  Vague.
19   A.   We presume that it was a group of
20 Chugach Eskimo.  But, the occupation of the site
21 extended back several thousand years from
22 probably the early historic period, back, I
23 think, the earliest radiocarbon date we had is
24 about 3,000 years.  So it was a substantial time
25 depth there.  I've stated -- I've stated in my

Page 27

1  report that our understanding is that the people
2  who occupied this site were probably the
3  ancestors of the current occupants of Prince
4  William Sound.
5    Q.   And, just for the record, who are the
6  current occupants of Prince William Sound?
7    A.   Chugach Eskimo.
8    Q.   I think the reason I started asking
9  these questions is you testified that you had
10 relied on the personal research you conducted at
11 this site.  And I'm sorry, I can't pronounce it.
12 But, you relied on the personal research you
13 conducted at this site in formulating your
14 opinions in this case, correct?
15   A.   Only in part.
16   Q.   But, in part, you did?
17   A.   In part.
18   Q.   And the reason you mention that is
19 because I was asking about soil science.  Did
20 you -- have you conducted any personal research
21 in any other areas of Prince William Sound or
22 Lower Cook Inlet?
23        MR. McLACHLAN:  Objection.  Vague.
24   A.   Yes.
25   Q.   (BY MR. DUDUKGIAN) What other research

Page 28

1  have you personally conducted?
2    A.   You want the full list?
3    Q.   Well, depends how long it is.
4    A.   Okay.  Okay.  I participated in an oil
5  spill damage assessment project in 1990, I
6  believe it was.  That involved work at several
7  sites in Prince William Sound.  This is under
8  contract for the Forest Services.
9    Q.   Okay.  Before you go on, sir, did you
10 rely on any research you did in that project in
11 formulating your opinions in this case?
12   A.   Only in a general way.  That -- that
13 project had a specific purpose.
14   Q.   And when you say "in a general way,"
15 what do you mean by that?
16   A.   That project contributed to my general
17 overall understanding of Prince William Sound,
18 prehistoric past, but it was an oil spill damage
19 assessment project.
20   Q.   Okay.  What other research have you
21 personally conducted in Prince William Sound?
22   A.   I worked for the -- I worked for Exxon
23 on the oil spill in Prince William Sound in 1989.
24 I have done several archeological surveys in the
25 Sound as an archeological consultant.  Chenega

Page 29

1  Bay, Tatitlek.  I'm going to forget some things.
2  Lower Cook Inlet.  I've worked in Tutka Bay.
3  I've done some work in Homer.  I did some work at
4  Eyak Lake.  Those are the ones that come to mind
5  immediately.
6    Q.   Okay.  The communities or areas you
7  identified and you said you worked, are you
8  referring to archeological surveys?
9    A.   Yes.  For example, the Chenega Bay
10 project was for a new airport and access road.
11 The project in Ellamar Tatitlek was for a
12 subdivision.  That's essentially the kind of work
13 I do.
14   Q.   You say you worked for Exxon on the oil
15 spill.  Was that oil spill remediation or
16 archeological work?
17   A.   Archeological surveys.
18   Q.   Okay.  Is that different than the oil
19 spill damage project?  Or is that the same?
20   A.   Different.
21   Q.   Okay.  How is it different?
22   A.   Our work for Exxon was related to their
23 permit with the Federal agencies.  It was
24 precleanup archeological surveys to locate and
25 evaluate protection measures for the

8 (Pages 26 to 29)

EXHIBIT  2
Page  8  of  58

Michael R. Yarborough
May 23, 2008

Page 30

1  archeological sites during the cleanup. The oil
2  spill damage assessment was a specific contract
3  the Forest Service had with the State University
4  of New York Binghamton to evaluate whether the
5  archeological sites were affected by the oil
6  spill. Different purposes.
7      Q.   Did you rely on any of your work for
8  Exxon in formulating your opinions in this case?
9      A.   Again, only in a general way.
10     Q.   And when you say that, just in a general
11  understanding of the Chugach people?
12         MR. McLACHLAN: Objection. Vague.
13     A.   Let me -- let me say that all of my
14  experiences in the Sound, both archeologically
15  and just with the geography, the nature of the
16  Sound, I think, contributes to my understanding
17  of the prehistoric past, the nature of the Sound,
18  its geography, the character of the Sound
19  resources.
20     Q.   (BY MR. DUDUKGIAN) And as far as the
21  different archeological surveys you mentioned in
22  Chenega Bay, Tatitlek, Tutka Bay, Homer, Eyak,
23  did you rely on the findings of any of those
24  surveys in formulating your opinions in this
25  case?

Page 31

1      A.   Again, not specifically.
2      Q.   And first thing you had mentioned was
3  your project with Linda Yarborough in the '80s,
4  and you said you relied on that, in part. Was
5  that the same kind of general understanding of
6  the Prince William Sound area, or was that a more
7  specific --
8      A.   No, very specific.
9      Q.   And can you explain for me what
10  specifically from that project you relied on in
11  formulating your opinions in this case?
12     A.   Our work in 1988 was only the second
13  major archeological excavation in Prince William
14  Sound. The first one being de Laguna's work in
15  the '30s.
16         So, after 50 years we, basically --
17  our work there resulted in pretty much a complete
18  reevaluation of the prehistoric sequence of
19  Prince William Sound. And, to date, still
20  remains, probably, only the second large
21  excavation in the Sound.
22     Q.   Prior to your excavation, what was the
23  understanding of the -- to use your language, the
24  prehistoric sequence of Prince William Sound?
25         MR. McLACHLAN: Objection. Vague.

Page 32

1      A.   Sequence was formulated by Frederica de
2  Laguna from her work in the '30s as articulated
3  in her 1959 Chugach prehistory. She had,
4  basically, established a sequence of named
5  phases; but de Laguna was working pretty much
6  before radiocarbon dating. And although I think
7  she was very right about many things, I think we
8  added to that sequence. We evaluated it. Plus,
9  we're able to compare it to a lot of work that
10  had gone on in other parts of Southcentral Alaska
11  since she did her work -- de Laguna was a
12  pioneering archeologist, and there's been quite a
13  bit more work done since then.
14     Q.   Okay. Am I correct in assuming that
15  archeologists in your field routinely rely on de
16  Laguna's work?
17     A.   Oh, yes.
18     Q.   And can you explain to me how the
19  prehistoric sequence changed or the understanding
20  of the prehistoric sequence changed after your
21  excavation in Prince William Sound?
22         MR. McLACHLAN: Objection. Vague.
23     A.   We defined a new earlier phase. We were
24  able to refine some of de Laguna's definitions of
25  some of the phases that she had defined. We --

Page 33

1  we had an early historic period occupation at
2  Uqciuvit that was not present at Palugvik which
3  de Laguna did most of her work in. We added to,
4  augmented, and in a few circumstances, corrected
5  her assumptions from her '30s work.
6      Q.   The early historic occupation that you
7  referred to, how far back does that go?
8         MR. McLACHLAN: Objection. Vague.
9      A.   How --
10     Q.   (BY MR. DUDUKGIAN) How many years back
11  does it go?
12     A.   We -- based on one human burial with a
13  large collection -- large associated collection
14  of trade beads, early trade beads, we estimated
15  that that occupation was probably from the 1750s,
16  maybe, through the 1780s. Either immediately
17  before contact during the protohistoric period
18  when the Native peoples had access to trade
19  goods, but weren't in direct contact with the
20  Russians, possibly up into the period where
21  the -- the groups were in direct contact with the
22  Russians. It's difficult to tell.
23         MR. McLACHLAN: Can I clarify? My
24  confusion was whether you were talking about the
25  historic period or the prehistoric. And I just

9 (Pages 30 to 33)

Michael R. Yarborough
May 23, 2008

Page 34

1 wanted to make sure that the witness knew what he
2 was referring to.
3    Q.  (BY MR. DUDUKGIAN) Let me back up a
4 little bit. You said that after your excavation
5 in Prince William Sound you identified a new
6 period that de Laguna had not previously
7 identified.
8    A.  To clarify that, there was not a similar
9 aged occupation at the site where she did the
10 bulk of her work.
11    Q.  And that age -- am I correct in
12 understanding that that age that was not present
13 in de Laguna's excavation is the age between the
14 1750s and 1780s?
15    A.  Approximately.
16    Q.  Okay. In what -- which of de Laguna's
17 conclusions did -- were corrected, to use your
18 words, following your excavation in Prince
19 William Sound?
20    A.  De Laguna -- well, for example, for
21 example, de Laguna did run -- I think it was
22 three radiocarbon samples from Palugvik. She did
23 her work in '32, but she wrote her report -- it
24 was published in '56. So, she was, basically,
25 writing her report at the very beginning of -- of

Page 35

1 what I call the radiocarbon age.
2      She rejected two out of the three
3 of her radiocarbon samples because she believed
4 they were too early. But based on our work at
5 Uqciuvit, the samples that she had rejected fit
6 very well into the sequence that we established.
7      So I would say that she was maybe
8 premature or maybe a little hasty in rejecting --
9 she had -- I think what she thought was valid
10 reasons to do that. But we decided that in
11 rejecting those dates she was probably mistaken.
12      We -- she made some statements
13 about the presence or absence of certain artifact
14 types that we found to be either untrue or not
15 entirely true. Our -- or my wife's analysis of
16 the faunal material from that site suggested
17 additional information about the subsistence
18 patterns.
19      As I said, we added an earlier
20 phase that we named the Uqciuvit phase that was
21 not found at Palugvik. So, we basically added
22 some time depth to the prehistory of -- and as I
23 said, we were -- we were able to draw on a lot of
24 work that was done subsequent to that from
25 Kachemak Bay and Kodiak and draw some broad

Page 36

1 regional comparisons that she just couldn't do
2 because the information wasn't available.
3    Q.  The Uqciuvit phase that you refer to, is
4 that the phase between the 1750s and 1780s?
5    A.  No. This is an earlier one that's 3,000
6 years, plus or minus.
7    Q.  3,000 years from now, approximately?
8    A.  BP, before present.
9    Q.  Now, you said that you disagreed with
10 some of de Laguna's conclusions on the presence
11 or absence of artifact types. I want you to just
12 focus now on the presence of artifact types.
13 Which of her conclusions on the presence of
14 artifact types did you disagree with?
15    A.  Let me think of an example.
16      For example, I believe, if I'm
17 recalling correctly, that she made some
18 statements about certain sorts of splitting
19 adzes, planing adzes, woodworking tools. I'm
20 trying to remember specific examples. I can't
21 recall anything specifically.
22    Q.  And how are your conclusions with
23 respect to those artifacts different than de
24 Laguna's?
25    A.  She -- she talks about the prevalence of

Page 37

1 certain artifacts or the absence of certain types
2 of artifacts from sites. And I think -- I
3 don't -- I wouldn't say that -- that she was
4 specifically wrong, but that we were looking at
5 different sites from different parts of the
6 Sound, possibly with different seasonal
7 occupations. And we were just, basically,
8 increasing the sample of tested sites in the
9 Sound by 100 percent. And anytime -- anytime you
10 do an additional excavation, you get another look
11 at a culture, basically, add to, correct. And
12 that's in the paper what we were doing.
13      As I said, I -- I think -- I think
14 de Laguna was an amazing woman who was working in
15 a difficult time for archeologists, and was more
16 right than not. I'd say we just added to her
17 work.
18    Q.  Okay. When you talked about the absence
19 of artifact types, are you saying that you in
20 your project found certain artifacts that de
21 Laguna had not found?
22    A.  I believe so, yes.
23    Q.  Did any of those artifacts deal with --
24 have to do with fishing?
25    A.  I don't believe we found any

10 (Pages 34 to 37)

Michael R. Yarborough
May 23, 2008

Page 38

1 fishing-related artifacts that de Laguna did not.
2    Q.   Okay.  What kinds of fishing-related
3 artifacts did you find?
4            MR. McLACHLAN:  Objection.
5    A.   My recollection is that we found some
6 net sinkers or line weights.  The bone
7 preservation at the site was fairly poor.  So we
8 didn't find any fish hooks.
9    Q.   (BY MR. DUDUKGIAN) Did you find any
10 other fishing-related artifacts at that site?
11    A.   I'm trying to recall.  Not that I can
12 recall.
13    Q.   And what's your opinion on why the bone
14 preservation was so poor at the Uqciuvit site?
15    A.   Forest soils are extremely acidic.  In
16 order to get bone preservation, you have to reach
17 a certain equillibrium of acid to base.
18 Archeological shell middens because of all the
19 calcium carbonate in clam shells tend to be very
20 basic.  If you reach that tipping point -- if you
21 reach the point where -- because of the
22 accumulation of shell, the soil is not so acidic,
23 you get good preservation.  So, essentially, bone
24 preservation is -- is -- it's basically a result
25 of changes in the soil chemistry.  And if you

Page 39

1 don't -- if you don't get enough shell middens
2 accumulated, then, essentially, with age the bone
3 basically disintegrates.
4            That can vary from site to site and
5 from area of a site to area of a site.
6    Q.   Okay.
7    A.   And, in general -- in general, the bone
8 preservation at Uqciuvit was not great.
9    Q.   Okay.  Did your excavation find any
10 hunting-related artifacts that de Laguna had not
11 found?
12    A.   No specific types.
13    Q.   Did your excavation find any
14 hunting-related artifacts?
15    A.   Oh, certainly.
16    Q.   What kinds of artifacts did you find?
17    A.   Quite a range of projectile points,
18 spear points, presumably, arrow points.  Dart
19 points.
20    Q.   Did you find any other hunting-related
21 artifacts at the site?
22    A.   I would say "no."
23    Q.   Okay.  Did you find any fish bones at
24 the site?
25    A.   Yes.

Page 40

1    Q.   Do you recall what species of fish bones
2 you found?
3    A.   I don't think that -- my wife did the
4 analysis of the fish bones.
5    Q.   Okay.
6    A.   And I think -- so she's the person to
7 ask.  She's the person to ask.
8    Q.   You have no independent recollection
9 of --
10    A.   Only generally.
11    Q.   Okay.  What do you generally recall?
12    A.   Cod, halibut, sculpin, rockfish.  But,
13 again, that's general recollection.
14    Q.   And when you say "cod," do you know
15 which species of cod that would include?
16    A.   Pacific.
17    Q.   Did you find any bones of black cod at
18 that site?
19    A.   No.
20    Q.   How would you be able to distinguish the
21 bones of black cod from Pacific cod?
22    A.   I can't.
23    Q.   But I guess -- is it your testimony that
24 your wife would be able to do that?
25    A.   Yes.

Page 41

1    Q.   Were bones of sea mammals found at the
2 site?
3    A.   Yes.
4    Q.   Do you know what species?
5    A.   Seal, sea lion, some whale.  I don't
6 recall if we found any sea otter or not.
7    Q.   And, again, is it the case that Linda
8 Yarborough would have a better account of the
9 marine mammal bones that were found at the site?
10    A.   That is her expertise.
11    Q.   Okay.  How would you describe her area
12 of expertise?
13            MR. McLACHLAN:  Objection.  Vague.
14    A.   Linda has the same general background in
15 Arctic archeology that I do.  Again, I'm speaking
16 about her; not for her.  Her dissertation relies
17 on faunal analysis, the analysis of animal bones,
18 fish bones, bird bones from archeological sites.
19    Q.   (BY MR. DUDUKGIAN) One other thing you
20 mentioned about your excavation at Uqciuvit -- is
21 that correct?
22    A.   I say Uqciuvit.
23    Q.   Uqciuvit?
24    A.   If you ask my wife, she will pronounce
25 it differently.

11 (Pages 38 to 41)

EXHIBIT  2
Page  11  of  58

Michael R. Yarborough
May 23, 2008

Page 42

1    Q.  I might pronounce it any number of ways.
2  But if you're not clear as to what site I'm
3  referring to, let me know.  As far as your
4  excavation at Uqciuvit, you testified that the
5  faunal materials that were excavated at the
6  Uqciuvit site led to additional information about
7  the subsistence patterns of the people that
8  occupied the site or Prince William Sound.  Which
9  of the two is it?
10    A.  Prince William Sound, in general, or the
11  people that occupied the site of the faunal
12  material from the site gave us information
13  specifically about seasonality and subsistence
14  patterns at the site.  Combined with the
15  information from Palugvik, de Laguna's work, it
16  gave us a broader picture of subsistence patterns
17  in Prince William Sound as a whole.  So the
18  answer to your question is both.
19    Q.  Okay.  And as far as subsistence
20  patterns in Prince William Sound as a whole, what
21  conclusions did you draw following your
22  excavation?
23        MR. McLACHLAN:  Objection.  Vague.
24    A.  Again, I think you would be better
25  discussing that with my wife since that's really

Page 43

1  the topic of her Ph.D. dissertation and her
2  expertise.
3    Q.  Did you personally draw any conclusions
4  as far as subsistence patterns in Prince William
5  Sound following the excavation?
6        MR. McLACHLAN:  Objection.  Vague.
7    A.  Our report and the subsequent articles
8  that we wrote on Prince William Sound were
9  basically co-authored, and, again, relied on
10  Linda's expertise and her conclusions.
11    Q.  (BY MR. DUDUKGIAN) Okay.  What is your
12  current understanding of the subsistence patterns
13  in Prince William Sound during prehistoric times?
14    A.  That's a broad question.
15    Q.  As broad, do you consider it broad
16  because it encompasses a large period of time, or
17  can you explain to me why you consider it broad?
18    A.  Both.  It encompasses probably a
19  5,000-year time period.
20    Q.  Uh-huh.
21    A.  And subsistence patterns in the Sound, I
22  think, vary both regionally in the Sound and
23  seasonally.
24    Q.  Let me put the question a little bit
25  differently.  I'm trying to understand what your

Page 44

1  personal conclusions from that excavation were.
2  And I think you testified now a couple of times
3  that the excavation led to new information on
4  subsistence patterns in Prince William Sound.
5    A.  Uh-huh.
6    Q.  And new conclusions.  Did you personally
7  make any new conclusions about subsistence
8  patterns in Prince William Sound?
9    A.  Did I personally?
10    Q.  Yes.
11    A.  No.
12    Q.  So, any conclusions that were made on
13  subsistence patterns as a result of that
14  excavation were made by Linda Yarborough; is that
15  correct?
16    A.  They are from her expertise, yes,
17  incorporated into authors that -- co-authored
18  articles.
19    Q.  Okay.  Now, backing up a little bit, we
20  kind of went on a little tangent here, but
21  backing up you talked about various archeological
22  surveys that you've done in Prince William Sound
23  that led to your general understanding of the
24  area and generally factored into your opinions in
25  this case.  And then I believe you testified that

Page 45

1  your excavation in Prince William Sound,
2  specifically, the findings from that excavation
3  specifically factored into your opinions in this
4  case; is that correct?
5        MR. McLACHLAN:  Objection.
6  Improper summary of the witness' testimony.
7    Q.  (BY MR. DUDUKGIAN) Did your excavation
8  findings from the Uqciuvit site specifically
9  factor into your opinions and conclusions of this
10  case?
11    A.  It was one of the things that I
12  considered in my report in deposition, yes.
13    Q.  Okay.  I'm going to ask you about the
14  other things you considered, but specifically
15  limited to excavations or research that you've
16  been personally involved with, did you consider
17  any other personal research in formulating your
18  opinions in this case?
19        MR. McLACHLAN:  Objection.  Vague.
20    A.  Archeological research?
21    Q.  (BY MR. DUDUKGIAN) Let's start with
22  archeological.
23    A.  I have a long history of research in the
24  North Pacific Southwestern Alaska from work --
25  actually work in Southeast Alaska through Prince

12 (Pages 42 to 45)

Michael R. Yarborough
May 23, 2008

Page 46

1   William Sound, Cook Inlet, Kodiak, the Alaska
2   Peninsula. And I think all of the archeological
3   and attendant background research I've done on
4   those projects really informs my report and my
5   opinions in this case.
6       Q.   When you say that it informs your
7   opinions, is that the same as when you were
8   saying it had generally factored into your
9   opinions in this case?
10      A.   Not to be vague, but I think generally
11  and specifically. You know, the nature of my
12  archeological work has varied from
13  project-related surveys to more detailed
14  archeological work. And all of that factors into
15  my conclusions in this case.
16      Q.   Okay. Well, then, I guess I'd like to
17  make a list of all of the different personal
18  research that you've conducted that factored into
19  your opinions in this case.
20          So, we have the excavation at
21  Uqciuvit. You've talked about surveys in Chenega
22  Bay, Homer, Tatitlek, Tutka Bay. Those factored
23  into your opinions in this case, correct?
24          MR. McLACHLAN: Objection.
25  Misstates the witness' testimony.

Page 47

1       A.   I think, as I noted before, all of my
2   archeological work and the attendant background
3   research that I've done in Prince William Sound
4   comes together in the formulation of my
5   professional opinion. General or specific, I
6   think it all -- it all adds to my -- my
7   conclusions in this case.
8       Q.   (BY MR. DUDUKGIAN) Okay. When we talk
9   about your various opinions in a second, I'm
10  going to go through a lot of the same questions
11  like what facts did you base your opinions on,
12  and we can cover specifically as to each opinion,
13  which -- you know, which of your personal
14  excavations you relied on. But, for the time
15  being, we can move on, and I want to ask you
16  about the -- besides your personal work history,
17  what else did you rely on in formulating your
18  opinions in this case?
19      A.   I don't understand the question.
20      Q.   Fair enough.
21          Did you rely on any knowledge of
22  climate change in formulating your opinions in
23  this case?
24      A.   Only in the most general way.
25      Q.   Okay. Did you rely on your knowledge of

Page 48

1   tectonics in formulating your opinions in this
2   case?
3       A.   Same answer.
4       Q.   What about your knowledge of volcanism
5   in formulating your opinions in this case?
6       A.   In this case, no.
7       Q.   You testified earlier that you will
8   oftentimes, generally speaking, consult
9   historical resources in formulating opinions and
10  conducting your work. And you identified for me
11  various types of historic resources, and that was
12  at the time we were talking about generally. So
13  now I want to talk specifically as it relates to
14  this case. Did you refer to any published
15  summaries in formulating your opinions in this
16  case?
17      A.   Published summaries of historic
18  resources? Is that the question?
19      Q.   Well, earlier do you recall talking
20  about published summaries?
21      A.   Yes.
22      Q.   And were you referring to published
23  summaries of historic resources?
24      A.   In part, yes.
25      Q.   What other types of published summaries

Page 49

1   were you referring to?
2       A.   There are compilations of archeological
3   research, if that's your question. As I said, I
4   deal with both primary sources and secondary
5   sources.
6       Q.   So, is that a broad, basic distinction
7   of the types of historic resources you consult,
8   primary and secondary?
9           MR. McLACHLAN: Objection. Vague.
10      A.   I think most historians would recognize
11  that there are primary sources and secondary
12  summaries, yes.
13      Q.   (BY MR. DUDUKGIAN) Okay. So which
14  primary sources did you consult in formulating
15  your opinions in this case?
16      A.   Historic?
17      Q.   Yes.
18      A.   Primary sources?
19      Q.   Yes.
20      A.   I would say that primary sources that I
21  consulted were the Annals of Exploration, Russian
22  and English Explorers.
23      Q.   And would all of the primary sources you
24  consulted be in the bibliographies of your expert
25  reports in this case?

13 (Pages 46 to 49)

EXHIBIT  2
Page  13  of  58

Michael R. Yarborough
May 23, 2008

Page 50

1    A.    I think so, yes.
2    Q.    Okay.  Later on I'll probably show you
3    the reports and we can revisit this.
4    A.    Okay.  I try to be very diligent in my
5    bibliographying.
6    Q.    What types of secondary sources did you
7    consult in forming your opinions in this case?
8    A.    Again, historic?
9    Q.    Yes.
10    A.    For example, Bancroft's History of
11    Alaska, I believe I consulted.  I'm not sure if I
12    consulted it for this case, but Svetlana Federova
13    has written a history of Russian American --
14    Russians in Alaska.
15        So those are two that come to mind
16    immediately.
17    Q.    Can you think of any others at this
18    time?
19    A.    I'm sure there are others that I'm
20    forgetting.
21    Q.    Did you consult any ethnographic
22    resources in formulating your opinions in this
23    case?
24    A.    I would consider Kaj Birket-Smith's
25    Chugach Eskimo to be ethnographic.

Page 51

1    Q.    Anything else?
2    A.    De Laguna, although many would consider
3    her an archeologist, she uses a lot of
4    ethnography in her work, too.
5    Q.    And, again, just so we're on the same
6    page, can you briefly define for me what
7    "ethnography" is?
8    A.    Ethnography is -- definition?  An
9    ethnography is the product of cultural
10    anthropological field work.
11    Q.    I guess I'm not understanding that.
12    A.    I'm trying to explain -- cultural --
13    cultural anthropologists, their field work
14    consists of interviewing living individuals about
15    their cultural lifeways.
16    Q.    Okay.
17    A.    And the product of that cultural
18    anthropological field work is an ethnography.
19    Q.    And besides de Laguna and Birket-Smith
20    and I understand you said de Laguna is considered
21    mostly an archeologist, but besides those two
22    individuals, did you consult with or consider any
23    other ethnographic resources in formulating your
24    opinions in this case?
25    A.    Let me clarify that for my initial

Page 52

1    report in this case, which I believe was written
2    13 years ago, I relied on certain historical
3    ethnographies, primarily, de Laguna and
4    Birket-Smith, although I believe that you could
5    probably -- you could probably call Hassen's work
6    an ethnography, too.
7        Now, since then, of course, I have
8    looked at Plaintiffs' reports which bring in a
9    large -- you know, a variety of sources.
10    Q.    Okay.
11    A.    I have read Ron Stanek's work.  I'm not
12    sure I would call Stanek's work an ethnography.
13    It probably is.
14        Those are the main ones that I can
15    remember at this time.
16    Q.    Do archeologists in your field regularly
17    rely on Stanek's work?
18    A.    No.
19    Q.    No?  Do they rely on any of Stanek's
20    work?
21        MR. McLACHLAN:  Objection.  Vague.
22    Q.    (BY MR. DUDUKGIAN)  Do archeologists in
23    your field regularly rely on any of Stanek's
24    work?
25    A.    Specifically -- I don't rely on Stanek's

Page 53

1    work in my general, you know -- I personally do
2    not.
3    Q.    Is it the case that you did not rely on
4    any of Stanek's work in this case?
5    A.    I considered -- as I said, I -- I relied
6    on certain resources from my initial report, but
7    in formulating my opinions for later, I did
8    consider both, you know, Matt Ganley and Polly
9    Wheeler's summations of Stanek, and, you know,
10    went back to the original source.  And, you know,
11    I have considered his -- his work for my later
12    opinions.
13    Q.    In this case?
14    A.    In this case.
15    Q.    But, as a general rule, you do not rely
16    on Stanek's work?
17    A.    As a general rule, I do not.
18        MR. McLACHLAN:  Objection.  Vague.
19    Q.    (BY MR. DUDUKGIAN)  And why is that?
20    A.    Well, for -- for two reasons:
21    Specifically, I have not been involved in any
22    other project other than this case where Stanek's
23    work is pertinent.
24    Q.    Okay.
25    A.    And, two, Stanek is looking at a time

14 (Pages 50 to 53)

EXHIBIT  2
Page  14  of  58

Michael R. Yarborough
May 23, 2008

Page 54

1 period that generally does not factor into my
2 archeological work. Much more modern.
3    Q.    Would you consider yourself an expert --
4 strike that.
5           Would you consider yourself
6 qualified to offer expert testimony in the field
7 of fisheries biology?
8    A.    Certainly not.
9    Q.    Would you consider yourself qualified to
10 provide expert testimony in the field of fish
11 migration patterns?
12    A.    No.
13    Q.    Okay.
14           MR. DUDUKGIAN:  I think we should
15 probably -- it's been probably more than an hour
16 now we've been going.  It's almost an hour and 20
17 minutes.  So if it's okay, let's take about a
18 five- to ten-minute break.
19           THE WITNESS:  Okay.
20           (Break.)
21    Q.    (BY MR. DUDUKGIAN) Sir, do you consider
22 yourself qualified to provide expert testimony in
23 the area of linguistics?
24           MR. McLACHLAN:  Objection.
25 Ambiguous.

Page 55

1    A.    I do not.
2    Q.    (BY MR. DUDUKGIAN) Do you understand
3 what I mean by the word "linguistics"?
4    A.    As much as anybody understands
5 linguistics.
6    Q.    And is linguistics considered a sub -- a
7 subcategory of anthropology?
8    A.    I would style it a sub, subcategory.
9 Subdivision of cultural anthropology, in my view.
10    Q.    Do you consider yourself to be qualified
11 to provide expert testimony on place/time names
12 in Prince William Sound?
13           MR. McLACHLAN:  Objection.
14 Ambiguous.
15    Q.    (BY MR. DUDUKGIAN) An expert in place
16 names?
17    A.    An expert in place names?  I would say
18 place names falls under the rubric of
19 linguistics.  I don't consider myself a linguist.
20    Q.    Would that be a sub, sub, subcategory of
21 anthropology?
22    A.    I certainly have considered the place
23 name information that's available.
24    Q.    Besides the area of archeology, the
25 field of archeology, do you consider yourself

Page 56

1 qualified to provide expert testimony in any
2 other fields?
3           MR. McLACHLAN:  Objection.  Vague.
4    A.    Archeology.
5    Q.    (BY MR. DUDUKGIAN) Let me back up for a
6 second.  Do you consider archeology a science?
7    A.    Yes.
8    Q.    Do you consider yourself qualified to
9 provide expert testimony in any other fields of
10 science?
11           MR. McLACHLAN:  Objection.  Vague.
12    A.    I think I'll go back to what I said
13 earlier in that archeologists -- and I'm not just
14 including myself in this -- draw upon a wide
15 range of information in forming our conclusions.
16 While I might not consider myself an expert in
17 the techniques -- again, I'll use the example --
18 radiocarbon dating, we certainly use radiocarbon
19 dating in our site reports.  We -- we take the
20 information from other experts and evaluate it,
21 in part, to formulate our conclusions.  So, the
22 specific answer to your question of am I an
23 expert in any other science?  No.  But do we use
24 other sciences in formulating our archeological
25 conclusions?  The answer's "yes."

Page 57

1    Q.    Okay.  And one more question, which is
2 the same as my previous question, but in
3 nonscience areas.  So, do you consider yourself
4 an expert qualified to present expert testimony
5 in any other -- I'll just make it a broad
6 question.  Do you consider yourself qualified to
7 provide expert testimony in any other fields
8 besides archeology?
9           MR. McLACHLAN:  Objection.  Vague
10 and overbroad.
11    A.    Let me just say specifically that I am
12 qualified under the Secretary of Interior
13 Standards as both an archeologist and a historic
14 archeologist.
15    Q.    (BY MR. DUDUKGIAN) Okay.
16    A.    And so the latter -- the latter,
17 basically, means that I use a lot of history in
18 some of my archeological work.
19    Q.    Does that mean -- using history mean
20 consulting the resources that we talked about
21 earlier as far as the historical resources that
22 you generally consult?
23           MR. McLACHLAN:  Objection.  Vague.
24    A.    I consult -- as I mentioned earlier, I
25 consult a wide -- a wide range of historical

15 (Pages 54 to 57)

EXHIBIT  2
Page  15  of  58

Michael R. Yarborough
May 23, 2008

Page 58

1  resources.
2      Q.   (BY MR. DUDUKGIAN) I understand that,
3  but I guess my specific question -- I probably
4  wasn't very clear.  As far as being a historic
5  archeologist, does that mean consulting the
6  historic resources, or does that mean something
7  more than that?
8          MR. McLACHLAN:  Objection.  Vague.
9      A.   Historic archeology is the archeology of
10 the historic period.
11     Q.   (BY MR. DUDUKGIAN) Oh, I see.
12     A.   The principal difference between
13 prehistoric archeology and historic archeology is
14 that historic archeology is the age of historic
15 records.
16     Q.   Now I understand.  When is the
17 approximate cutoff between prehistoric age and
18 historic age?
19         MR. McLACHLAN:  Objection.  Vague.
20     A.   It varies.
21     Q.   (BY MR. DUDUKGIAN) Well, for Prince
22 William Sound.
23     A.   For Prince William Sound?  There is --
24 there is an interim between what we would call a
25 prehistoric period and what I would define as the

Page 59

1  early historic period.  Between the time of
2  Bering's expedition and the later English
3  explorations, Cook and Vancouver.  So, I think,
4  as is the case in many areas of archeology, it's
5  hard to draw a fine, bright line; but I think if
6  I was going to define the beginning of the
7  contact period for Prince William Sound, it would
8  be in the late 1700s.
9      Q.   So, let me see if I understand.  So, up
10 until -- after the late 1700s, you would consider
11 to be the late historic phase, or is that -- am I
12 wrong about that?
13     A.   After the period of direct and intensive
14 contact with European explorers --
15     Q.   That's considered the historic?
16     A.   Historic.
17     Q.   And that is roughly in the late 1700s
18 where that occurred?
19     A.   1770s.
20     Q.   Okay.  And then right immediately before
21 that period, there was the early historic period
22 which --
23     A.   Protohistoric.
24     Q.   It's called protohistoric?
25     A.   (Nods head.)

Page 60

1      Q.   That's the period between Bering's
2  voyage and Vancouver and Cook, roughly?
3      A.   Roughly.
4      Q.   And then prior to that is considered the
5  prehistoric period?
6      A.   Prehistoric.
7      Q.   Prehistoric?
8      A.   Prehistoric, yes.
9      Q.   So, other than the fields of archeology
10 and historic archeology, do you consider yourself
11 qualified to offer expert testimony in any other
12 fields or areas?
13         MR. McLACHLAN:  Objection.  Asked
14 and answered.  And vague.
15     A.   I would say "no."
16     Q.   (BY MR. DUDUKGIAN) Okay.  What is your
17 understanding of what this case is about?
18         MR. McLACHLAN:  Objection.  Vague.
19     A.   That's an interesting question.  I -- I
20 will quote -- I will quote here -- maybe not
21 entirely correctly, but in general from maybe
22 Matt Ganley and Polly Wheeler's earlier reports
23 when they say that:  Our work is to consider
24 whether there was use of the OCS or EEZ joint and
25 amicable to the exclusion of all others, I

Page 61

1  believe, is the general nature of that statement.
2      Q.   And when we're talking about "use," it's
3  by the five Plaintiff villages, correct?
4      A.   Economic use by the five Plaintiff
5  villages, yes.
6      Q.   What do you mean by "economic use"?
7      A.   Subsistence.
8      Q.   Is that all, or is there anything else
9  that goes into economic use?
10     A.   That would be my consideration.  That is
11 my consideration.
12     Q.   Okay.  And then you said of the OCS or
13 EEZ.  Just so we're all on the same page, in your
14 mind, are those two the same thing?
15         MR. McLACHLAN:  Objection.  Vague.
16     A.   In my mind, I think those -- those terms
17 have been used -- they've been thrown out and
18 about in this case since '95.  I think they've
19 been used interchangeably.
20     Q.   (BY MR. DUDUKGIAN) What is your
21 understanding of what the OCS means?
22     A.   My general understanding is out beyond
23 the three-mile limit.
24     Q.   And what is your general understanding
25 of what EEZ means?

16 (Pages 58 to 61)

EXHIBIT  2
Page 16 of 58