Page 62

1  A. Essentially, the same thing.
2  Q. And I noticed in reading your reports in
3  your first few you were calling it OCS, and then
4  the more recent one from 2008 you started calling
5  it the EEZ. Is there a reason why you switched
6  terminology?
7  A. I think the use of OCS originally is
8  from Bruce Landon, the original material. And
9  somewhere -- somewhere in the interim in the past
10 18 -- 13 years the terminology has switched, not
11 of my doing. I think I'm just using the
12 current -- the current terminology.
13 Q. Okay. Is Bruce Landon the person that
14 first contacted you about this case?
15 A. Yes.
16 Q. And do you remember approximately when
17 that was?
18 A. I -- about 199- -- 1995, as I remember.
19 Q. Besides Bruce Landon, have you spoken
20 with any other attorneys about this case?
21 A. Brian McLachlin.
22 Q. Anybody else?
23 A. Beverly -- Beverly Lee, also associated
24 with Bruce. I think that's it -- Brian, I'm
25 sorry.

Page 63

1  Q. You also mentioned another term, and I
2  want to have these terms defined so we're on the
3  same page today. You said "joint and amicable
4  use." What is your understanding of what that
5  means?
6       MR. McLACHLAN: Objection. Vague.
7  A. I would -- I would rely on the common
8  definition. Joint meaning together, and amicable
9  meaning friendly.
10 Q. (BY MR. DUDUKGIAN) Okay. And when
11 you -- I think you said that your understanding
12 of this case, as you defined it, came from
13 reading the materials from Ganley and Wheeler; is
14 that correct?
15      MR. McLACHLAN: Objection.
16 Misstates testimony.
17 A. No. My citation of Ganley and Wheeler
18 was an attempt to clarify what the Plaintiffs, I
19 believe, are trying to prove.
20 Q. (BY MR. DUDUKGIAN) Okay.
21 A. In their words.
22 Q. Have you read any of the Pleadings in
23 this case? Do you understand what I mean by the
24 word "pleading"?
25 A. Define "Pleadings."

Page 64

1  Q. Have you read the Complaint that was
2  filed by the Plaintiffs?
3  A. I don't believe I have.
4  Q. Have you read the Answer that was filed
5  by the U.S. Government?
6  A. I do not believe I have.
7  Q. Have you read any of the first round of
8  summary judgment briefings that happened in the
9  early 2000s?
10 A. No.
11 Q. Have you read -- and by that I mean both
12 by the Plaintiff and the responses by the U.S.
13 Government.
14 A. The legal? No.
15 Q. Have you read any of the briefing -- the
16 summary judgment briefing that was filed with the
17 Court in -- I believe it was 2005 in this case?
18 A. I don't believe I have. Can you be more
19 specific?
20 Q. Well, in 2005, the U.S. Government moved
21 for summary judgment and filed legal motions and
22 briefs with the Court. And there are many pages,
23 I would guess. All in all, there were about 70
24 or 80 pages.
25 A. No.

Page 65

1  Q. You did not read those?
2  A. No.
3  Q. And the Plaintiff villages filed an
4  opposition to that and those, I think, together
5  were about 70 to 80 pages as well. Did you read
6  any of those papers?
7  A. No.
8  Q. How did you first find out about this
9  case?
10 A. Bruce Landon called me.
11 Q. Before that time, did you know anything
12 about the fact that this case had been filed?
13 A. No.
14      MR. McLACHLAN: Objection. Vague.
15 If I may. Just there was a previous case --
16      MR. DUDUKGIAN: I was going to
17 get --
18 Q. (BY MR. DUDUKGIAN) When I say this
19 case --
20 A. Oh, this case --
21 Q. Let's back up.
22 A. I'm lumping.
23 Q. This case was -- the lawyers have been
24 calling it Eyak 2. I don't know if I have a
25 caption -- yeah, I do. It's Native Village of

Page 66

1  Eyak, Native Village of Tatitlek, Native Village
2  of Chenega, Native Village of Nanwalek, and
3  Native Village of Port Graham.
4      A.  Let me qualify my statement. I'm
5  lumping. My original report was for the trawl --
6  it was a TRAWLER DIANE MARIE versus whoever the
7  Secretary of the Interior was. Without --
8  without putting a fine legal point on it, I -- I
9  view it as all one continuum. So when you say
10 "this case," without being more specific, that's
11 my answer.
12     Q.  Well, let me put it this way: If you
13 agree to it, anytime I talk about this case, I'll
14 be talking about both the first Eyak case and the
15 second Eyak case.
16     A.  Okay. That's fine.
17     Q.  So Eyak 1 and Eyak 2. So, before Bruce
18 Landon called you, were you aware that this case
19 had -- this case existed?
20     A.  I did not.
21     Q.  And had you worked previously with Bruce
22 Landon?
23     A.  No.
24     Q.  Do you have any idea how Bruce Landon
25 knew about you?

Page 67

1      A.  I do not.
2          MR. McLACHLAN: Objection. Calls
3  for speculation.
4      Q.  (BY MR. DUDUKGIAN) And prior to the
5  time Bruce Landon called you and -- I think you
6  testified that that was approximately 1995,
7  although the exact date is not so important.
8          Prior to that time, had you ever
9  worked as an expert witness in any case?
10     A.  No.
11     Q.  Prior to that time, had you ever
12 testified in any case?
13     A.  No.
14     Q.  Since that time, have you testified in
15 any -- in any lawsuit?
16     A.  No lawsuit, no.
17     Q.  Have you -- besides the other deposition
18 you gave in this case, have you testified at any
19 other deposition?
20     A.  That's the only one.
21     Q.  Besides this case, have you worked as an
22 expert witness in any other case at any point in
23 time?
24     A.  No.
25     Q.  What was your original compensation rate

Page 68

1  at the time Bruce Landon retained you?
2      A.  I believe it was $90 an hour. I think
3  that was my billing rate back then.
4      Q.  And currently it's $100 per hour?
5      A.  (Witness nods head.) I work cheap.
6      Q.  Besides the hourly rate that you are
7  receiving, have you received any other
8  compensation from any source for your work in
9  this case?
10     A.  No.
11     Q.  Earlier I asked you about the attorneys
12 that you have been contacted by. Besides those
13 attorneys, have you been contacted by any other
14 person about this case?
15         MR. McLACHLAN: Objection. Vague.
16     A.  Any other person?
17     Q.  (BY MR. DUDUKGIAN) Right.
18     A.  Could you be more specific? That's hard
19 to answer.
20     Q.  Well, let's back up a little bit. At
21 the time Bruce Landon contacted you for the first
22 time, did he explain what your assignment was
23 going to be for this case?
24     A.  I had a scope of work from Bruce for my
25 original report.

Page 69

1      Q.  Did you have a written contract with
2  him?
3      A.  I had an original -- I had a written
4  contract with the Department of Justice, Expert
5  Witness --
6      Q.  Okay.
7      A.  -- Division.
8      Q.  Did that contract, as far as you
9  remember, contain a description of your scope of
10 work in this case?
11     A.  I went back and looked at it just
12 recently, and it was very general.
13     Q.  Okay. At the time you were contacted by
14 Bruce Landon, what was your understanding of what
15 your scope of work was for this case?
16     A.  My scope of work, the written document
17 just basically called for an expert report, and
18 it was -- it was procedural. Expert report,
19 deposition, possible testimony.
20         On the other hand, in discussions
21 with Bruce, we set sort of the areas that I would
22 consider.
23     Q.  And what were those areas?
24     A.  In sum, Bruce asked me to bring my
25 expertise, as an archeologist who had worked in

18 (Pages 66 to 69)

Page 70

1   Prince William Sound and Southcentral Alaska, to
2   the historic literature and the archeological
3   literature pertinent to this case.
4        Also, including works of de Laguna
5   and Birket-Smith which, as I said, Birket-Smith's
6   Chugach Eskimo is best styled as an ethnography.
7   De Laguna's work is really archeology, history.
8   She deals with several different areas.
9   Q.   So, your task, as you understood it from
10  your conversations with Bruce Landon, was to
11  bring your expertise from historical literature
12  and archeological literature and de Laguna and
13  Birket-Smith and to analyze what exactly?
14  A.   My original report is really in two
15  parts. It's a literature review and summary of
16  historical literature, archeological literature.
17  And then my opinions, my expert professional
18  opinions about that material vis-a-vis that case
19  or this case.
20  Q.   Okay. Did Bruce Landon ask you to
21  conduct any primary research in the scope -- in
22  the scope of your work on this case?
23  A.   Field --
24       MR. McLACHLAN: Objection. Vague.
25  A.   Field research?

Page 71

1   Q.   (BY MR. DUDUKGIAN) Thank you for
2   clarifying. Like I said, I'm not an
3   archeologist.
4   A.   He did not.
5   Q.   Let me just rephrase the question for
6   the record. Did Bruce Landon ask you to perform
7   any field research in the scope of your work on
8   this case?
9   A.   He did not.
10  Q.   Did you perform any field research?
11  A.   I did not.
12  Q.   So, am I accurately describing your
13  testimony when I say that as you understood the
14  scope of your work, at least originally, it was
15  to review the literature that you identified as
16  historical archeology, de Laguna and
17  Birket-Smith, and to derive expertise from that
18  literature?
19  A.   As I said earlier, Bruce asked me to
20  review the body of both primary, secondary
21  historic sources. Archeological reports that
22  were available at that time, and other sources
23  such as de Laguna and Birket-Smith. And some
24  others that I'm probably not remembering at this
25  time. And bring my experience as an Alaskan

Page 72

1   archeologist and someone who had worked in Prince
2   William Sound, Kodiak, really, to form some
3   professional opinions about how that material was
4   relevant to this case. Form certain conclusions.
5   Q.   So, earlier I'd asked you about your
6   understanding of what this case is about, and you
7   identified that the case is about whether there
8   was economic use of the OCS or EEZ, joint and
9   amicable to the exclusion of all others by the
10  five Plaintiff villages. So, is it accurate to
11  say that the opinions you were asked to make upon
12  reviewing the literature and bringing your own
13  experience into the mix were opinions relative to
14  those issues?
15       MR. McLACHLAN: Objection. Vague.
16  Q.   (BY MR. DUDUKGIAN) Let me strike that
17  question and ask it differently.
18       Were you explained about the
19  different areas in which you were to make
20  opinions or make conclusions?
21       MR. McLACHLAN: Objection.
22  Confusing.
23  A.   Bruce -- Bruce and I -- Bruce and I
24  discussed the scope and scale of what he asked me
25  to do. And my summary -- my summary of what the

Page 73

1   case is about, I think, maybe has been refined
2   over the course of 13 years. But, in general,
3   my -- my initial report dealt with a number of
4   topics, both historical and archeological.
5   But -- and I have -- my conclusions deal with
6   quite a number of topics. But, as I say, that --
7   the statement you just read is my basic
8   understanding of what the Plaintiffs are
9   asserting. And my -- my work was -- my
10  conclusions really go to use of the EEZ, the
11  nature of the relationships between the
12  inhabitants of Prince William Sound, their
13  neighbors, nature of subsistence and any number
14  of facts.
15  Q.   Sir, I'd like to make a list, even -- I
16  like to make lists.
17       So your conclusions are related to
18  the use of the EEZ by the five Plaintiff
19  villages, the nature of the relationship among
20  the Chugach villages, the nature of the
21  relationships between the Chugach and neighboring
22  nonChugach peoples. Am I right so far?
23  A.   Let me clarify. My research did not
24  deal specifically with the five Chugach villages.
25  My research dealt with the peoples of Prince

Page 74

1  William Sound. Some of the villages -- some of
2  the villages like Chenega Bay that are occupied
3  now were not occupied at the time of Russian
4  contact. So the -- the five villages who have
5  brought this suit, in my understanding, really
6  were not -- I view that, in many ways, as a
7  modern formulation that was really not part of my
8  research.
9      Q.  So, if I were to rephrase my question
10 and just refer to the Chugach people and not to
11 the five specific Plaintiff villages in this
12 case, again, it's whether the Chugach people used
13 the EEZ -- is there a time period for that?
14         MR. McLACHLAN: Objection. Vague.
15     A.  I would -- I think -- I think -- I think
16 that's -- that's a problem. I think that's a
17 problem with this case is in looking at both the
18 prehistoric and the historic record, we're
19 dealing with about 5,000 years and oftimes the
20 question gets asked without specifying when or
21 where. It really makes it difficult to give a
22 specific answer.
23     Q.  (BY MR. DUDUKGIAN) Okay. Let me see if
24 I can rephrase my question, because, again, the
25 overall goal of my questions, the next few

Page 75

1  anyway, is to identify the areas in which you
2  were asked to provide conclusions by Bruce.
3      A.  Uh-huh.
4      Q.  And you identified use of the EEZ as one
5  area. And, first of all, I want to clarify that
6  I'm talking about use of the EEZ by the Chugach
7  peoples. And when you were asked to provide
8  conclusions on the use of the EEZ by the Chugach
9  peoples, were you given any time frame as to
10 when -- were you given any time frames by Bruce
11 about the time frames you should be looking at?
12     A.  My charge from Bruce, as I understood
13 it, was to look at the prehistoric period, the
14 early Russian period, the Russian period, the
15 early American period, and we -- we discussed,
16 basically, bringing my research up to the -- I'll
17 use the term ethnographic present as established
18 by Birket-Smith and de Laguna's work.
19     Q.  Okay. A second area on which you
20 testified that you were asked to provide
21 conclusions was as far as the relationship among
22 the various Chugach peoples. Was there a time
23 frame during which you were asked to provide
24 conclusions on the relationship among the Chugach
25 peoples?

Page 76

1      A.  Same answer as before, although the
2  amount of information that's available on the
3  relationship between the various people of Prince
4  William Sound is certainly -- as I say, more
5  abundant from the historic period.
6      Q.  Okay.
7      A.  Could I take five?
8      Q.  Sure, no problem.
9         (Break.)
10     Q.  (BY MR. DUDUKGIAN) Okay. The third
11 area that you said you were asked to provide
12 conclusions on was the nature of the relationship
13 between the Chugach and the neighboring tribes;
14 is that correct?
15     A.  Yes.
16     Q.  The neighboring nonChugach.
17         The third area you were asked to
18 provide conclusions on related to the nature of
19 the relationship between the Chugach and
20 nonChugach peoples, correct?
21         MR. McLACHLAN: Objection. Vague.
22     A.  I understand your question, and the
23 answer is "yes."
24     Q.  (BY MR. DUDUKGIAN) And was there a time
25 period as to which you were to provide a

Page 77

1  conclusion on this topic?
2      A.  Again, prehistorically and historically.
3      Q.  Up until the ethnographic present?
4      A.  De Laguna uses the term in her report
5  "in former times"; and I like that.
6      Q.  So in former times from de Laguna's
7  times?
8      A.  From the '30s.
9      Q.  Besides the three areas we just covered,
10 were you asked to provide conclusions on any
11 other topics?
12     A.  My -- my earlier report goes beyond --
13 let's see. Try to remember here. I talk about
14 the antiquity of the occupation of Prince William
15 Sound. Let me go back and specify that my report
16 deals with the area from the Eastern side of
17 Prince William Sound to, basically, Nanwalek,
18 Port Graham. So beyond Prince William Sound.
19         The nature of the Russian
20 relationship with the Native peoples, I think
21 there's discussion of technology, there's
22 discussion of -- as you say, relationships, both
23 within the Chugach Eskimo and between them and
24 their neighbors. I think the answer to your
25 question is more than just the three areas that

Page 78

1  you've listed.
2      Q.  Right. So that's why I'm trying to make
3  a complete list.
4          Besides everything you mentioned,
5  can you think of any other areas on which you
6  were asked to provide conclusions?
7          MR. McLACHLAN: Objection as vague.
8      A.  Let's just say there are probably some
9  that I'm not remembering right now.
10     Q.  (BY MR. DUDUKGIAN) Okay. Now, some of
11 these things like the antiquity of the
12 occupation, was this a topic that you were
13 specifically asked to provide an opinion on by
14 Bruce?
15     A.  As an archeologist, yes.
16     Q.  And the topic of the nature of the
17 Russian relationship, was that also a topic that
18 you were asked to provide an expert opinion on?
19     A.  Yes.
20     Q.  And the technology of the Chugach
21 peoples, is that a topic you were asked to
22 provide an expert opinion on?
23     A.  Specifically asked, no, but it -- it
24 figures into the discussion of -- Bruce -- Bruce
25 and I discussed broad topics, and then there are

Page 79

1  other subsidiary topics that feed into those.
2      Q.  Which would you classify as the broad
3  topics?
4      A.  Tenure, relationships, subsistence
5  patterns, relations with the Russians,
6  relationship considering the American period.
7  Those are the ones I remember right off.
8      Q.  Which ones would you classify as the
9  subsidiary topics?
10     A.  I think discussions of technology, of
11 prehistoric sequences, archeological background,
12 those sorts of things, feed into the broader
13 topics.
14     Q.  And the subsistence patterns, is that
15 something that Bruce specifically asked you to
16 provide an expert opinion on?
17     A.  I don't recall specifically. I know
18 that it's the subsistence round, subsistence
19 patterns or something that both come from the
20 archeological literature and something that de
21 Laguna and Birket-Smith discuss.
22     Q.  Okay. Now, during the 15 or so years --
23 I guess, 13 or so years that you've been working
24 on this case, did the scope of your retention as
25 an expert witness change in any way?

Page 80

1      A.  I don't consider that it has, no.
2      Q.  Okay. When Bruce first contacted you
3  about being an expert, did he place any
4  restrictions on your work?
5          MR. McLACHLAN: Objection. Vague.
6      A.  Explicitly, no.
7      Q.  (BY MR. DUDUKGIAN) Okay. What about
8  implicitly, then?
9      A.  Well, we discussed what I would do
10 which, I think, in some ways excludes what I
11 wouldn't do.
12     Q.  Okay. Did Bruce provide you with any
13 materials to review?
14         MR. McLACHLAN: Objection. Vague.
15     A.  For my -- for my original report and
16 research?
17     Q.  (BY MR. DUDUKGIAN) Okay.
18     A.  No.
19     Q.  What about for your subsequent
20 declarations and reports?
21     A.  For the original case, I did the -- the
22 Eyak 1, I did the report; 2, declarations and a
23 deposition.
24         And I don't recall -- I'm trying to
25 remember -- information from my research, no. We

Page 81

1  went through the depositions and Matt and Polly's
2  reports, and I think I was provided with that.
3  Certainly, I was.
4      Q.  So, you were provided with deposition
5  transcripts and the Ganley-Wheeler report --
6      A.  Ganley-Wheeler report. I don't recall
7  if I saw Matt's deposition or not.
8      Q.  Were you provided with any other
9  materials from any of the lawyers that have
10 worked on this case for the U.S. Government?
11         MR. McLACHLAN: Objection. Vague.
12     A.  Recently?
13     Q.  (BY MR. DUDUKGIAN) Well, let's go, I
14 guess, time period by time period.
15         For your original 35-or-so-page
16 report, were you provided with any materials from
17 any lawyers for the U.S. Government?
18     A.  No.
19     Q.  For your subsequent two declarations
20 that you did in July and October of 2001, were
21 you provided with any materials to review by
22 lawyers for the U.S. Government?
23     A.  I'm fairly sure that I had Matt and
24 Polly's reports for those. In fact, I know I
25 did.

21 (Pages 78 to 81)

Page 82

1  Q. Okay.
2  A. Like I said, I'm not -- I can't recall
3  specifically if I had Matt's deposition, but --
4  but other than that, I think the answer's "no."
5  Q. What about for your March 2008 report
6  that you prepared? Did you -- were you provided
7  with any materials to review by the lawyers for
8  the U.S. Government?
9  A. Yes.
10 Q. What materials were you given?
11 A. Oh, let's see. I had a complete set of
12 Matt Ganley's reports. It included a copy of my
13 wife's dissertation. Steve Langdon's report. A
14 fairly complete record up to that point of
15 reports, depositions, subsequent reports.
16 Q. Have you had any conversations with
17 Langdon about this case?
18 A. No.
19 Q. Besides any reports that were prepared
20 for this case or deposition transcripts from this
21 case, at any point in time were you provided with
22 any materials to review for purposes of preparing
23 any of your reports or declarations?
24     MR. McLACHLAN: Objection. Vague.
25 A. I don't -- I don't exactly understand

Page 83

1  the question.
2  Q. (BY MR. DUDUKGIAN) Okay. It sounds to
3  me like you were provided with copies of the
4  various reports that our experts and the other
5  U.S. experts submitted in this case, right?
6  A. Yes.
7  Q. And it sounds to me like you were
8  provided with deposition transcripts to review
9  from this case?
10 A. I -- the latest -- the package of
11 materials to review that Brian gave me most
12 recently does not have deposition materials in
13 it.
14 Q. Okay.
15 A. But, I am certain that I reviewed Matt
16 Ganley's deposition during Eyak 1.
17 Q. When did you get this latest packet of
18 materials from Brian?
19 A. Well, it was before my March report.
20 So, it would have been prior to that. But not
21 long prior to that.
22 Q. And did this packet of materials consist
23 entirely of the other expert reports prepared for
24 this case?
25 A. As I understand it, yes.

Page 84

1  Q. What do you mean as you --
2  A. Well, like I said, it included -- no, it
3  included my wife's dissertation, which was
4  certainly not prepared for this case. I think in
5  the main, though, it was both Plaintiff and
6  Defendant reports, declarations.
7  Q. Okay. Did you review any of these
8  materials in preparing for your deposition today?
9  A. Yes.
10 Q. Which ones did you review?
11 A. Well, since I've gotten the package,
12 I've reread all of them.
13 Q. So the entire package that you were
14 provided before your March report, you've read
15 everything for today's deposition?
16 A. Uh-huh. Some in more detail than
17 others.
18 Q. Did you reread your previous reports and
19 declarations?
20 A. Yes.
21 Q. Did you review your previous deposition
22 transcript?
23 A. No.
24 Q. Did you do anything else in preparing
25 for this deposition today?

Page 85

1  A. I -- in going back through all the
2  documents, certain things I felt I needed to
3  explore further. My -- my March report deals
4  with some additional resources that -- that have
5  come about since my original report back in the
6  '90s. As I have gone through both my report and
7  Matt's report, there have been questions that
8  have come up that I've gone back to the original
9  sources. So I think the answer to your question
10 is "yes."
11 Q. I forgot what my question was.
12     MR. McLACHLAN: Then I'll object as
13 vague.
14 Q. (BY MR. DUDUKGIAN) So, I guess one
15 thing I want to follow up on is you said in
16 reviewing these materials to prepare for the
17 deposition you identified certain areas where you
18 think you'd like to explore further; is that
19 accurate?
20 A. Explore further or clarify or just --
21 this case has been going on for a long time, and
22 there was a break in the middle; and some of the
23 material has been new to me. And so I have spent
24 quite a few hours reading, reviewing, like I
25 said, some in more detail than others, where

Page 86

1  there have been questions raised.  I've gone back
2  to the -- both from my report and from some of
3  Matt's many reports, gone back to the original
4  cited source just to clarify, maybe form my own
5  opinion on things.
6      Q.  And just to clarify, that's for purposes
7  of this deposition, not for your supplemental
8  report that you did?
9      A.  I have some of it.  Some of it -- some
10  of it was reviewed in order to prepare my March
11  report, and some of it was just basically to
12  refresh my memory for this deposition.
13     Q.  Okay.  Are there any areas that you
14  still believe, sitting here today, that you need
15  to explore further?
16     A.  It's a broad, open-ended question.
17     Q.  Well.
18     A.  I'm sure -- well, the broader answer to
19  your question is I think I have covered the
20  available material adequately.  Is there
21  additional material out there that nobody knows
22  about that I haven't looked at?  Sure.
23     Q.  Are you anticipating reviewing any
24  additional materials that you haven't to date
25  reviewed before you testify in trial in this

Page 87

1  case?
2      A.  What -- I think what I have done both
3  for my subsequent reports, declarations and what
4  I did in preparing for this is basically just go
5  back and relook at -- refamiliarize myself with,
6  really, a large body of information.  And also
7  read -- read the declarations of some -- some of
8  the newer declarations that have come up since
9  then.
10     Q.  I might have misspoken, but my question
11  was a little bit different.  Before you testify
12  in trial -- by the way, have you been told
13  whether or not you're going to be testifying at
14  trial in this case?
15     A.  I've been told when the trial is.
16     Q.  Okay.
17     A.  And that I might be called to testify.
18     Q.  And you understand that the trial --
19  it's going to start August 18th and go for about
20  two weeks, do you --
21     A.  That's my understanding, yes.
22     Q.  And are you anticipating doing any other
23  work on this case as far as -- strike that.
24         Are you anticipating reviewing any
25  additional materials that you haven't up to this

Page 88

1  point in time reviewed before you are possibly
2  called to testify in August?
3      A.  If -- I can't answer that specifically.
4  I mean, if anything new comes to light, I would
5  certainly review it.  But I think, again, I would
6  mainly before testifying go back and -- there's a
7  large amount of information in this case.  And I
8  find that reading it again really, really helps.
9      Q.  So, there's no additional work that you
10  know of as far as reviewing literature out there
11  that you know will have to get done before trial?
12         I mean, let me just back up.  This
13  is what I'm getting at.  I'm not trying to be
14  tricky.  I'm trying to be clear.  There might be
15  some work that you simply didn't have time to do
16  before today, but you know it will need to be
17  done before trial.  There might be a book out
18  there that you know of that you haven't had the
19  chance to review yet or a report out there that
20  you haven't had a chance to review yet.  Do you
21  know of any -- was there any work that would have
22  been helpful to you in formulating your opinions
23  in this case that you know of that you have not
24  been able to accomplish to this day?
25     A.  That question I can answer.  I think the

Page 89

1  answer to that is "no."
2      Q.  Okay.  At any point in time, did you
3  request any materials to review for this case
4  that you were not able to get?
5         MR. McLACHLAN:  Objection.  Vague.
6      A.  Requests from Brian?
7      Q.  (BY MR. DUDUKGIAN) Well, first of all,
8  did you request any materials from Brian or any
9  other U.S -- any other lawyers working for the
10  U.S. Government that you were not -- that they
11  were not able to provide you with?
12     A.  No.
13     Q.  Were you -- at any point, did you
14  identify any reports or resources or any kind of
15  literature that you thought might be helpful for
16  you in reviewing but you just did not have access
17  to?
18     A.  Because of really 30 years of working in
19  Alaska in the subject area, I have -- we have a
20  fairly extensive library or access to the
21  available information.  I think in general, to
22  answer your question is was there anything I
23  wanted to look at that I could not find, I think
24  the answer to that is "no."
25     Q.  Okay.  I'd like to move on now and start

Page 90

1  talking about the different opinions you may be
2  offering at trial in this case. And, as you
3  know, I like to make lists, so let's start by
4  making a list of the different areas -- the
5  different opinions that you might be offering in
6  this case. So, if you want, we could go from
7  more broad to more specific or do it any way you
8  would like. I'd like to at least come up with a
9  list of your opinions in this case.
10         MR. McLACHLAN: Objection. Vague.
11     A.  You want me to list the opinions that I
12  might be offering at trial?
13     Q.  (BY MR. DUDUKGIAN) Right.
14         MR. McLACHLAN: Objection. Calls
15  for speculation.
16     A.  Yeah, could I -- could I discuss some of
17  the opinions that I offered in, say, my report
18  and my declarations? Is that the same thing?
19     Q.  (BY MR. DUDUKGIAN) First of all, I
20  think you said you had a chance to review before
21  this deposition your first report, your
22  declarations, your March, 2008 report and your
23  supplemental report from a few weeks ago,
24  correct?
25     A.  Uh-huh.

Page 91

1     Q.  In reviewing all of those reports, did
2  you come across any conclusions or opinions that
3  you made that you would like to withdraw?
4     A.  No.
5     Q.  Did you -- and I know that your first
6  report was 1995, and in your subsequent
7  declarations and subsequent reports you talk
8  about some additional research that has been done
9  by Mann and Crowell --
10    A.  Aron Crowell.
11    Q.  Crowell. And other additional
12  literature that you have reviewed. So I just
13  want to limit this question to the March, 2008
14  report.
15    A.  Okay.
16    Q.  Are there any opinions or conclusions
17  that you made in your March, 2008 report that you
18  would like to modify in any way?
19    A.  I don't think so, no.
20    Q.  Are there any opinions or conclusions
21  that you would like to supplement?
22    A.  Supplement?
23    Q.  By that, I mean, additional opinions
24  that you thought in reviewing the report were
25  maybe omitted that should have been in there?

Page 92

1     A.  One -- I think one clarification that I
2  would make is regarding de Laguna's discussion of
3  the -- the eight local groups in Prince William
4  Sound. In going back -- my -- my March, 2008
5  report includes additional information, as you
6  stated, and then, basically, concludes with a
7  summation of my conclusions from my 2000 -- or
8  '95 report, and basically says that, really, I
9  have considered this additional information, and
10  this additional information -- I still consider
11  this information to be true.
12    Q.  Okay.
13    A.  And then I list the various summarized
14  conclusions. I think the one thing I would
15  clarify, although not disagree with, is de
16  Laguna's characterization of the eight local
17  groups in Prince William Sound, and the time
18  period of consideration or her statement of those
19  groups. As I said earlier, de Laguna uses the
20  phrase and I quote it directly "in former times."
21  And I state in that summation something like
22  presumably at the time of Russian contact. I
23  would probably, upon considering that, modify
24  that to say that de Laguna's discussion of the
25  eight local groups in Prince William Sound

Page 93

1  follows upon her discussion of history of Russian
2  contact. So, in context, in her '56 report,
3  she's discussing the eight local groups in
4  context of her discussion of Russian contact.
5          Birket-Smith, upon rereading
6  Birket-Smith, mentioned that some of the eight
7  local groups are actually mentioned in some of
8  the early historic records. Although he does
9  also note that other groups are also mentioned,
10 which are not in de Laguna's list. So, I think
11 if I was going to qualify -- or one qualification
12 that I would make is that I think in former
13 times, that vague reference is probably more
14 accurate than presumably at the time of Russian
15 contact, which is a conclusion that I came to,
16 which, upon consideration, maybe is a little too
17 precise.
18    Q.  Okay.
19    A.  That's one thing.
20         I think, in general, though --
21 another -- another thing that I have -- I think
22 would qualify based on really more recent work is
23 a statement that I attribute to Hassen about the
24 necessity of the Russians to obtain permission
25 from the Chugach to hunt. Very recently I've

Page 94

1  gone back and reread Hassen and gone back to the
2  original reading, Akoun -- Akoun, who Hassen
3  cites on his report. I would say on very recent
4  rereading of the sources that Hassen's statement
5  that the Russians had to obtain permission from
6  the Chugach to hunt is a mischaracterization of
7  Akoun's -- basically, his statement in his
8  history of the Russian American Company. Those
9  are two specific examples.
10  Q.  How recently did you read that primary
11  source?
12  A.  Maybe last week or so.
13  Q.  Did you read it in English or Russian?
14  A.  It's in English.
15  Q.  Was it originally in English or
16  translated?
17  A.  It's translated.
18  Q.  Is it your opinion today that the
19  Russians did not need to get permission from the
20  Chugach in order to hunt in Prince William Sound?
21       MR. McLACHLAN:  Objection.  Vague.
22  A.  I would say that, you know, my -- my
23  characterization of the relationship between the
24  Russians and the Chugach, based on what Hassen
25  said, based on what Akoun had written, is

Page 95

1  incorrect because I believe Hassen was
2  attributing more to the Akoun source. So, when
3  Hassen basically says that the Russians had to
4  get permission from the Chugach to hunt, he's
5  going way beyond what Akoun said. And that, you
6  know -- my attributing to that -- it's a
7  misstatement.
8  Q.  Okay. Aside from Akoun, are you aware
9  of any other primary sources from which an
10  archeologist might be able to draw a conclusion
11  as to whether the Russians needed to obtain
12  permission from the Chugach to hunt in Prince
13  William Sound?
14  A.  Primary sources?
15  Q.  Right. Well -- first of all, would you
16  consider Akoun a primary source?
17  A.  No.
18  Q.  So what was the primary source?
19  A.  Akoun relied on the archives in
20  Leningrad and Moscow for his work.
21  Q.  I see.
22  A.  His research was primary research. But
23  I would consider it a secondary source, because
24  he's summarizing the primary work.
25  Q.  Well, without -- without distinguishing

Page 96

1  between primary and secondary sources, aside from
2  Hassen and Akoun, are there any other -- is there
3  any literature from any other sources that would
4  allow you to draw a conclusion as to whether the
5  Chugach needed to obtain Russian -- sorry, the
6  Russians needed to obtain Chugach permission in
7  order to hunt?
8       MR. McLACHLAN:  Objection.  Vague.
9  A.  That is the only reference that I can
10  recall in my report that addresses that
11  relationship between the Russians and the Chugach
12  and the whole permission thing.
13  Q.  (BY MR. DUDUKGIAN) When you originally
14  talked about the Russians and the Chugach and
15  permission to hunt, were you referring to the
16  Russians hunting in, quote, unquote, Chugach
17  territory?
18       MR. McLACHLAN:  Objection.  Vague.
19  A.  I was referring originally to Prince
20  William Sound.
21  Q.  (BY MR. DUDUKGIAN) Okay. So your
22  original reference had nothing to do with the
23  Gulf of Alaska or Cook Inlet?
24       MR. McLACHLAN:  Objection.  Vague.
25  A.  As Hassen -- Hassen says nothing of the

Page 97

1  Gulf of Alaska or Cook Inlet. He was talking
2  specifically about the relationship to -- the
3  relationship between the Russians and the Chugach
4  in Prince William Sound.
5  Q.  And I know you disagree with Hassen, but
6  as far as Hassen and his -- and his -- I guess
7  literature was that the Russians needed to obtain
8  Chugach permission in order to hunt in Prince
9  William Sound?
10  A.  In Prince William Sound.
11  Q.  Was it throughout Prince William Sound,
12  or was it any specific areas of Prince William
13  Sound?
14  A.  I can't answer that. In my
15  understanding, he just refers to Prince William
16  Sound.
17  Q.  Okay. And the only person that Hassen
18  attributed for that statement was Akoun?
19  A.  That's his citation, yes.
20  Q.  And you went back and read Akoun and you
21  disagree with his characterization of what Akoun
22  said?
23  A.  I reread almost all of Akoun. He refers
24  to the Chugach in a very short paragraph, and
25  refers to Chugach Bay or Prince William Sound in

25 (Pages 94 to 97)

Page 98

1  only about four or five pages. And I think -- I
2  think Hassen was -- was maybe extrapolating, but
3  certainly -- certainly the word "permission"
4  never comes into Akoun's discussion.
5      Q.  Okay. And where did you find the Akoun
6  materials? Is that here in Anchorage?
7      A.  ARLIS, UAA.
8      Q.  Approximately, how many pages of Akoun
9  materials are there?
10     A.  How many pages? It's -- I would say,
11 oh, it's a fairly thin little book (indicating).
12 Maybe less than 200.
13     Q.  And aside from Akoun -- I think I asked
14 you this, let me just clarify and ask the
15 question more clearly. Aside from Akoun and
16 Hassen, is there any other literature that you
17 are aware of that talks about the Russians
18 needing to obtain permission to hunt in Prince
19 William Sound?
20         MR. McLACHLAN: Objection. Vague.
21     A.  There -- there are a number of historic
22 sources that talk about the relationship between
23 the Koniag, the Aleuts, the Chugach and the
24 Tlingit, but that's the only reference that I can
25 recall; and Hassen uses the word, I'm sure,

Page 99

1  "permission" specifically that I can recall that
2  talks about permission.
3      Q.  And do you have an opinion one way or
4  another whether the Russians did need to get
5  Chugach permission to hunt in Prince William
6  Sound?
7      A.  I -- I'd say on further recollection
8  that the Russians probably did not need to get
9  permission to hunt in Prince William Sound.
10     Q.  And what is the basis for your opinion?
11     A.  Probably the historical relationship
12 between the Russians and other Native groups in
13 Alaska.
14     Q.  Can you explain? I'm not sure I
15 understand.
16     A.  The nature of the contact, the early
17 contact between the Aleuts and the Russians was
18 very violent. The early relationship between the
19 Russians and the Koniag was very violent. There
20 are numbers of battles between the Russians and
21 the Tlingits. And the early -- the early
22 relationship between the Russians and the Chugach
23 was not that friendly either.
24         But, in all instances, whether
25 through just force of arms, disruption of the

Page 100

1  population, decimation of the population because
2  of diseases, the Russians will out. Now, the
3  nature of the relationship between the Aleuts,
4  the Koniag, the Chugach and the Tlingits varied
5  for numbers of reasons. But, in my professional
6  opinion, I don't think the Russians really ever
7  needed permission to do anything they wanted to.
8      Q.  Okay. So besides the nature of the
9  relationship between the Russians and the other
10 Native tribes, like the Tlingits, Koniags and
11 Aleuts, are there any other reasons for your
12 opinion that the Russians did not need to obtain
13 Chugach permission to hunt within Prince William
14 Sound?
15         MR. McLACHLAN: Objection. Vague.
16     A.  Well, I think -- if -- again, going back
17 to Akoun and what I've recently read, you know,
18 his -- what does he say about the Chugach? And
19 he basically characterizes the relationship that
20 the -- the Russians -- the Russians -- the
21 Chugach -- the Chugach did not hunt for the
22 Russians, and the Russians did not employ them.
23 I think there's varying -- there's a number of
24 reasons for that. Again, going back to the
25 evolution of the Russians' relationship with the

Page 101

1  Native peoples and the nature of Prince William
2  Sound and the peoples there.
3          But, no, to answer your question
4  specifically, I think there's a large body of
5  historical literature narratives, both primary,
6  Russian-English sources, and more secondary
7  compilations of the history of the Russians and
8  the Native relationships that basically
9  characterizes the nature of both the -- you know,
10 the aggressive occupation of the Aleutians in
11 Kodiak by the Russians and the cultural
12 disruption that resulted therein.
13     Q.  Are there any sources that are specific
14 to the relations between the Russians and the
15 Chugach?
16         MR. McLACHLAN: Objection. Vague.
17     A.  Any -- yes.
18     Q.  (BY MR. DUDUKGIAN) What sources are
19 those?
20     A.  The -- there are early -- there are
21 early accounts of the first Russian forays into
22 Prince William Sound that talk about -- you know,
23 the relationship changed, and there are any
24 number of the Russian explorers that left
25 accounts that talk about the relationships.

26 (Pages 98 to 101)

Page 102

1  It -- like I said, it evolved from the early
2  contact period into the -- through the late
3  1800s, into the late 1700s into the 1800s.
4    Q.  Are you talking specifically about
5  relations between the Russians and the Chugach?
6    A.  The Russians and the Chugach, yeah.
7    Q.  What are the sources that you're
8  familiar with that talk about those relations
9  between the Russians and Chugach?
10   A.  Well, I think Davydov talks about some
11 of that.  There's some of the English explorers.
12 Davydov who spends a lot of time on Kodiak
13 basically collecting ethnographic information
14 more specifically about the Koniag, but he also
15 mentions the Chugach and the Kenaitze and the --
16 basically, the Eyak or the -- and then, again, if
17 you look at some of the secondary sources like
18 Bancroft or Svetlana Federova, the Russians and
19 Russian America.
20   Q.  Besides what you've testified to
21 already, is there any other reason for your
22 opinion that the Russians did not need to get
23 permission from the Chugach to hunt within Prince
24 William Sound?
25   A.  Not -- not that comes to mind

Page 103

1  immediately.
2    Q.  Okay.  And besides the two -- the
3  clarification you made on de Laguna and the
4  change of your opinion about the need for the
5  Russians to obtain permission, did you identify
6  any other opinions in reviewing your March, 2008
7  report that you would like to clarify?
8    A.  I don't think so.  I think -- I think
9  I'm comfortable with my conclusions and opinions
10 other than -- and I'd say that maybe the two
11 preceding examples are more clarifications
12 really.
13   Q.  Just to be clear and use your language,
14 you don't believe any other clarifications are
15 necessary at this point in time?
16   A.  I'm comfortable with my conclusions.
17   Q.  And in reviewing the report, the March,
18 2008 report, did you identify any omissions that
19 should have been in the report that you'd like to
20 supplement now?
21   A.  Supplement now?  No, I don't think so.
22   Q.  Other than the opinions that are
23 contained in your March, 2008 report, did you
24 reach any other opinions about -- about this
25 case?

Page 104

1         Sorry.  Let me rephrase.  That's
2  kind of broad.
3         Other than the ones contained -- do
4  you recall earlier when we talked about the six
5  or seven different areas where Bruce Langdon
6  asked you to make conclusions?
7    A.  Uh-huh.
8    Q.  Relative to those six or seven areas,
9  did you reach any other conclusions other than
10 the ones contained in your March, 2008 -- March,
11 2008 expert report?
12        MR. McLACHLAN:  Objection.  Vague.
13   A.  I have read a large amount of
14 information for this case, including more recent
15 expert -- what's the word? -- declarations by
16 people who really, I'm not -- things from --
17 things from outside of my area of expertise, you
18 asked me before, fisheries.  But other than
19 reading those, considering them, I think -- in
20 terms of my research, my opinions, my report, my
21 declarations, I think that -- those are my expert
22 opinions.
23   Q.  Well, I'm going to be upfront to you and
24 kind of explain to you why I'm asking the
25 questions the way I am.  Because you've been

Page 105

1  retained as an expert witness in the case, we're
2  entitled to ask about what you'll be testifying
3  about.  The expert report, the March, 2008,
4  report in which you reached opinions in this
5  case, I'm basically giving you another
6  opportunity here today to add to those opinions,
7  if you're going to be testifying to something
8  additional at trial, and you should understand
9  that if -- unless we are told of those opinions
10 today or in your report, you're probably not
11 going to make -- give those opinions at trial.
12 So I'd like you to really think carefully about
13 whether there are any additional opinions you'd
14 like me to know about so we have it in
15 anticipation of trial.
16        MR. McLACHLAN:  Objection.  Calls
17 for speculation and mischaracterizes what would
18 be available at trial, opinions.
19   A.  Several -- several personal observations
20 came to mind while I was reading the documents
21 pertaining to this case, none of which are
22 pertinent to my expert opinions in terms of
23 expert opinions that I would offer.  I think they
24 are well documented in my reports and my
25 declarations.  I don't feel at this time the need

27 (Pages 102 to 105)

Page 106

1  to add anything to what I've already put in the
2  record.
3     Q.   (BY MR. DUDUKGIAN) Okay. Fair enough.
4  And just -- just because I'm curious, what are
5  some of these personal observations that you've
6  made?
7     A.   Is she going to write this down?
8     Q.   Yeah, she is.
9     A.   As I noted before, I'm impressed or
10 amazed at the number of reports and declarations
11 that Matt Ganley has written. Those sorts of
12 things.
13    Q.   When you say "impressed" or "amazed," I
14 mean, those generally have a positive
15 connotation. I want to make sure I'm
16 understanding you correctly. Are you saying that
17 it's a positive thing that he's submitted so many
18 reports, or a negative thing?
19    A.   I -- I just -- I offer no -- neither
20 way. I'm just -- he's submitted a lot of
21 reports. That's one thing -- it's that sort of
22 personal observations that really have nothing to
23 do with my opinion on the facts.
24    Q.   Are you familiar with Matt Ganley?
25    A.   I've known Matt. We're not -- we're

Page 107

1  professional colleagues. We don't socialize.
2     Q.   Are you familiar with his work?
3     A.   I'm familiar, generally, with his work.
4  But he works in a part of Alaska that is in the
5  main outside of where I work. So my main -- my
6  main articulation with Matt has been through this
7  case.
8     Q.   What is Matt Ganley's reputation among
9  archeologists in Alaska?
10    A.   I can't speak to that. I can tell you
11 that, you know -- I have -- my impression of --
12 you know, my impression of Matt is he's -- he's a
13 capable archeologist. I've not heard anything
14 derogatory about him. But, like I said, we --
15 we -- we work in the same field, in the same
16 state; but our orbits are different. Except,
17 like I said, we come together for this case.
18    Q.   Do you know whether he's well respected
19 in the community of archeologists in Alaska?
20    A.   I can't speak for my colleagues. I -- I
21 have -- I don't know respect -- like I said, I --
22 I think he's -- I think he's accepted into the
23 community as a competent archeologist.
24    Q.   Okay.
25         MR. DUDUKGIAN: Could we go off

Page 108

1  record for a second?
2        (Discussion off the record.)
3        (Lunch break.)
4        MR. McLACHLAN: Mr. Yarborough
5  would like to clarify two points from his prior
6  testimony, one about, you asked about prior
7  testimony; and the other about materials he
8  received -- reviewed in this case.
9        THE WITNESS: I, this past summer,
10 testified in a civil case on one of my employees
11 regarding a restraining order. Basically, a
12 civil hearing before a magistrate in Unalaska.
13 Nothing to do with this case or anything to do
14 with archeology.
15    Q.   (BY MR. DUDUKGIAN) That was a protective
16 order against some other person, I'm guessing?
17    A.   Not me. Definitely not me, no.
18         And the other thing is that I -- I
19 received two folders of reports and depositions.
20 I guess I wasn't clear -- I wasn't clear. One I
21 received prior to my March report, and the other
22 one, most recently, I received about a week and a
23 half ago. The most recent materials. So, two
24 sets, but all since March.
25    Q.   Just to clarify, the most recent

Page 109

1  materials you received were the reports and
2  supplemental reports of the other expert
3  witnesses in this case?
4     A.   Since -- since my March report.
5     Q.   Okay. Other than expert reports and
6  supplemental reports, were any other materials
7  provided to you in the last two weeks?
8     A.   No.
9     Q.   Okay. A couple other points I just
10 wanted to ask you about before we dive back into
11 your opinions.
12         Have you read Crowell's 2008 paper?
13 I think it's still in draft form.
14    A.   Have I read that? No, I don't think so.
15    Q.   Okay. Have you heard of someone by the
16 name of Lydia Black?
17    A.   I know Lydia. Or I knew Lydia. She's
18 deceased.
19    Q.   She is. Okay. Do you know her body of
20 work? I mean, what I mean by that is: Do you
21 know what areas she has written about?
22         MR. McLACHLAN: Objection. Vague.
23    A.   In some areas, yes.
24    Q.   (BY MR. DUDUKGIAN) And she has written
25 about the Russian period in Alaska?

Page 110

1  A.  Russians in Alaska, yes.
2  Q.  And have you read that book, "Russians
3  in Alaska"?
4  A.  No.
5  Q.  Would you consider Lydia Black a person
6  whom archeologists would rely upon?
7  A.  I have used her Aleut Art in my
8  profession, so I have to truthfully answer that
9  "yes."
10 Q.  I'm not sure I understand.  She was also
11 an artist, or is that the name of her book?
12 A.  That's the name of her book.  She wrote
13 a book on Aleut art.  How would I -- Lydia would
14 be -- Lydia would be best styled a cultural
15 anthropologist, despite her last name, she was
16 very Russian did a lot of work in the Russian
17 Archives.
18 Q.  Do you know whether other archeologists
19 would rely on her "Russians in Alaska" book?
20 A.  I would think so, yes.
21 Q.  Okay.  Are you familiar with
22 Dr. Patricia Partnow?
23 A.  I know Pat.
24 Q.  When you say -- like --
25 A.  I know her personally.

Page 111

1  Q.  And is she well regarded in the field
2  of -- I guess would it be anthropology or
3  archeology?  What would you consider her to be?
4  A.  I think Pat's a cultural anthropologist,
5  too.  I know her personally, but I don't know her
6  body of work.  Our spheres do not overlap.
7  Q.  And do you know anything about her
8  reputation in the community of anthropologists
9  and archeologists in Alaska?
10 A.  Not specifically, no.
11 Q.  Okay.  All right.  Well, before the
12 break -- actually, quite a while before the
13 break, we had identified the different topic
14 areas that Bruce Landon asked you to provide
15 opinions on.  And I think we came up with a list.
16 And I want to ask you about the conclusions you
17 reached as to each one.
18        The first one you had identified
19 was use of the EEZ by the Chugach, and relative
20 to three time periods prehistoric, protohistoric
21 and historic eras; is that correct?
22 A.  Prehistoric, protohistoric and -- I
23 would further divide the historic period, but in
24 the main, yes.
25 Q.  Okay.  What conclusions, if any, did you

Page 112

1  reach about the Chugach's use of the EEZ in
2  prehistoric times?
3        MR. McLACHLAN:  Objection.  Vague.
4  Q.  (BY MR. DUDUKGIAN)  And by this
5  question -- you know, it's a broad question
6  intended to cover, you know, as many years -- I
7  know there's thousands of years in this period.
8  So if there are differences, please identify that
9  for me.
10 A.  I think I could -- I could truthfully
11 correctly say that there is no definitive
12 archeological evidence for use of the EEZ during
13 the prehistoric period.
14 Q.  Now, is that the same for the historical
15 period?
16 A.  You're asking if the Russian records,
17 the historical accounts, the explorers' accounts,
18 and -- I think -- I think my conclusion, as
19 stated in my reports were that there -- there is
20 certainly evidence of travel across -- however
21 you want to style it, the OCS, the EEZ, that's
22 well documented, portrayed for -- portrayed for
23 warfare.  Specific evidence of the use of the
24 outer, beyond-three-mile-limit waters for
25 hunting/fishing, no, I would say that there is

Page 113

1  little to no evidence of that.
2  Q.  Okay.  Now, there's a lot that I need to
3  follow up on.  First of all, going back to my
4  first question and your first answer, you said
5  there's no definitive archeological evidence,
6  what would you consider to be definitive evidence
7  of use?  And for purposes of this question, I'm
8  not talking about travel, but you called it
9  economic use.  Let's call it economic use.
10       MR. McLACHLAN:  Objection.  Vague.
11 A.  I would say that the archeological
12 evidence speaks to subsistence practices.  And
13 that there is no evidence in the archeological
14 record of use of any fish or land mammal, sea
15 mammal that would necessitate going out --
16 necessitate going out beyond the three-mile
17 limit.  I think the overwhelming evidence is that
18 these were locally available resources.
19 Q.  (BY MR. DUDUKGIAN)  So, just to make sure
20 we're on the same page, when you talk about
21 archeological evidence, are you referring
22 specifically to faunal remains?
23 A.  Faunal remains.
24 Q.  Is there anything else that would fall
25 within archeological evidence?

Page 114

1   A.   Tool types and technology speak to,
2   basically, capabilities and subsistence patterns;
3   but in the main we were talking about
4   seasonality, subsistence, we're looking at the
5   faunal remains.
6   Q.   And what would you consider to be
7   definitive archeological evidence?  Are you
8   saying if there were faunal remains of species
9   that were only available on the EEZ, that would
10  qualify as definitive evidence?
11         MR. McLACHLAN:  Objection.  Vague.
12  Also, speculation.
13  A.   I think I would go back to what I said
14  earlier.  There is no evidence in the
15  archeological record that -- whichever time
16  period we have information for that they were
17  hunting, using species that would require them to
18  go out beyond whatever, the three-mile limit, to
19  obtain.
20  Q.   I guess what I'm trying to understand is
21  what kind of archeological evidence would it take
22  for you or an archeologist to have -- to be able
23  to give an opinion that there was use of these
24  EEZ waters?
25  A.   What kind of evidence?  I think -- I

Page 115

1   think the evidence -- the evidence suggests what
2   species, what animals they were hunting, fishing.
3   And the evidence is such that there is really no
4   indication that these were not locally available
5   species that would require you to travel long
6   distances out into the open ocean to obtain.
7   Q.   So, is it fair to say that the evidence
8   of the faunal remains were of a species that were
9   found both within Prince William Sound and on the
10  EEZ?
11         MR. McLACHLAN:  Objection.
12  Compound.  Vague.
13  A.   That's different.  We're talking about
14  many different species of sea mammals, fish.  I
15  think there is no one answer to that.
16  Q.   (BY MR. DUDUKGIAN) Okay.  Let me ask it
17  differently.  Are you aware of any faunal remains
18  that were found at any site within Prince William
19  Sound of species that are only available on the
20  EEZ?
21  A.   Species that are only available on the
22  EEZ?  No.
23  Q.   Besides finding faunal remains of
24  species that are only available in the EEZ, can
25  you think of any other types of definitive

Page 116

1   archeological evidence of the use of EEZ waters?
2          MR. McLACHLAN:  Objection.
3   Misstates testimony.
4   A.   Could you repeat that question?
5   Q.   (BY MR. DUDUKGIAN) Okay.  What I'm
6   trying to understand is how an archeologist would
7   go about either proving or disproving the fact
8   that the waters of the EEZ were used by the
9   Chugach people.  So I'm asking you to identify
10  for me what types of evidence would allow you to
11  make an opinion that the Chugach did use the
12  waters of the EEZ for economic purposes.
13  A.   You turn that around and say -- I think
14  your question is:  Is there any archeological
15  evidence that they used the EEZ?  And I think the
16  answer to that is "no."
17  Q.   Sir, that wasn't my question.  So let me
18  try it again.
19  A.   Sorry.  Try it again.
20  Q.   Is it possible to archeologically prove
21  use of the EEZ in prehistoric times?
22  A.   Is it possible to prove?
23         MR. McLACHLAN:  Objection.  Vague.
24  A.   No, I don't think so.
25  Q.   (BY MR. DUDUKGIAN) Is it possible to

Page 117

1   archeologically rule out Chugach's use of the EEZ
2   in prehistoric times?
3   A.   I think it's possible to demonstrate
4   archeologically that the people would not have
5   needed to use the EEZ.
6   Q.   But that wasn't my specific question.
7   A.   I know that's not your question.
8   Q.   My question is:  Is it possible to rule
9   it out through archeological evidence?
10  A.   I think, to be most correct, I think
11  from archeological evidence, you can't prove or
12  disprove use of the EEZ.
13  Q.   Okay.
14  A.   But -- the only logical evidence is very
15  suggestive, and how -- so much of the
16  archeological evidence is very suggestive that
17  there is no species that they were using that was
18  not locally available or that you would need to
19  travel great distances out into the open ocean to
20  obtain.
21  Q.   Is this -- is your answer limited to
22  prehistoric times or more than --
23  A.   We're talking about archeological
24  evidence, yes.  Prehistoric.
25  Q.   Is there any archeological evidence that

Page 118

1  you are aware of suggesting use of the EEZ by the
2  Chugach in prehistoric times?
3    A.  I think that's the same question as you
4  asked before, and I would say, again, if I
5  understand the question, the answer's "no."
6  From --
7    Q.  Okay.  Well, just so I explain my
8  question to you, I'm saying:  Is there any
9  archeological evidence that you are aware of that
10  would support the inference that the Chugach were
11  using the EEZ waters in prehistoric times.
12    A.  For --
13         MR. McLACHLAN:  Objection.  Vague.
14    A.  For --
15    Q.  For nontravel --
16    A.  No, I know of none.
17    Q.  Now, in support of your opinion that
18  there is no archeological evidence of Chugach use
19  of the EEZ waters in prehistoric times, you
20  mentioned as one basis for your opinion that no
21  species were not -- or that Chugach were not
22  using any species that were not locally
23  available.  Are there any other reasons why --
24  that support your opinion that the Chugach did
25  not use the EEZ waters during prehistoric times?

Page 119

1         MR. McLACHLAN:  Objection.  Vague
2  and confusing.
3    Q.  (BY MR. DUDUKGIAN) Okay.  Let me back
4  up.
5    A.  I think I understand the question, but
6  maybe you could --
7    Q.  Just tell me all evidence on which you
8  base your opinion that the Chugach did not use
9  the OCS or EEZ waters in prehistoric times?
10    A.  I think we're -- I think we're looking
11  at both presence and absence of evidence.  The
12  data from the archeological record establishes
13  both what species they were hunting, land mammal,
14  sea mammal, fish, intertidal invertebrates, and
15  from that you can infer seasonality of the site;
16  meaning that there are certain species that are
17  available certain times of year.  Based on that,
18  you can establish for a site seasonality and
19  conclusions about the subsistence patterns for a
20  particular site.
21         Now, as I mentioned before, if
22  you're looking at Aishihik in the Northwest
23  corner of the Sound and Palugvik in the Southeast
24  corner of the Sound, you are going to get
25  different seasons, different locally available

Page 120

1  species.  Same thing with the outer Coastal Kenai
2  Peninsula.  You've got different coastline types.
3  You've got different available resources.  That
4  is the archeological data that you're looking at.
5  And my -- I think at this point we're into
6  professional opinion formed on, you know -- in
7  the main by studies my wife has done, but also
8  from other people's information, that given what
9  we know about seasonality and subsistence
10  patterns, local occupation patterns, even
11  variations in different parts of the Sound, that
12  I see no resources that would not have been
13  available locally.  And no reason, in my
14  personal -- or professional opinion, for the
15  Chugach to have needed to go out into ocean
16  waters to obtain the resources we know they were
17  using.
18    Q.  Which studies from your wife are you
19  referring to?
20    A.  Mainly her dissertation.  But she's also
21  done faunal analysis of Aron Crowell's, she's
22  also done faunal analysis for me on my analysis
23  that went into her dissertation.
24    Q.  I'm going to sum up, and if I speak in
25  any way wrong let me know.  First of all, your

Page 121

1  opinion is Chugach did not prehistorically use
2  the waters of the EEZ for nontravel, correct?
3         MR. McLACHLAN:  Objection.
4  Misstates testimony.
5    A.  I think -- no, I -- two things, I
6  think -- you asked me before is there any
7  archeological evidence that they did, and I think
8  my answer to that is "no."
9    Q.  No.
10    A.  My professional opinion, based on my
11  experience as an archeologist, is that the
12  prehistoric peoples of that Coast would not have
13  needed to use the OCS to obtain the resources
14  that they were depending on.  So it has a
15  two-part answer.
16    Q.  Right.  So, is it your professional
17  opinion, then, that the Chugach people in
18  prehistoric times did not hunt or fish in the
19  EEZ?
20         MR. McLACHLAN:  Objection.  Vague.
21    A.  I think my -- my professional opinion is
22  that there is no -- my conclusion is that there
23  isn't any evidence that they did.  Not proven.  I
24  think you cannot say based on the archeological
25  evidence -- you can't say based on the

31 (Pages 118 to 121)

Page 122

```
 1  archeological evidence that the people of the
 2  coast we're talking about used the EEZ. The
 3  evidence is just not there to make a positive
 4  statement of.
 5          My professional opinion, based on
 6  many years of looking at the information and
 7  working the area is -- my personal opinion is
 8  that the resources were available locally and
 9  they would not have needed to -- subtle
10  difference. You can't use archeology to say they
11  did use the EEZ. And my professional opinion is
12  that they really would not have needed to.
13  Subtle difference.
14     Q.  Okay. I see what you're saying.
15     A.  Never mind.
16     Q.  And what is the reason you think that
17  during prehistoric times the Chugach would not
18  have needed to fish out in the EEZ or hunt out in
19  the EEZ?
20          MR. McLACHLAN: Object. Asked and
21  answered.
22     A.  Well, as I stated previously, I think
23  that based on what we know of the resources they
24  were using and their subsistence patterns, those
25  resources were available locally. And what I
```

Page 123

```
 1  mean by locally, not out in open waters.
 2     Q.  (BY MR. DUDUKGIAN) Is there any reason
 3  besides that why they would not need to hunt or
 4  fish in the EEZ during prehistoric times?
 5          MR. McLACHLAN: Objection. Vague.
 6     A.  Not that I could cite at this time, no.
 7     Q.  (BY MR. DUDUKGIAN) Putting aside the
 8  archeological evidence for a second, is there any
 9  other anthropological evidence that the Chugach
10  hunted or fished on the EEZ during prehistoric
11  times?
12     A.  There -- it's certainly well established
13  from historic records, both -- especially the
14  early Russian records, the Russian records, that
15  there was travel, there was travel between
16  Kodiak, Kenai Peninsula; Kenai Peninsula and
17  Prince William Sound. We know that there was
18  travel. But I can think of no specific
19  historic -- from the Russian accounts, from the
20  English accounts -- reference to hunting or
21  fishing in the open ocean.
22     Q.  Okay.
23     A.  Beyond the three-mile limit. However
24  you want to define it.
25     Q.  Besides the reports of the early
```

Page 124

```
 1  Russian, British, and others, would there
 2  potentially be any other types of anthropological
 3  evidence of use of the EEZ by the Chugach in
 4  prehistoric times?
 5     A.  Prehistoric times? No.
 6     Q.  And is that because there was no written
 7  material that the Chugach people were compiling?
 8  Or because they had no -- I mean, is it the case
 9  that there was no written language?
10     A.  I'm -- okay. Prehistorically, no, we --
11  prehistorically, we're dealing with the
12  archeological record.
13     Q.  Is there, as far as you know, any
14  ethnographical evidence of Chugach use of the EEZ
15  during prehistoric times for hunting or fishing?
16     A.  Ethnographic for the prehistoric period?
17          I don't think any of the
18  ethnographic information that we have for the
19  Chugach really is applicable to the -- well, let
20  me qualify that.
21          The further -- the further away we
22  get from the time of Russian contact into what I
23  would call true ethnography, the less applicable
24  it is to the historical period. And I'm really
25  not certain that some of the early Russian
```

Page 125

```
 1  observations -- like I said earlier, I think
 2  Davydov, who was working principally on Kodiak
 3  Island, I think you could almost call what he was
 4  doing ethnography. But even -- even before the
 5  period of, say, Vancouver and Cook and later
 6  on -- I think disease and population crash really
 7  had affected the culture. So, to answer your
 8  question specifically: Are any of the formal
 9  ethnographies that we're talking about,
10  Birket-Smith, de Laguna, and even some of the
11  more recent stuff, are they familiar in the
12  prehistoric period? No.
13     Q.  Are you saying it's impossible to use
14  that ethnography to make the determination one
15  way or another whether the Chugach were using the
16  EEZ in prehistoric times?
17          MR. McLACHLAN: Objection. Vague.
18     A.  Do I -- again, I think I would give the
19  same answer. I think the -- if you're talking
20  about the more formal ethnography of Birket-Smith
21  it was so far removed from the prehistoric period
22  that I think it gives hints to the past, and I
23  think some -- some of the -- some of the material
24  in Birket-Smith when combined with archeological
25  information where there is correspondence between
```