Comments on Anthropological Source Documents
By Patricia H. Partnow, Ph.D.
May 15, 2008
Revised June 5, 2008

### Scope of work

I have been asked by Natalie Landreth, Staff Attorney with the Native American Rights Fund, to comment on testimony and reports by various anthropologists whose work has been cited in the case concerning off-shore (defined as more than three miles) use of waters off Prince William Sound and the Lower Kenai Peninsula. I was also asked to provide my opinion on the central issues of this case, namely whether the Chugach (Sugpiat) used and occupied the waters off-shore waters outside Prince William Sound and Lower Cook Inlet.

I am currently the Vice President of Cultural and Educational Services at the Alaska Native Heritage Center. I have worked at the Center for two years, preceded by four years as an independent contractor (Partnow Consulting), preceded in turn by nearly four years at the Alaska Native Heritage Center as Vice President of Programs and Education. I have worked in Alaska since 1971 in museum, educational, and research capacities. I have a Ph.D. in Anthropology from the University of Alaska Fairbanks, an MA in Anthropology from Northwestern University in Evanston, Illinois, and an AB in Anthropology from Brown University in Providence, RI. My dissertation and fieldwork considered the question of Alutiiq ethnicity based on a combination of archaeological, oral historical, and documentary evidence.

The expertise I bring to this case is my knowledge of Russian and American-era documents that relate to the Alutiiq region, my understanding of social organization and land use in other parts of the Alutiiq universe, and a familiarity with the ethnographic literature. I will report on Alutiiq (Sugpiaq) practices, since that is where my expertise lies. It is my understanding that the ancestors of many who identify themselves as Eyak today are also Sugpiat, so this information pertains to them as well. I also have expertise in the Native oral tradition and include some of those references here. I will additionally be reviewing the plaintiffs' depositions when they are available and comment upon the oral history information contained within them.

### Ocean travel by the Sugpiat (Alutiit)

The reports all agree that the Sugpiaq people were expert kayakers, capable of both navigating on open water and traversing vast expanses of ocean. The anthropologists' reports cite the same early European sources (Davydov 1977, Sauer 1802, Vancouver) who noted that the Sugpiat traveled immense distances across open water in their skin-covered boats. Sauer specifically stated that two kayakers paddled three miles out to his ship. (See also Lisiansky 1814:211ff). Davydov spoke of both the Chugach Sugpiat and rather the Kodiak and Alaska Peninsula men who paddled along the coast past Prince William Sound on their way to Sitka – using, importantly, the same type of kayak that the Chugachmiut used (Davydov 1977:194, 195; see also Gideon 1989:62. See also Golovin

1

EXHIBIT 4
Page 1 of 8

1979:76-78. But note: The Russian-era sources agree including Davydov 1977:202-203, that there were slight differences in kayak form that differentiated Koniag, Alaska Peninsula, Kenai, and Chugach Alutiiq vessels).

The anthropological reports cited in this lawsuit likewise agree that Sugpiat from the lower Kenai Peninsula (now Nanwalek and Port Graham) traveled regularly across Cook Inlet to the western shore of the Inlet.

Other sources not cited by the four anthropologists are also relevant to the question of whether the Sugpiat practiced open-water travel. Twenty-mile wide Shelikof Strait, for example, between Kodiak and the mainland, was regularly traversed by the Alaska Peninsula Sugpiat in kayaks up to at least 1912 when Novarupta Volcano near Katmai erupted – to transport the itinerate Russian Orthodox priests to the Alaska Peninsula each summer (Veniaminov 1993, AOM 1898, 1899) and, in the case of the disaster, to find help for the victims of the ashfall that resulted from the eruption (Kaiakokonok 1956, Partnow 2001:191). Although these Alutiiq kayakers were not the Chugachmiut discussed in the case, their material culture (technology) was virtually identical.

The continuity of this seagoing ability and tradition is attested by a kayak made in 2000 at the Alaska Native Heritage Center by Nick Tanape of Nanwalek. It is a seagoing vessel made on an ancient pattern learned by Nick from his older male relatives, designed with a split bow to ply the ocean waves. The entire process was recorded and the boat is now on display and in the Center's collection. This particular kayak, which is based on Nick's own height and dimensions, can carry 200 pounds of cargo in addition to the paddler himself. The ethnographic and historical record (as well as testimony by contemporary Alutiiq kayakers and tradition bearers) describes the practice of lashing kayaks together to form flotillas or floating islands in storms or for rest, and this practice helped make long distance travel possible. These craft were designed for the kind of open water, long distance travel witnessed and described by early explorers. (See also Bryson 1986 and the more scholarly Zimmerly 2000 for lengthy discussions of the history and seaworthiness of the Alutiiq kayak (also called baidarka, the Russian term for the vessel).

Although all researchers agree that the kayakers' skill was prodigious, Michael Yarborough concluded, in a non sequitur that I was not able to follow, that even though Sauer observed two kayakers paddling three miles out to visit his ship, they were not particularly skilled.

**Traditional social structure of the Sugpiat**
The ethnographic and historical literature agrees that the Sugpiat obeyed no one single central authority, but rather that their social unit was the settlement (winter village, fishcamp, sealing camp, berry camp – changing throughout the seasonal cycle), and the political unit was the extended family –a lineage (likely matrilineal) led by a male. Archaeological and historical evidence indicates that, in contrast, Kodiak Island Sugpiaq society was probably stratified – that is, there were high class and lower class people, as well as slaves – but evidence does not exist for the same stratification in either

Chugach/Kenai Peninsula areas or the Alaska Peninsula. Archaeologists and ethnographers agree that these areas were less densely populated than was Kodiak Island and that their houses were smaller – two clues to the apparent difference in emphasis on social status. Perhaps the reason was that the Alaska Peninsula and Chugach people needed to expend more energy making a living than did their Kodiak Island relatives – but to my knowledge anthropologists have not fully pursued the ramifications or reasons for this difference between Kodiak Island and the other Sugpiat. However, the situation does call into question Wooley's assertion that, because the Chugachmiut society was stratified (for which there is no evidence), the land and sea resources were owned by their rich leaders, not the group as a whole. For a discussion about the social structure and leadership practices of the Alaska Peninsula Alutiiqs that draws on primary sources, see Partnow 2001:42-57.

Wooley's assertion is a misunderstanding of the social structure, even among the Kodiak Sugpiat. Hieromonk Gideon, who visited Kodiak Island in the early 1800s (contemporaneous with Davydov), explained that leadership depended on personal ability and charisma, and was not strictly hereditary (Gideon 1989:40-41 and Merck 1980:109). In other words, a lineage leader was only as powerful as his relatives allowed him to be. They would follow him only if he gave good advice. And he was wealthy only because they agreed to give him the fruits of their labor so that the entire lineage could benefit. I was told a traditional story about a "rich man" who refused to share and who ended up dying alone, starving, because all his stores of food turned into dirt (Partnow 2001:101-103). The message is clear – the expectation in Sugpiaq society has always been that each person exists to help others. The group is greater than the individual.

Wooley also spends a great deal of time discussing whether or not the five current tribes in this case constituted a "regional tribal authority." He is probably correct that there has never been a single authority in the region that would be considered a "tribe" according to the anthropological understanding of the term. In fact, no "tribes" existed in Alaska if one uses the term as defined by anthropologists, which is a hierarchical socio-political organization consisting of a number of lineages ruled by a single individual. The term "tribe" is used in this case only because it carries a specific meaning in federal law, relating to federal legislation that sought to make sense of a variety of political structures practiced by hundreds of Native American groups. It is not indicative of any particular social structure or set of administrative practices. Anthropologists describing Alaska's indigenous cultures in fact try to stay away from the word "tribe" because it is loaded with political connotations and serves only as an imprecise fit for ancient political organizations. Ganley instead describes the Chugachmiut as a "socio-territorial group," rather than a "tribe," and I find Ganley's approach to be more accurate.

Furthermore, whether or not the Chugachmiut constituted a single tribe or pan-Chugach political entity is irrelevant to the question of whether they used and occupied the territory in question. The fact is that there was indeed a political system that encapsulated processes for making decisions that affected the group, there were leaders with relative (though not absolute) authority, and the local lineages were understood by

their neighbors to have certain rights and prerogatives, including the use of specific territories.

A final issue raised by Wooley is the question of whether the Chugachmiut were a unified group or were in a state of war with each other. DeLaguna and Birket-Smith (like Russian writers describing Sugpiaq life on Kodiak and the Alaska Peninsula) did generally note that the same people battled, traded, married, and enslaved each other. This ambiguous and ambivalent set of relationships was the norm throughout Alaska in pre-contact days (see, for instance, Holmberg 1985:56, Partnow 2001:42 ff), and is only strange to modern minds schooled on a Cold War view that strives to separate the world into the good guys and the bad guys. Life has always been more complex in Native Alaska and to evaluate a culture on whether they ever fought one another is an oversimplification. Because people must live with each other in order to survive, they have developed ways of disagreeing while remaining civil to each other and, depending on kinship or other social ties, often working together.

However, again, whether or not the five tribes were historically unified or at each others' throats is irrelevant to the question of whether they, in their social groupings of localized lineages, used the land and sea in such a way that their territories and rights to the territories were generally recognized. If anything, the fact that there were battles among the various social groupings indicates that territories were important enough and taken seriously enough to go to battle over. One example of this is that there is evidence of Tlingit and Chugachmiut warfare when the former ventured into the latter's territory.

**Chugachmiut territory**
Ganley correctly points out that the ocean is different from the land; there are no markers to differentiate one stretch of ocean from another (except the landmarks in the distance that indicate one's location relative to the shore). It is therefore nonsensical to expect that the offshore area was policed or "controlled" in the same way land might have been.

All researchers agree that people other than the Chugachmiut occasionally (though not regularly, until the coming of the Russians) crossed the waters off the shores of Prince William Sound and the Kenai Peninsula, and that these outsiders sometimes traveled those waters without being attacked by Chugachmiut. This fact is not an argument against traditional use and occupancy of the waters. It does not preclude a general, area-wide understanding that the Chugachmiut groups had the right to use certain parts of the ocean without being molested. In fact, it is clear from the ethnographic record that there was a general agreement among the various neighboring lineages that certain areas were customarily used by certain groups.

Thus the Chugachmiut did not *control* the waterways in a modern property sense, but four crucial pieces of evidence, footnoted and referenced in the anthropological reports quoted in this discussion, point to the fact that they did customarily use and occupy the area:
- Ethnographic reports by Birket-Smith and deLaguna note the presence of habitation sites on islands far offshore;

- Oral histories note the births of some elders on the offshore islands;
- A pattern of Sugcestun place names clearly establishes long-time use of the areas far off-shore;
- Oral testimony by the people themselves and careful research by resource managers (Alaska Department of Fish and Game Subsistence Division) describe a long pattern of fishing, gathering, and hunting in the areas under question.

### The relationship between the Chugachmiut and the territory they customarily used and occupied

Ganley accurately describes the notion of territoriality as it applied to the Chugachmiut historically and in pre-contact days. The idea of strict land ownership as understood in the United States today was foreign to the Chugachmiut, but the rights of a particular group of people to a particular resource were universally understood. So, for instance, a particular salmon stream would be revisited regularly by a lineage. A summer camp would be set up and the fish cleaned and dried. No other group would dare to use that salmon stream. If, however, neighboring people noticed that the stream had been abandoned for a year or two, they might be emboldened to take it over. Similarly, shellfish zones, berrying areas, and rookeries were understood to "belong" to specific groups, in the sense that members of those groups had the rights to harvest the resources there while others did not. It is my understanding that the Chugachmiut view the areas in question the same way today; they are uncomfortable with non-Chugachmiut or non-members exploiting the resources in what they view as "their" traditional areas. In fact, this view probably explains how this case came about.

A local lineage used a variety of places within a wide area over a long period of time to obtain the varied resources it needed. The people utilized different parts of the territory at different seasons, because there were few locations that were so rich that they could sustain a population throughout the year (see Crowell's 2008 paper for one possible short-term exception).

However, the general practice was for most or all people to disperse during the summer to pursue various resources. Because of this pattern, to determine the use and occupancy of a group, one must observe a large territory over a number of years. Some sites will be revisited often during the year while others might be visited only every other year (two halibut areas might be used alternately, from year to year). And within a large territory, the group might decide to move to the next cove to adapt to changes in the topography or other natural vicissitudes. Or a group might become large as children grow up and have their own families, and split up, so that the original group's territory becomes smaller while the new group takes some of its old territory and adds to it additional land and sea to the west – assuming there is not another group already there (see Partnow 2001:40-42). But while territories shifted, ebbed and flowed a bit over time, people generally stayed within the same general region during their lifetimes (except when a person, usually the woman, moved to live in her new husband's territory). This continuity was a practical necessity, because a man had to learn his territory intimately in order to utilize its resources. He needed to know the reefs and shoals, the bird populations on specific rookeries, the shallow areas where halibut were likely to be found at certain times of

year, locations of sea lion haul-outs, and the currents around those haul-outs. This sort of detailed knowledge could only be learned through years of apprenticeship and practice. It was extremely difficult for a man to learn a new territory to the necessary degree, so he avoided doing so if possible.

### The relative merits of the resources
Although I disagreed with several of Yarborough's conclusions, his work, like Ganley's and Crowell's, follows the standards of sound scholarly research.

Wooley's work is less reliable. His footnotes are incomplete (many of them are absent page numbers). He relies on sources that were themselves unreliable (Seton-Karr 1887, for instance, was a New York journalist in Alaska for only a season; he could scarcely be expected to have a deep knowledge or understanding of Sugpiaq life; see Partnow 2001:110-125). Wooley draws unwarranted conclusions about the Chugachmiut based on ethnographic information from Kodiak, after claiming that there were essential differences between the Sugpiaq of Kodiak and Prince William Sound. He seems to misunderstand the social structure of the Chugachmiut. He confuses modern notions of land ownership with traditional practices of use and occupancy. And he unnecessarily argues that the Chugachmiut were not a unified tribal authority, and that they did not exclusively use the offshore waters, neither of which – even if true -- is relevant to the case.

### Conclusion
Given the Russian accounts, other explorer accounts, the ethnographic literature, and what we know about the specific design and seaworthiness of the Alutiiq kayak, it is my opinion that the Chugachmiut did use and occupy certain waters of the Gulf of Alaska and Lower Cook Inlet. By "use and occupy" I mean that they obviously could and did traverse the areas in question and that they had the capacity to hunt and fish while in transit. Moreover, given that their seasonal round required them to follow the abundant resources, and we know there were camps and sites on offshore islands (in fact as far away as Middleton Island, which Chuagchmiut owns to this day), it is my opinion that it is extremely likely that they directly hunted (that is, not just while in transit across the area) for sea mammals and fished in what are now federal waters more than three miles from shore. This is how Native groups use and occupy territory: they exploit an area and try to prevent others from doing so in order to ensure their own access and survival. They did not patrol an area like modern border police and it would have been impractical for any Native group to do so. Finally, I agree with Ganley's description of the Chugachmiut as a "socio-territorial entity," because that more accurately reflects the more complex relationship and alliances in the prehistoric and early historic periods than does the term "tribe." The Chugachmiut shared (and continue to share) a common language and culture and probably resource exploitation areas.

### Sources Cited
Documents by Wooley, Crowell, Yarborough, and Ganley, admitted into evidence for this case

**Additional sources cited in this document:**
AOM: Pravoslavnyi Amerikanskii Vestnik' [American Orthodox Messenger]
1898: Short Church Historical Description of the Kodiak Parish (from the archives of the Kodiak Church). Draft translation by P.H. Partnow. Vol. 2:265-6, 508-510.

1899: Report on Kodiak Parish. Draft translation by P.H. Partnow. Vol. 3:91, 160.

Davydov, Gabriil I. 1977 [1810-1812] Two Voyages to Russian America, 1802-1807. Translated by Colin Bearne. Kingston, Ontario: Limestone Press.

Dyson, George. 1986. Baidarka. Alaska Northwest Publishing Company.

Gideon, Hieromonk. 1989. The Round the World Voyage of Hieromonk Gideon 1803-1809. Translated and with an introduction and notes by Lydia T. Black: edited by Richard A. Pierce. Kingston, Ontario: The Limestone Press.

Golovin, P.N. 1979 [1862]. The End of Russian America: Captain P.N. Golovin's Last Report 1862. Translated by Basil Dmytryshyn and E.A.P. Crownhart-Vaughan. Portland: Oregon Historical Society.

Holmberg, Heirich Johan. 1985 [1855-1864]. Holmberg's Ethnographic Sketches. Translated by Fritz Jaensch and edited by Marvin W. Falk. Fairbanks: University of Alaska Press.

Kaiakokonok, Harry O. 1956. Story. Photocopy of ms. originally published in Island Breezes. Sitka: Public Health Service.

Lisiansky, Urey. 1814. A Voyage Round the World in the Years 1803, 4, 5 & 6. London: John Booth.

Merck, Carl H. 1980. Siberia and Northwestern America 1788-1792. Translated by Fritz Jaensch and edited, with an introduction, by Richard A. Pierce. Kingston, Ontario: The Limestone Press.

Partnow, Patricia 2001. Making History: Alutiiq/Sugpiaq Life on the Alaska Peninsula. Fairbanks: University of Alaska Press.

Sauer, Martin. 1802. An Accopunt of a Geographical and Astronomical Expedition to the Northern Parts of Russia. Performed by Commodore Joseph Billings, in the Years 1785, &c. to 1794. London: T. Cadell, Jun. and W. Davies, in the Strand.

Seton-Karr, Heywood. 1887. Shores and Alps of Alaska. Chicago: A.C. McClurg.

Veniaminov, Ivan. 1984. [1840] Notes on the Islands of the Unalashka District. Translated by Lydia T. Black and R.H. Geoghegan; edited, with an introduction, by Richard A. Pierce. Kingston, Ontario: The Limestone Press.

Zimmerly, David W. 2000. Qayaq: Kayaks of Alaska and Siberia. Fairbanks: University of Alaska Press.