BRUCE M. LANDON
DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
907-271-5452
Facsimile: 907-271-5827

Attorney for Federal Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

NATIVE VILLAGE OF EYAK,            )
NATIVE VILLAGE OF TATITLEK,        )
NATIVE VILLAGE OF CHENEGA,         )      Case No. A98-365-CV (HRH)
 (aka CHENEGA BAY), NATIVE         )
VILLAGE OF NANWALEK, NATIVE        )
VILLAGE oF PORT GRAHAM,            )
                                   )
            Plaintiffs,            )
                                   )
                                        )
                                   )
DONALD EVANS, Secretary            )
of Commerce,                       )
                                   )
            Defendants.            )
_____)

SECOND DECLARATION OF MICHAEL YARBOROUGH

Pursuant to 28 USC 1746 Michael Yarborough declares and states:

1.  On July 9, 2001, I signed a Declaration in this case.  That declaration was attached as Exhibit 4 to Federal Defendant's Motion for Summary Judgment.  Attached to that declaration was a copy of my curriculum vitae which is true and correct.

2.  In connection with <u>Native Village of Eyak v. Trawler Diane Marie</u>, A95-063 CV (HRH)(D. Alaska) I prepared a report entitled "Traditional Aboriginal Use of the Outer Continental Shelf from Kayak Island to Lower Cook Inlet" dated November 20, 1995.  That report considered uses up until approximately 1930.  I believed the statements in that report to be true and correct in 1995, and I believe them to be true and correct today.  Subsequent to

2nd YARBOROUGH DECL.

EXHIBIT 7
Page 1 of 7

the preparation of that report, additional information became available that I discussed in paragraphs 3 through 6 of my July 9, 2001 Declaration.

3.  I have read Plaintiffs' Memorandum in Support of Motion for Summary Judgment filed on July 16, 2001.  I disagree with certain of the factual assertions and opinions stated in that memorandum as set forth below.

4. Alutiiq Place Names

Plainiffs' brief asserts that "widespread presence of Alutiiq place names on and across the OCS is evidence of Chugach aboriginal use of the OCS."  It is common for peoples to have names for places outside a groups' own territory or in areas used by more than one group.  I do agree that areas used exclusively and intensively by a group are likely to have a greater concentration of places names in the language of that group, but I do not believe that there is a high concentration of Aluutiq place names in the EEZ off Alaska.  Plaintiffs cite only three in the Gulf of Alaska - Middleton Island, Seal Rocks and Wessels Reef.  I do not consider this a high concentration of place names.  This suggests that while Chugach traveled to Middleton Island as a destination, that there was little use of the EEZ itself.

5. Travel to Middleton Island Does Not Indicate Use of the EEZ for hunting and fishing

Plaintiffs assert that because the Chugach had an "opportunistic lifestyle," they must have "routinely hunted and fished the OCS."  That assertion does not follow.  It ignores the limitations of Chugach technology, the disadvantages in trying to engage in harvest activities while making the crossing to Middleton Island, and the comparative difficulties in

2nd YARBOROUGH DECL.

EXHIBIT 7
Page 2 of 7

harvesting subsistence resources on the EEZ as opposed with harvesting then in the immediate vicinity of Middleton Island. Davidson reported in 1868 that the "natives temporarily "sojourn[ed] here [i.e. on Middleton Island] for the purpose of collecting sea weeds and hunting seals.] Davidov reported that the area surrounding Middleton was "abounding in otter." Such activities make sense in the relatively shallow and reef filled waters surrounding Middleton, but not in the deeper waters of the EEZ in general.

The accounts of early Europeans in Alaska include reports of Aleuts engaged in harvest activities far from land. There are no similar reports of high seas harvest by the Chugach, only reports that the Chugach traveled to Middleton Island. Even if one assumes that the Chugach engaged in incidental harvest on their way to and from the island, such harvest could occur only on the relatively restricted route of travel, not on the EEZ in general.

6. <u>The literature demonstrates that there was no joint and amicable use of the EEZ by Plaintiffs</u>

Plaintiffs' assertion that the "Plaintiff Chugach Tribes jointly and amicably used their respective areas of the OCS to the exclusion of all other tribes" is belied by the literature. Plaintiffs themselves identify Frederica de Laguna and Kaj Birket-Smith as the leading authorities on the Chugach. De Laguna reported that Prince William Sound was occupied by eight groups of Chguach that were politically independent, with their own leader and principal village (de Laguna 1956:27). Each group's territory varied in size and some were richer in resources than others (Birket-Smith 1953:20-21). Warfare was just as common <u>among</u> the eight Chugach groups, as it was between

the Chugach and their Indian and Eskimo neighbors (Birket-Smith
1953:101):

> Nuchek was considered the best village site on the
> Sound, due to its proximity to the sea-otter herds off
> Montague and Hinchinbrook Islands, its sheltered
> harbour, and the abundance of salmon and whales in the
> neighbourhood.  No wonder, therefore, that there was
> almost continuous fighting for its possession (Birket-
> Smith 1953:20).

> War parties from the west side of the Sound used to
> pass [Atyarmiut] territory without stopping and
> continue to Sheep Bay where there was a better chance
> for booty (Birket-Smith 1953:20).

> …for mountain goat [the Kangirtlurmiut] went right
> across the Sound to Sheep Bay because there the game
> was nearer to the sea and they did not have to climb
> so far.  They were careful, however, to arrive when
> the local inhabitants were away fishing salmon in the
> Copper River, as they were afraid of them (Birket-
> Smith 1953:21).

Many legends also deal with feuds between Chugach
villages.  For example:

> They [villagers from Matyangknat in Zaikoff Bay]
> headed for Chenega.  They were going to kill the
> Chenega people.  It was summer, and most of the
> inhabitants were away fishing.  On the way they met a
> baidar full of people from Kodiak.  The Kodiak boat

joined them, they were also going to kill the Chenega
people (Birket-Smith 1953:135-136).

According to the Russian Zaikof, there was "continuous
warfare between the Pacific tribes" (Birket-Smith 1953:101).
Writing about the Chugach, Portlock (1968:250) noted that the
"weaker tribes ... are frequently robbed and plundered by the
stronger, and prevented from hunting."

I learned from my late visitors that the country where
Sheenawon and his tribe take up their residence, is
called Toaticklagmute [Tatitlarmiut]; that they were
the most powerful tribe about the Sound, and hated by
all their neighbors, with who they were continuously
at variance (Portlock 1789, quoted in Birket-Smith
1953:21).

I have found no indication that the Chugach excluded or
attempted to exclude other Alaska Natives from using the EEZ
south of Prince William Sound.  The Chugach were greatly
outnumbered by both the Koniags and the Tlingit.  The highest
census figure given for Prince William Sound is recorded by
Wrangell was 1,563, of which 782 were males.  Most other census
numbers and explorer's estimates are "strikingly and
consistently" low, on the order of 300 to 600 (De Laguna
1956:255-256).  By way of comparison, estimates of the Koniag
population at the time of Russian contact range from 10,000
(Richard Jordan, personal communication 1990) to 30,000
(Haggarty et al. 1991:218).

The Tlingit and Koniag traded with each other.  I have
found no indication that the Koniag or Tlingits obtained or

2nd YARBOROUGH DECL.

EXHIBIT 7
Page 5 of 7

believed they needed Chugach permission to cross the Gulf of Alaska when they traded.  Given the population imbalance, it is doubtful that the Chugach could have excluded either of the larger groups from the Gulf of Alaska, had they desired to do so.

I would note that the Tlingit and Koniag also observed an "opportunistic lifestyle."  As I stated above with regard to the Chugach, I do not believe it is likely that significant subsistence harvest occurred during travel on the Gulf of Alaska.  To the extent incidental harvest occurred, there is no reason to believe that it occurred less frequently in the case of the Tlingits and Koniags than with the Chugach.

During the Russian and early American periods, sea otters were sufficiently valuable that any Native or non-Native coming upon one on the high seas could be expected to harvest it.  This would be particularly true in the case of Koniags and Aleuts on their way to hunt sea otter in Southeast Alaska.  However, sea otters would normally congregate in near shore areas.

In sum, the Chugach traversed the Gulf of Alaska, but so did the Koniag and Tlingits.  There is no indication of subsistence harvest on the EEZ as opposed to in the vicinity of Middleton Island.  Any incidental harvest of the EEZ by the Chugach would not differ significantly from incidental use of the EEZ by the

Koniags and Tlingits.

I declare under penalty of perjury that the foregoing is true
and correct.

MICHAEL YARBOROUGH