IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF EYAK, NATIVE VILLAGE OF TATITLEK, NATIVE VILLAGE OF CHENEGA, (aka CHENEGA BAY), NATIVE VILLAGE OF NANWALEK, NATIVE VILLAGE OF PORT GRAHAM,<br><br>Plaintiffs,<br><br>v.<br><br>CARLOS GUTIERREZ, Secretary of Commerce,<br><br>Defendant. | Case No. A98-365-CV (HRH) |

## EXPERT REPORT OF MICHAEL R. YARBOROUGH

**Introduction**

1. I have been retained as an expert witness in the above referenced action. I previously prepared an expert report, supplemented by declarations in this action and *Native Village of Eyak v. Trawler Diane Marie*. Those reports were prepared at a time when the parties were pursuing summary judgment. I have been asked to prepare an expert report incorporating and updating my prior report and declarations.

**Professional Qualifications**

2. I am currently the Principal Archeologist for Cultural Resource Consultants LLC (CRC) in Anchorage, Alaska. I have a Bachelor of Arts degree in anthropology from the University of Arkansas and a Master of Arts degree in anthropology from the University of Toronto. I have over 30 years of archeological experience in Alaska and have worked in all areas of the state. I meet the Secretary of the Interior's professional qualifications standards in both prehistoric and historic archeology (FR Vol.48, No.190, pp 44738-44739) and have an excellent working knowledge of the historical and archeological literature available for Alaska.

3. I began working in Alaska in 1974. Prior to joining CRC in 1981, I conducted archeological surveys and excavations along the Alyeska Pipeline for the University of Alaska, and worked as an archeologist for the U.S. Fish and Wildlife Service's Alaska Regional Office.

4. A curriculum vitae detailing my professional background is attached.

5. I have published only one journal article within the last 10 years ("Prehistoric Marine Adaptations of Prince William Sound and the Pacific Coast of the Kenai Peninsula," *Arctic Anthropology* 1998), although I have authored or co-authored dozens of technical reports describing my work as an archeological consultant. I have not testified, as an expert at trial or by deposition, in any other cases during the previous four years.

6. CRC is billing at a rate of $100 per hour for my services.

**Matters Considered**

7. My research and analysis as an expert witness in the above referenced action has focused on the anthropological and historical literature on traditional aboriginal use of the waters and biological resources of the Exclusive Economic Zone (EEZ) from Kayak Island to Lower Cook Inlet, from my perspective as a prehistoric and historic archeologist.

8. Since my November 20, 1995 expert report—*Traditional Aboriginal Use of the Outer Continental Shelf from Kayak Island to Lower Cook Inlet*—and my first and second Declarations of July 9, 2001 and October 9, 2001, respectively, I have reviewed additional archeological reports that I consider pertinent to this discussion and re-read some of the material used in preparing my expert report. As detailed in the discussion below, these include:

- a journal article and a detailed report by Aron Crowell and Dan Mann (1996, 1998) describing archeological research along the outer Kenai Peninsula coast;
- a U.S. Forest Service report by Linda Finn Yarborough (1997) on restoration activities at two archaeological sites, SEW-440 and SEW-488, in western Prince William Sound Forest Service; and
- a travel narrative written by Charles Sheldon in the early 1900s.

9. In addition, I considered the following documents:

- Declaration of Simon Kvasnikoff in Support of the Chugach's Sur-reply in Opposition to Defendant's Motion for Summary Judgement, dated March 2, 2006.
- Declaration of Michael Sigler, dated July 6, 2001.
- Declaration of Maribeth Murry, Ph.D. in Support of the Chugach's Sur-reply in Opposition to Defendant's Motion for Summary Judgment, dated March 6, 2006.
- Declaration of Bob Henrichs in Support of the Chugach's Opposition to Defendant's Motion for Summary Judgement, dated June 14, 2005.
- Indigenous Use of Lands, Waters, and Resources: Prince William Sound and Lower Cook Inlet, Alaska by Matt Ganley and Polly Wheeler, Ph.D., September 5, 2000.

- Supplemental Report, Indigenous Use of Lands, Waters, and Resources: Prince William Sound and Lower Cook Inlet, Alaska by Matt Ganley, March 28, 2001.
- Declaration of Matt Ganley, dated July 13, 2001.
- Secondary Supplemental Report to Use of Lands, Waters, and Resources: Prince William Sound and Lower Cook Inlet, Alaska by Matt Ganley, October 2, 2001.
- Third Declaration of Matt L. Ganley, Expert for the Plaintiffs in the Matter of Eyak v. Daley, dated November 14, 2001.
- Supplemental Declaration of Matt Ganley in Support of the Chugach's Opposition to Defendant's Motion for Summary Judgement, dated June 16, 2005.

*Outer Kenai Peninsula Coast*

10. Aron Crowell and Dan Mann's work along the coast of the Kenai Fjords National Park has added greatly to our archeological understanding of this relatively unknown area. Their 1998 report describes a 1993 archeological and geological survey of the park. Conducted for the National Park Service, this survey was an interdisciplinary effort aimed at "locating, documenting, and interpreting cultural sites in Kenai Fjords National Park" (Crowell and Mann 1998:5). Their report is a detailed summary of geological, paleoenvironmental, and archeological investigations, with a chapter on the history of the outer Kenai coast by National Park Service historian Linda Cook and an appendix on faunal remains from Kenai Fjords sites by Forest Service archeologist Linda Yarborough.

11. Among their conclusions, Crowell and Mann (1998:151) note the distinct individuality of Unegkurmiut culture:

> Although close cultural and linguistic relationships between the Unegkurmiut and the Chugach population of Prince William Sound are evident, local distinctions of custom, material culture, and perhaps dialect were also recognized. One possible expression of the individuality of Unegkurmiut culture is suggested by the frequent occurrence of surface house pits at outer Kenai coast sites. At least eight sites within Kenai Fjords National Park are dotted by house depressions, whereas these features are relatively rare in Prince William Sound...

12. They also provide additional information on the subsistence base of two outer coast protohistoric/historic sites and the reliance on local resources:

> Faunal evidence...is still generally too scanty to ascertain distinguishing features of Unegkurmiut diet or subsistence practices or to define the season of occupation for habitation sites. An important exception is the Verdant Cove Early Contact Village site (XBS-029), where test pits yielded a sample of more than 5,700 faunal specimens. Bird eggshell, large amounts of cod, and minor representations of salmon suggest occupation in late winter through April. The early Denton site (XBS-014) produced seal, sea lion, cod and gull remains that are consistent with oral history data on late fall trips to Aialik Bay, where hunting and trapping continued through spring (Crowell and Mann 1998:152).

13. Crowell and Mann's 1996 article confirms the relatively low population of the outer Kenai Peninsula and Prince William Sound:

> ...there were real and longstanding differences in population densities between [the outer Kenai Peninsula and Prince William Sound] on the one hand, and the Kodiak Island and Alaska Peninsula subregions on the other, where population density at contact was estimated to be twice as high (Crowell and Mann 1996:34).

14. The Chugach were greatly outnumbered by their neighbors. The highest census figure given for the sound during the Russian period, recorded by Wrangell in 1825, was 1,563, of whom 782 were males. Most other census numbers and explorer's estimates are "strikingly and consistently" low, on the order of 300 to 600 (de Laguna 1956:255-256). By way of comparison, Richard Jordan (personal communication 1990) estimates that the Koniag population at the time of Russian contact could have been as high as 10,000, and some estimates run as high as 30,000 (Haggarty et al. 1991:218).

*Prince William Sound*

15. Linda Yarborough's work at two sites—SEW-440 and SEW-488—in western Prince William Sound during 1994 and 1995 is the most recent major archeological investigation in the area. SEW-440, on Eleanor Island, was occupied during the first half of the first millennium AD, and again in the middle of the second millennium AD. The prehistoric deposits at SEW-488, on Knight Island, "represent occupations during the early first millennium BC, the late first millennium AD, ...the early to middle second millennium AD [and a] short-term use of the site during the first half of the twentieth century" (Yarborough 1997:ix).

16. Yarborough notes that the defensive considerations postulated by Frederic de Laguna may have been important in determining the locations of both SEW-440 and SEW-488: According to de Laguna (1956:11), "dead ends from which no escape by water would be possible in the event of an attack," were avoided. Visibility is generally good from both sites: "In the case of SEW-440 and SEW-488 it is possible to see some 20 to 30 miles north to the mainland, and to the south for at least a mile" (Yarborough 1997:107).

17. The faunal remains from these two sites show "an almost exclusive reliance on marine fish, birds, mammals, and mollusks" (Yarborough 1997:105). Commenting specifically on the local nature of the subsistence base at SEW-440, Yarborough (1997:54) reports:

> In general it appears that this site was used briefly, perhaps as a hunting camp... The species recovered would have been readily available less than a kilometer north of Eleanor Island, where the sound floor drops rapidly to over 100 m in a series of shelves.

*Charles Sheldon*

18. Charles Sheldon was a writer, hunter, and naturalist who explored Alaska during the early years of the twentieth century. He is commemorated on the National Park Service's Denali National Park & Preserve web page (http://www.nps.gov/dena):

> Between 1906 and 1908 gifted hunter-naturalist and writer Charles Sheldon roamed the present day park gathering vital information about Dall Sheep. It was during these travels that Sheldon developed the concept of protection and preservation of these wild lands. His vision embraced the hope that visitors in the future could share the same enjoyment and inspiration he had been privileged to experience. Sheldon collaborated with other supporters including Belmore Brown and James Wickersham for the establishment of protected lands.

19. Sheldon was a witness to the end of the American period sea otter trade, which reached its peak in the mid 1880s. However, because of a region-wide decline in the number of sea otters, the trade collapsed in 1898, and the federal government established a total ban on sea otter hunting in 1911. Sheldon's commentary shows the ultimate result of years of American control of the fur trade. Writing in 1906, Sheldon reported that:

> Tributary to Prince William Sound are four widely separated feeding-grounds of the sea-otter: one off Point Steele, on the east end of Hinchinbrook Island; one off Wooded Island, near the southeast corner of Montague Island; one about midway between that and Middleton Island, near Wessell Reef; and the last off Cape St. Elias, on the southwest end of Kayak Island. The otters killed at this last point are said to be lighter in fur than those killed at the other places...In order to keep the natives hunting, [Charles] Swanson [owner of the store at Nuchek] is obliged to make the following arrangement: If they go to Point Steele or Wooded Island, they can paddle in their bidarkas direct from Nuchek, and may reach either feeding-ground in from two to seven days, as the weather permits. If they go to the other places Swanson carries them, with their bidarkas, in his schooner, and anchors while they hunt. In any case he furnishes them, free, half of their provisions, consisting of flour, bacon, sugar, and tea; and for each sea-otter killed, whatever its quality may be, he pays them in trade at reasonable prices, or $200 in cash. The native who kills the otter gets most of the money, allowing the others only enough to pay for the other half of their provisions and something extra to the men in his own boat. The hunter who sits in the bow of the bidarka is its owner, and is usually paddled by his sons or other boys. The hunters must start out and hunt as Swanson may direct them. They usually keep in debt, as otters have become so scarce that he can no longer keep even with them, and were it not for a few land-otters—thirty or forty in the course of the winter—he would run badly behind. In 1904 eight sea-otters were killed; in 1905, only three. The previous years averaged from eight to fifteen, the number decreasing each year. It is not likely that Swanson can continue his trading-store, and the natives must then go to Ellamar to trade their skins, or some time they may abandon Nuchek altogether.

20. Sheldon (1912:74) also commented on subsistence and commercial activities around Montague Island:

> On the east side, there is only one river, near the south end, in which salmon enter, and only the humpback and silver salmon run up it. Halibut, cod, and bass are caught anywhere about the island, but the natives do not often seek them, and then only in the calm water of the bays. Scattered all along the coast at intervals, and always at the mouth of a creek, are loose little huts made by the Nuchek natives from hewn plank and driftwood, in which they live while trapping land-otters in the winter. These are called *barrabaras* by white men, *mumduks* by the natives. About thirty or forty land-otters are taken every winter, and each native has his own territory and barrábaras, which others respect as his exclusive property.

21. The last sentence is instructive, in that it suggests a Western notion of private property rather than shared group territory.

**Opinions**

22. I believed the statements in my report and declarations to be true and correct at the time they were given. I also believe them to still accurately reflect my conclusions and findings. My prior report and declarations are attached and herein incorporated by reference. Having considered the additional information outlined above, I have no need to change or qualify the following opinions and conclusions from my prior report and declarations:

   A. The Pacific Eskimo have a long tenancy in the study area. The direct cultural descendants of the Chugach appeared in Prince William Sound at least 2,400 years ago, while the ancestors of the Unegkurmiut have probably lived along the coast of the Kenai Peninsula for at least 1,700 years.

   B. "In former days" (de Laguna 1956:11)—presumably the time of Russian contact during late 1700s—the lands and waters of Prince William Sound and the Lower Kenai Peninsula were used and occupied by three cultural groups. Most of Prince William Sound was occupied by eight "tribes or geographical groups" of Chugach Eskimo (de Laguna 1956:11). Much of the coast between the sound and Cook Inlet was inhabited by the Unegkurmiut (de Laguna 1956:34-35), and the area between the Chugach and the Tlingit was occupied by Eyak Indians. However, these areas were also "used" by the Tlingit and Koniag for at least travel, trade, and warfare.

   C. The Eyak, Chugach Eskimo, and Lower Kenai Eskimo each had their own, self-identified territory. However, ethnic boundaries in the region have likely shifted several times during the past millennium. The Eyak occupation of a former Chugach territory in the Cordova-Copper River region in the early 1800s is a perfect example of this. The relationship between these groups was complex. While trade and intermarriage were common, warfare was endemic between the Chugach and their Indian and Eskimo

neighbors. Although the groups may not have considered all marine waters open to general navigation, it does not necessarily follow that they were always able to prevent the passage of other, more powerful groups. Even though, for example, the Eyak may have recognized that they were trespassing when they hunted off Hinchinbrook and the Egg Islands, they did it anyway (Birket-Smith 1953:18-19).

D. The eight "tribes or geographical groups" of Chugach did not jointly and amicably use Prince William Sound. The Chugach were far from amicable. Birket-Smith (1953:20), for example, noted that there was "almost continuous fighting" for the possession of Nuchek. Each group's territory varied in size and some were richer in resources than others (Birket-Smith 1953:20-21). This led to conflict, and warfare was just as common among the Chugach as it was between the Chugach and their Indian and Eskimo neighbors.

E. The cultural boundaries between the Eyak, Chugach, Unegkurmiut, and Koniag were probably more imagined than real. There were marked similarities between the late prehistoric and contact period cultures of the Gulf of Alaska, and the ethnographic Eyak and northern Tlingit area. In addition, due to common ancestry and diffusion, the Chugach, Unegkurmiut, and Koniag were physically, culturally, and linguistically related.

F. The native inhabitants of the northern Gulf of Alaska coast suffered economic deprivation, disruption of sociopolitical organization, and disastrous losses of population as a result of Russian contact. The Russian American Company tried to exert strict control over Native participation in the fur trade, although the Chugach were never controlled to the degree that the Koniag and Aleuts were.

G. Ethnographic information from the 1930s suggests that people in Prince William Sound depended on much the same wild species as their ancestors, thus there has been a certain amount of continuity in the use of subsistence resources from prehistoric through modern times among the Chugach. The main difference between contact period and modern diets is that less sea mammal meat is now being eaten. Archeological data and the earliest historic records specify that fish were the mainstay of the Chugach diet.

H. The hunting-gathering lifestyle required subsistence harvests when and where migratory and seasonal resources were found. However, it does not follow that any or all species that became available during a seasonal hunt were harvested.

I. The Chugach had seaworthy boats, but Birket-Smith's ethnography suggests that they did most of their hunting within Prince William Sound (Birket-Smith 1953). Sea otters were apparently the only species hunted on exposed shores, and it would not have been necessary for the Chugach to travel out onto the open ocean to catch deepwater species of fish.

J. There is no conclusive evidence of aboriginal use of the waters of the EEZ in the archeological or historical literature of the study area for anything other than travel. The

Chugach did cross the Gulf of Alaska to Middleton Island, to collect seaweed and hunt seals and sea otters. However, according to George Davidson (1868:292) this use was seasonal and temporary: "A few huts are scattered about [Middleton Island] and serve as shelter for the natives temporarily sojourning here for the purpose of collecting sea weeds and hunting seals." Lower Cook Inlet Eskimos crossed portions of the OCS to Augustine Island and the Barren Islands. However, travel across the EEZ to the western side of Cook Inlet and the Barren Island, or to Middleton Island to harvest subsistence resources in the immediate vicinity does not logically demonstrate routine hunting and fishing on the waters of the EEZ.

Dated: 3-13-08

Michael R. Yarborough

### References Cited

Birket-Smith, Kaj
  1953 *The Chugach Eskimo*. Nationalmuseets Skrifter Ethnografisk Række, VI. Nationalmuseets Publikationsfond, København.

Crowell, Aron L., and Daniel H. Mann
  1996 Sea Level Dynamics, Glaciers, and Archaeology Along the Central Gulf of Alaska Coast. *Arctic Anthropology* 33(2):16-37.

  1997 *Archaeological and Coastal Dynamics of Kenai Fjords National Park*. National Park Service, Alaska Region, Anchorage.

Davidson, George
  1868 Report of Assistant George Davidson relative to the coast, features, and resources of Alaska territory. In *Russian America*, Report of the Secretary of State in Alaska, pp. 219-325. Washington, D.C.

Haggarty, James C., Christopher B. Wooley, Jon M. Erlandson and Aron Crowell
  1991 The 1990 Exxon Cultural Resource Program: Site Protection and Maritime Cultural Ecology in Prince William Sound and the Gulf of Alaska. Exxon Shipping Company and Exxon Company, USA, Anchorage.

Laguna, Frederica de
  1956 *Chugach Prehistory: The Archaeology of Prince William Sound, Alaska*. University of Washington Publications in Anthropology No. 13, University of Washington, Seattle.

Sheldon, Charles
  1912 *The Wilderness of the North Pacific Coast Islands: A Hunter's Experiences*. Charles Scribner's Sons, New York.

Yarborough, Linda Finn
1997 *Site Specific Archaeological Restoration at SEW-440 and SEW-488.* Exxon Valdez Oil Spill Restoration Project 95007B Final Report. United States Department of Agriculture Chugach National Forest.